STATE OF ALABAMA
IN THE CIRCUIT COURT FOR THE COUNTY OF LEE
THIRTY-SEVENTH JUDICIAL CIRCUIT
CRIMINAL

THE STATE OF ALABAMA,

     PLAINTIFF,

    VS.              CASE NO. CC-95-741

RODRIGUES G. HUGULEY,

     DEFENDANT

## REPORTER'S OFFICIAL TRANSCRIPT ON APPEAL

Before:

       HON. ROBERT M. HARPER, Circuit Judge, and a jury, in the Courtroom Number Four of the Lee County Justice Center located at Opelika, Alabama, on the 28th of August, 1995, and being concluded on the next day.

## A P P E A R A N C E S

    HON. RONALD L. MYERS, District Attorney for the 37th Judicial Circuit of Alabama, and HON. VANCE NICHOLAS ABBETT, Assistant District Attorney for the 37th Judicial Circuit of Alabama, Opelika, Alabama, appearing for the State of Alabama.

    HON. CHARLES R. GILLENWATERS, Attorney at Law, appearing for the Defendant.

2

I N D E X

PAGE

STATE'S WITNESSES:

HARRY CARPENTER:
        Direct Exam by Mr. Abbett                44
        Cross Exam by Mr. Gillenwaters           67
        Redirect Exam by Mr. Abbett              75
        Recross Exam by Mr. Gillenwaters         80
        Further Redirect by Mr. Abbett           82

MICHAEL E. HORNE:
        Direct Exam by Mr. Abbett                94
        Cross Exam by Mr. Gillenwaters          100
        Redirect Exam by Mr. Abbett             107

M. L. RICKS:
        Direct Exam by Mr. Abbett               109
        Cross Exam by Mr. Gillenwaters          126
        Redirect Exam by Mr. Abbett             133

P. J. JONES:
        Direct Exam by Mr. Abbett               135

BRYAN BOTEET:
        Direct Exam by Mr. Abbett               138

PAUL REGISTER:
        Direct Exam by Mr. Abbett               143
        Cross Exam by Mr. Gillenwaters          156

WILLIAM RAMSEY:
        Direct Exam by Mr. Abbett               164
        Cross Exam by Mr. Gillenwaters          167

JODIE HILLYER:
        Direct Exam by Mr. Abbett               169
        Cross Exam by Mr. Gillenwaters          176
        Redirect Exam by Mr. Abbett             185
        Recross Exam by Mr. Abbett              187
        Further Redirect by Mr. Abbett          191

BILLY ASBERRY:
        Direct Exam by Mr. Abbett               196
        Cross Exam by Mr. Gillenwaters          201

3

## I N D E X (CONTINUED)

PAGE

STATE'S WITNESSES CONTINUED:

DEWAYNE P. CLARK:
Direct Exam by Mr. Abbett ........ 204
Cross Exam by Mr. Gillenwaters ... 212
Redirect Exam by Mr. Abbett ...... 246

BETH FRISK:
Direct Exam by Mr. Abbett ........ 256
Cross Exam by Mr. Gillenwaters ... 262
Redirect Exam by Mr. Abbett ...... 266
Recross Exam by Mr. Gillenwaters . 266

PAUL REGISTER (RECALLED):
Redirect Exam by Mr. Abbett ...... 278
Recross Exam by Mr. Gillenwaters . 298

DEFENDANT'S WITNESSES:

CORNELIUS REESE:
Direct Exam by Gillenwaters ...... 310
Cross Exam by Mr. Abbett ......... 316

GLENDA BROOKS:
Direct Exam by Mr. Gillenwaters .. 318

JAMES RICE:
Direct Exam by Mr. Gillenwaters .. 321

MELINDA WHITE:
Direct Exam by Mr. Gillenwaters .. 325

MORRIS LEWIS:
Direct Exam by Mr. Gillenwaters .. 328
Cross Exam by Mr. Abbett ......... 330

DEANNE HAND:
Direct Exam by Mr. Gillenwaters .. 331
Cross Exam by Mr. Abbett ......... 336

4

## I N D E X (CONTINUED)

PAGE

DEFENDANT'S WITNESSES CONTINUED:

    RODRIGUES G. HUGULEY:
        Direct Exam by Mr. Gillenwaters    345
        Cross Exam by Mr. Abbett    373

COURT'S CHARGE:    391

SENTENCE HEARING:    422

REPORTER'S CERTIFICATE:    426

5

# E X H I B I T S

STATE'S EXHIBITS:

| NUMBER | MARKED | ADMITTED |
|--------|--------|----------|
| 1 | 54 | 54 |
| 2 | 61 | 61 |
| 3 | 76 | 76 |
| 4 | 76 | 76 |
| 5 | 115 | 115 |
| 6 | 119 | 119 |
| 7 | 276 | 276 |
| 8 | 141 | 141 |
| 9 | 141 | 141 |
| 10 | 141 | 141 |
| 11 | 124 | 124 |
| 12 | 124 | 124 |
| 13 | 148 | 148 |
| 14 | 146 | 146 |
| 15 | 151 | 151 |
| 16 | 151 | 151 |
| 17 | 153 | 153 |
| 18 | 166 | 166 |
| 19 | 166 | 166 |
| 20 | 283 | 283 |
| 21 | 286 | 286 |
| 22 | 290 | 290 |
| 23 | 292 | 292 |
| 24 | 155 | 155 |
| 25 | 49 | 49 |
| 26 | 52 | 52 |
| 27 | 385 | 385 |

6

P R O C E E D I N G S

THE COURT: The Court is calling for trial the case of State of Alabama versus Rodrigues Huguley, case number 95-741.

Ladies and gentlemen, I'm going to read this indictment to you and then ask you some qualifying questions, so give me your attention while I do that.

The Grand Jury of Lee County charge that before the finding of this indictment, Rodrigues G. Huguley, alias Rodrigues Gomez Huguley, alias Rock, alias Oaky, whose true Christian name is otherwise unknown to the Grand Jury, did in the course of committing a theft of lawful paper currency of the United States of America, the exact denominations of which are unknown to the Grand Jury, the property of Heart of Auburn Motel Corporation,

7

a corporation, use force or threaten the imminent use of force against the person of

Harry Carpenter, with intent to overcome his physical resistance or physical power of

resistance or to compel acquiescence to the taking of or escaping with the said property,

while the said Rodrigues G. Huguley or another participant, to-wit: Dewayne P. Clark, was

armed with a deadly weapon or a dangerous instrument, to-wit: a pistol, in violation of

Section 13A-8-41 of the Code of Alabama, against the peace and dignity of the State of

Alabama. This indictment charges the offense known as robbery in the first degree. The

Defendant has entered a plea of not guilty.

Now I'm going to ask you some qualifying questions that will be very similar to the questions that I think Judge Gullage just asked you. I know they duplicate to some

8

extent what he asked you but we're required to ask these qualifying questions on the record in the presence of the Defendant before each case is started and that's the reason for that duplication. So just bear with me on that.

Now if any of these questions apply to you please let me know by raising your hand or if you don't want to reply out loud to any of the questions that I ask you or that the lawyers ask you, I'll give you a chance to come around and reply quietly here at the bench in a few minutes.

Have any of you been indicted within the last twelve months for the offense of robbery in the first degree?

(No response.)

THE COURT: Were any of you a member of

9

the Grand Jury which indicted this Defendant, and that's the Grand Jury that met in July of this year?

(No response.)

THE COURT:    Do any of you have any interest in either the conviction or the acquittal of this Defendant?

(No response.)

THE COURT:   Have you made any promises or given any assurances that you would either convict or acquit this Defendant?

(No response.)

THE COURT:    Do you know anything about

10

this case that would influence your verdict in any way?

(One response.)

THE COURT:   All right, sir.   And what's your name?

A VENIRE MEMBER:  Steve McFarland.

THE COURT:   Okay.   I'll get you up in just a minute and we'll go into that, Mr. McFarland.

Do any of you have a fixed opinion as to the guilt or the innocence of this Defendant?

(No response.)

THE COURT:  Are any of you a surety on the Defendant's bond?

11

(No response.)

THE COURT:   Are any of you  a witness in this case?

(No response.)

THE   COURT:   Has   anyone   talked to   you about this case?

(No response.)

THE   COURT:  Do  any of you  have a fixed opinion against penitentiary punishment?

(No response.)

THE   COURT:   Do   you   think   that   a conviction should not be had on circumstantial

12

evidence?

(No response.)

THE COURT: Are any of you related by blood or marriage to the Defendant, Rodrigues Huguley?

Would you stand briefly and face the jury, Mr. Huguley?

(No response.)

THE COURT: All right. You may be seated.

Are any of you related by blood or marriage to the alleged victim in this case and that is Harry Carpenter?

(No response.)

13

THE COURT:    Are any of you agents, servants, employees or stockholders of the Heart of Auburn Motel Corporation?


(No response.)


THE COURT:   Are any of you related by blood or marriage to the District Attorney Ron Myers or to any of his assistants, Nick Abbett, Kenny Wilkes, Gail Meek, Walter Northcutt or Margaret Mayfield?


(No response.)


THE COURT:   Are any of you related by blood or marriage to Charles Gillenwaters, the attorney for the Defendant who practices law in Alex City?

14

(No response.)

THE COURT:   And finally, do any of you know of any reason why you could not serve as an impartial juror in the trial of this case and render a fair and impartial verdict either for the State or for the Defendant?

(No response.)

THE COURT:   All right.   Now the lawyers have the right to ask you questions to get information that will assist them in selecting this jury, ladies and gentlemen.   What I have said with reference to my questions applies equally to theirs so please let them know if any of these questions apply to you.

Mr. Abbett?

MR. ABBETT:   Thank you, Your Honor.

15

Ladies and gentlemen, I have just a few questions. Does anyone, the Judge asked you if anyone is related to the Defendant Mr. Huguley, does anyone know the Defendant Rodrigues Huguley or the co-defendant in this case Dewayne T. Clark? Does anyone know either one of those people?

No answer.

Anyone know any member of the Defendant or the co-defendant's family, if you know?

(No response.)

MR. ABBETT: Anyone ever sought or retained Mr. Charles Gillenwaters for legal advice or representation, that is yourself or any close family member or have any kind of business relationship or social relationship

16

with Charles Gillenwaters, the attorney for the Defendant?

(No response.)

MR. ABBETT: Anyone because of moral or religious beliefs not want to sit in judgment of their fellow man?

(No response.)

MR. ABBETT: Anyone know of any reason they wouldn't want to sit on the trial of this case?

(No response.)

MR. ABBETT: Ladies and gentlemen, Alabama law treats everybody that participates

17

in a crime the same, that is each one is considered a principal. If a persons aids or abets in the commission of an offense they're treated as a principal in Alabama. Does anyone have a problem with that premise of law?


(No response.)


MR. ABBETT:  That's all the questions I have.

THE COURT: Mr. Gillenwaters?

MR. GILLENWATERS:  I too just have a few questions.  I need to ask you about some witnesses that may or may not testify in this case.  Do any of you know a Paul Register who is employed by the Auburn Police Department? Paul Register?

18

(No response.)


MR. GILLENWATERS:    No one knows  him, is that correct?

Are you related to him in any way?


(No response.)


MR. GILLENWATERS:    What about  a William Ramsey?    Do any  of  you  know Sgt.  William Ramsey  that  works   at  the  Auburn   Police Department?


(One response.)


MR.  GILLENWATERS:  Anyone  else know Mr. Ramsey?


(Two responses.)

19

MR. GILLENWATERS:    Does anybody know Officer M. K. Horne of the Auburn Police Department?


(Three responses.)


MR. GILLENWATERS: Okay. Anyone else?
What about an Officer M. L. Ricks?


(Two responses.)


MR. GILLENWATERS:    What about Officer J. H. Hillyer?  Anybody know Officer Hillyer?


(One response.)


MR. GILLENWATERS:  Anyone else?
Officer Bryan Botek, I'm sure I'm saying that wrong.

A VOICE IN THE AUDIENCE:  Boteet.

MR. GILLENWATERS:  Boteet?

A VOICE IN THE AUDIENCE:  Boteet.

MR. GILLENWATERS:  Anybody know Officer Boteet?

No one knows him?  Okay.

What about a Harry Carpenter, I believe the Judge asked you about him.


(One response.)


A VENIRE MEMBER:  Is that Jodie Hillyer?

MR. GILLENWATERS:  Yes.

A VENIRE MEMBER:  I know him.

MR. GILLENWATERS:  And your name?

A VENIRE MEMBER:  Michael Guy.

MR. GILLENWATERS:  Michael Guy?

Anyone else know Mr. Carpenter?

21

(No response.)


MR. GILLENWATERS:  Any  of  you know  a
Billy  Asberry  that  lives  in  Lafayette,
Alabama?


(No response.)


MR.  GILLENWATERS:  No  one  knows  Mr.
Asberry?

Or a Beth Fisk?  Any of you know --


(One response.)


MR. GILLENWATERS:  Anybody  know a  Ken
Wesson?  I  believe he's  an employee  of the
Heart of Auburn.


(One response.)

22

MR. GILLENWATERS:  Anybody else   know Mr.
Wesson?

Have any of you  ever worked for the
Heart of Auburn Motel?


(No response.)


MR. GILLENWATERS:  Have any of you worked

in  that  type  of  industry, as  a  clerk  or
receptionist at a hotel or  motel?  Any of you

ever been in that type of business?


(No response.)


MR.  GILLENWATERS:    No  one,  is  that
correct?

Thank you.

THE  COURT:  All  right.  Mr. McFarland,
let  me get  you  to come  up  just a  minute,

23

please.

(Whereupon, the following proceedings were had at the bench, inside the presence of the jury venire but out of its hearing, to-wit:)

THE COURT: What do you know about this case?

VENIRE MEMBER McFARLAND: Mr. Carpenter is a student of mine and we've discussed the case quite a bit.

THE COURT: You have?

VENIRE MEMBER McFARLAND: Yes, sir.

THE COURT: Then I think I'll excuse you from this case. We'll take Mr. McFarland off this case. But you need to stick around, you may end up on that case next door. Thank you.

24

(Whereupon, the following proceedings were had in the presence and hearing of the jury venire.)

THE COURT: If anyone else has any responses that they want to make if you'll get ready we'll bring you up.

(Whereupon, the following proceedings were had at the bench, inside the presence of the jury venire but out of its hearing, to-wit:)

THE COURT: Yes, ma'am, your name?

A VENIRE MEMBER: Kathy Hawkins.

THE COURT: Ms. Hawkins?

VENIRE MEMBER HAWKINS: This is a very

25

negative thing but since I don't know the answer to this. My mother's name is Melba Hall and it is possible that she does some work for Mr. Gillenwaters.

MR. GILLENWATERS:  I know Ms. Hall.  I know your mother, yes.  She used to work for Tom Mann?

VENIRE MEMBER HAWKINS: Yes.

MR. GILLENWATERS: Okay.

THE COURT:  I appreciate you telling us. Thank you.

This is Mr. John D. Norman?

VENIRE MEMBER NORMAN:  Yes, sir.  Mr. Gillenwaters asked if anybody knew Mr. Keith Horne, Officer Horne in Auburn.  His mother or stepmother is my brother's ex-wife but I don't even know him.  I speak to him but I thought I didn't want to jeopardize the jury.

THE COURT: Okay.  Thank you.

26

MR. GILLENWATERS: What the name?

THE COURT: Norman.

All      right.      Anything    else,
gentlemen?

MR. ABBETT: No.

MR. GILLENWATERS: I don't think so.

(Whereupon,    the    following
proceedings  were  had  in  the
jury  venire's  presence  and
hearing, to-wit:)

THE COURT: All right. Anybody else have
any responses, ladies and gentlemen?

(No response.)

THE JURY: All right. Now ladies and
gentlemen, they're still selecting the jury

27

next door and we can't begin the selection process until they get through because we don't know which twelve of you are going to be on that jury. So I'm going to let you go back downstairs to the jury assembly room. As soon as they get the jury selected for the case over there they'll come get you and then we'll start the selection process over here. When we get through with that then we'll come get you. And then those of you not selected on those two juries, you'll be through for the day and we'll be through with all that way before lunch, I can assure you. So we'll do it as quick as we can but right now we'll let you go back downstairs and please stay in the vicinity of the jury room so we can find you.

(Whereupon, proceedings were in a brief recess, after which the

28

following occurred, to-wit:)


MR. ABBETT: We ask that the victim Harry Carpenter be excused from the rule.

THE COURT:  All right.  The rule is requested.  If you've got any witnesses they need to wait outside.


(Whereupon, the jury venire returned to the courtroom and the following proceedings were had in their presence and hearing, to-wit:)


THE COURT: Now ladies and gentlemen, as your names are called please come around and have a seat in the jury box.


(Whereupon, the Clerk called

the jury to the box.)

THE COURT:    Raise  your right  hands and take  the following  oath, please,  ladies and gentlemen.

(Jury duly sworn.)

THE COURT:  I'm going to ask you  to step back in  the jury room  for just a  minute and we'll get your right back out and get started.

(Whereupon,  the  jury  retired from  the   courtroom  and  the Court  dismissed the  remaining jury  venire  members,  after which  the  following occurred, to-wit:)

30

THE COURT: All right. Now on the record. The juror that came up to me a minute ago and pointed out that she knows the lady in the back of the courtroom from somewhere, a book store or someplace, is she -- who is she?

MR. GILLENWATERS: She's the Defendant's mother, Your Honor.

THE COURT: All right. If there's any problem with that we'll talk to her and see, but otherwise --

MR. ABBETT: I've got a problem with it because I asked that question.

MR. GILLENWATERS: I thought you asked about --

THE COURT: Well, of course sometimes --

MR. ABBETT: I asked if anybody knew the Defendant.

THE COURT: Huh?

MR. ABBETT: I asked if anybody knew the

31

Defendant or any member of the Defendant's family.

THE COURT: Okay. Now a lot of times people don't know folks by names they have to see them in person and I'm not sure she was pointed out to any of the jurors as being kin to the Defendant, so we'll bring them back in and find out about that.

After we get through instructing the jury I'll tell her to wait here a minute and I'll ask her some questions.

I think we'll do the opening statements after lunch.

(Whereupon, the jury returned to the courtroom and the following proceedings were had in their presence and hearing, to-wit:)

32

THE COURT: All right. Ladies and gentlemen, how many of you have never served on a jury before, let me see a show of hands?

All right most of you. Let me tell you a few things about what we're going to be doing. We're not going to actually start this case until after lunch. I'm going to give you these few instructions and let you go and then we'll come back after lunch and get started.

This is a criminal case of course. Your job is going to be to determine the guilt or the innocence of the Defendant after you hear all the evidence. So as you listen to the evidence just keep in mind that's going to be your job to determine whether he is guilty or not guilty of the charge. If you should find the Defendant guilty the matter of punishment would be strictly up to the Court

33

and you would have no role in that at all.

Let me tell you how we operate.

There will be an opening statement. Opening statements that will be made to begin the case, that's a statement made by the lawyers just to tell you a little bit about what the case is about. Following that then you'll hear testimony of witnesses and receive evidence. When that's over with the lawyers will make their closing arguments to you and then I'll tell you what the law is that you apply to what you've heard.

Frequently during the trial of criminal cases there are objections or things that have to be taken up outside your presence. When that occurs I'll send you out of the courtroom and take those matters up. I know it gets to be a nuisance sometimes for that to take place where you're going and

34

coming all the time but that's what the law says we have to do and that's the way we'll be doing it.

You're free to take notes during the trial and we've provided pads and pencils for you. The first thing you need to do is write your name on those pads because we're going to take those up when you go to lunch and give them back to you when you come back. Now nobody will read anything that you've written on the pads so don't worry about that. And should the case go into tomorrow then we'll take up the pads at the end of the day and give them back to you in the morning.

There are thirteen of you there, one of you will be an alternate. We do that so that if somebody gets sick or has a family emergency then we can proceed on with the necessary twelve.

35

During breaks that occur here in the building I'd ask you to sort of stay together with the Bailiff. The reason for that is there may be witnesses out in the hallways who are discussing the case and I wouldn't want any of you to overhear what they're talking about. So try to stay together during the breaks.

Now you'll be free to go your separate ways during the lunch hour and should the case go into tomorrow you'll be free to go your separate ways.

Because of that you need to remember that oath that I gave you a little while ago and that is that you would decide this case based on the evidence and the testimony that you hear in this courtroom and not from any other source. It wouldn't be fair to either side for you to let anybody talk to you about

36

the case or for you to talk to anybody about the case and I trust that that won't take place.

Now I try to call recesses about every hour and fifteen minutes or every hour and a half. You're the first jury that's been sitting in that box since we had it remodeled this weekend. It used to be real tight and we've gotten in there and spread those chairs out a little bit so that it's not quite as cramped as it was. That end seat there, you're going to be strattling the post, you may want to go for that other seat back there if that gets to be uncomfortable. But we've had complaints from jurors over the last seven or eight years and the main complaint is the fact the jury boxes are too tight. So we hope that that will do something about that complaint, at least in this courtroom. The

37

one in Judge Gullage's courtroom is still the old way but it will be remodeled in about a week or so.

All right. Now I'm going to let ya'll go to lunch right now and when we come back then we'll begin the case with opening statements and I've got some other cases set right at one, so I don't need you back until 1:15. Now when you come back please come back to the jury room that's right here behind you, here on the second floor and as you go out you can see where it is relative to the front door. And when all of you get back then we'll begin the case at that time and I need to ask you to stay just a minute and let me follow up on what you told me about.

All right. The rest of you may go right out that door and we'll see you back at 1:15.

(Whereupon, all jury members retired from the courtroom except Juror Wright, who remained to be questioned by the Court as follows, to-wit:)

THE COURT: What is your name?

JUROR WRIGHT: Kathy Wright.

THE REPORTER: I'm sorry, Judge, I can't hear. Kathy what?

THE COURT: Wright.

THE REPORTER: Wright?

THE COURT: Let me ask you something. Okay. This is Kathy Wright, a juror in this case.

Ms. Wright you indicated to me just a minute ago that you knew the lady sitting in the back of the courtroom?

JUROR WRIGHT: Right.

39

THE COURT:  Do you know her personally or just by sight?

JUROR WRIGHT:  Well,  I knew her from the book store.  She  used to work in the  AU Book Store.

THE COURT:  Okay.  You know her name?

JUROR WRIGHT:  I think her name is Annie.

THE COURT:  Annie?  You don't know her as the mother of this Defendant?

JUROR WRIGHT:  No.

THE  COURT:  Did  you  have  a  close relationship with her when she worked there?

JUROR WRIGHT:  No.

THE  COURT:  Do you consider  yourself a close friend?

JUROR WRIGHT:  No.

THE  COURT:  Is the  fact that she is the mother  of the Defendant,  would that  make it difficult or uncomfortable for you to serve as

41

to-wit:)


THE COURT:  All right.   We'll be in recess until 1:15.


(Noon recess.)

42

## AFTERNOON SESSION

THE COURT:  Everybody ready to go?

MR. ABBETT:  Yes, sir.

THE COURT:  Ten minutes a side for opening statements.

Bring them on back.

(Whereupon, the jury returned to the courtroom and the following proceedings were had in their presence and hearing, to-wit:)

THE COURT:  All right.  Ya'll don't have to sit in the same seat every time, ladies and gentlemen.  You can move around as we come and go.

All right.  Opening statements.

43

(Whereupon, both attorneys made
their opening statements to the

jury, after which the following
occurred, to-wit:)


THE COURT:  Call your first witness.


## STATE'S EVIDENCE


MR. ABBETT:  We call Harry Carpenter.

THE    COURT:    Raise   your   right   hand,
please.


(Witness duly sworn.)


THE COURT:  Have a seat up here.


## HARRY CARPENTER,

a witness, having first  been duly sworn  to speak

44

the truth, the whole truth and nothing but the truth, was examined and testified as follows, to-wit:

## DIRECT EXAMINATION

BY MR. ABBETT:

Q.   Would you state your name to the jury, please sir?

A.   Barry Carpenter, III.

Q.   And where are you employed?

A.   Heart of Auburn Motel.

Q.   In what capacity, please?

A.   Night auditor.

Q.   And were you so employed back on Monday, the early morning hours of Monday, July 24th, 1995?

A.   Yes, sir.

Q.   Mr. Carpenter, how did you come to be employed

45

with the Heart of Auburn Motel?

A.    I'm a graduate student at Auburn University and assistanceship isn't enough money to live on and I had been doing it before and I just went and asked for the job because I had experience as a night auditor.

Q.    How long had you been employed back on July the 24th?

A.    Since mid January.

Q.    And what are you majoring in at Auburn University?

A.    History of technology.

Q.    And how far along are you in your studies?

A.    I finished one year toward my Ph.D.

Q.    Working on your doctorate?

A.    Yes, sir.

Q.    And what's an assistanceship?

A.    It's where you assist the professors and you get a stipend and a waiver of out of state

46

fees.

Q.    Mr. Carpenter, I'd like to ask you to just tell, I'm going to ask you some questions about what occurred during those early morning hours, and I'd just like for you to tell the jury what happened. If you would just begin with where the person first came in to register about 12:45 or whatever time you remember exactly that they came in.

A.    Well, it was around 1:00 o'clock Mr. Buguley came in and he wanted to rent a room and he handed me, you know, I said are you going to pay cash. He said yes. I said I'll need to see I.D. and he handed an I.D. that didn't have a picture. I said you've got to have a picture I.D. So then he handed me his driver's license and --

Q.    He handed you some other kind of I.D. first?

A.    It was like a driver's license without a

47

picture.

Q.   All right, sir.

A.   And I said no, I've got to have a picture I.D. And so then he handed me one, his driver's license and I took down the information, I checked the date because he was just barely eighteen I noticed but he was eighteen.

Q.   Do you remember the first I.D. that he handed you was in his name or do you remember?

A.   I didn't even look at it.  When I saw it didn't have a picture I said I've got to have a picture.  So I didn't even look at it.

Q.   Okay.  Go ahead.

A.   And then I put in the information and was checking him in and he gave me, like it was, the total was $30.24.  He gave me $40.00 and a quarter and I was getting his change when the man with the ski mask came in --

48

THE COURT:  You need to talk a little bit louder for us.

THE WITNESS:  I'm sorry.

A.  Then the man with the ski mask came in.

Q.  Let me stop you just a minute.  Let me show you what's been previously marked as State's exhibit number twenty-five and ask if you can identify that, please?

A.  Yes, this is what we fill out when a guest checks in and has the, with all the information, address and driver's license number and how much the cost of the room was plus tax and then what I took in.

Q.  All right.  Is that what you filled out on that occasion when this person that told you that his name was Rodrigues Huguley and presented an Alabama driver's license?

A.  Yes, sir.

49

MR. ABBETT: Your Honor, we offer State's exhibit number twenty-five.

MR. GILLENWATERS: No objection, Your Honor.

THE COURT: Admitted.

(Whereupon, the instrument hereinabove referred to and marked for identification as State's exhibit number twenty-five was admitted and received into evidence.)

## DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q. Okay. As you, as this person, the person that was checking in on that occasion, is he present in the courtroom?

A. Yes, sir.

Q. Would you point him out, please?

50

A.   It's the Defendant there (indicating).

Q.   Are you pointing to the Defendant right here,

Rodrigues Huguley?

A.   Yes, sir.  Uh-huh.

Q.   Does he appear the same today as he did back

on that occasion?

A.   Oh, no, he didn't, his hair is shorter and

he's wearing glasses.  He wasn't wearing

glasses that evening.

Q.   Are you sure about the identification?

A.   Yes, sir.

Q.   I show you what's been previously marked as

State's exhibit number twenty-six and ask if

you recognize that, please?

A.   Yes, sir, that's what he looked like that

night.


THE COURT:  You're mumbling, I can't

understand you.

51

THE WITNESS:  I'm sorry.

THE COURT:  I know you're not used to doing this but you need to try to speak good and clear for us in that mike.  He's got to write this down.

THE WITNESS:  Okay.


Q.  Is that a photograph, sir?

A.  Yes, sir.

Q.  Is it a photograph of the Defendant Mr. Huguley?

A.  Yes, sir.

Q.  Does it truly and accurately depict the way he appeared on the night of the robbery?

A.  Yes, sir.


MR. ABBETT:  Your Honor, we offer State's exhibit number twenty-six.

THE COURT:  Admitted.

52

MR. GILLENWATERS:  No objection.

(Whereupon,    the    instrument
hereinabove  referred    to   and

marked   for   identification  as
Defendant's    exhibit   number

twenty-six  was   admitted  and
received into evidence.)


## DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.   All right, Mr. Carpenter, if you would go
     ahead with your testimony, I believe you are

     to the point where a person came in with a ski
     mask.

A.   This man came in with a ski mask  and he had a
     pistol and  it was silver colored  and he held

     it, and he  pointed it toward  my head and  he
     said give me, give me the cash.

Q.   Okay.

53

A.   And he threw a bag at me.

Q.   Let me ask you to do something right now.

Would you look behind you on the board here.
We've marked a diagram that's State's exhibit
number one.  Would you take a look at that
diagram, please, sir?

A.   Yes, sir.

Q.   Does that diagram fairly and accurately depict
the office area of the Heart of Auburn Motel?

A.   Yes, sir.

Q.   All right.  Is the Heart of Auburn Motel in
Lee County, Alabama?

A.   Yes, sir.

Q.   Okay.  Would you point out where you, just
draw a little block and put your own name by
the block and show where you were?

A.   (Witness complying.)

Q.   Does that diagram fairly and accurately depict
the office area there?

54

A.   Yes, sir.


          MR.  ABBETT:   We  offer State's  exhibit

     number one,  Your Honor.

          THE COURT:  Admitted.


                    (Whereupon,    the    instrument

                    hereinabove  referred  to   and

                    marked  for  identification  as

                    State's  exhibit  number one was

                    admitted   and   received  into

                    evidence.)


**DIRECT EXAMINATION RESUMED BY MR. ABBETT:**

Q.   Okay.   Now if you  would show the  ladies and

     gentlemen of the jury on the diagram where the

     door  is  located  and  just  where  different

     things are located in the office area, please,

     sir.

55

A.   Well, this is a B, where it says B is the side
     door that's the door that most people would

     enter from and C is a back door that if a
     guest, we have an ice machine that's in the

     lobby and that's mainly where the guests would
     come in that wanted to use the ice machine.

Q.   Okay.   Where was Rodrigues Huguley as he was
     registering for a room?

A.   He would have been about right here.

Q.   Okay.   Would you draw an X there or a delta,

     draw a delta and write Huguley beside it,
     would you?

A.   (Witness complying.)

Q.   Okay.   If you would use the diagram and show

     the jury how the person with the ski mask came
     in and what they did, please, sir.

          You can speak loudly without the
     microphone.

A.   Okay.   He just came in through this door and

56

was standing about right here and was holding the pistol and said give me your cash.

Q. Was he holding the pistol pointed at you?

A. Yes, sir.

Q. Show the jury while you're standing how he was doing that, please, sir.

A. Like this (indicating).

Q. Over the counter at you?

A. Yes, sir.

Q. Okay. And what did he say?

A. Give me the cash.

Q. And what did you do?

A. When he, he threw a bag at me and I picked up the bag and I gave him the cash.

Q. And was that, how much cash did you give him? You can sit back down.

A. $259.00.

Q. And was that in United States currency?

A. Yes, sir.

57

Q.   And was that the property of the Heart of
Auburn Motel Corporation?

A.   Yes, sir.

Q.   Except for --

A.   The $10.00 in change that I was about to give,
give back $10.00 and a penny change.

Q.   To Rodrigues Huguley?

A.   To -- yes, sir.

Q.   Okay.  Tell the ladies and gentlemen in your
own words the best you can describe it, Mr.
Carpenter, of what happened as the person came
in and pointed the pistol at you and demanded
the money.  Just go ahead in your own words
about, in a narrative form about what
happened.

A.   Well he came in and he pointed a pistol at me
and said give me the cash and he threw this
little clear plastic bag like you would get
maybe if you bought something at a drug store,

58

a little bag. And I picked it up off the floor, he threw it over the counter, I picked it off the floor and I was giving him -- and when I had put all the bills in I started to put the change in and he said no, I just want the cash. So then I handed it to him and he ran out the door here (indicating) and headed straight back toward Gay Street.

Q. Can you go through that way, through the motel property to Gay Street?

A. Yes, sir.

Q. What did you do at that point?

A. I called 911.

Q. Okay. And did you report the robbery to the Auburn Police Department?

A. Yes, sir.

Q. Did you give them a description of the person that robbed you?

A. Yes, sir.

59

Q.   What did you tell them?

A.   It was a black man, I said I didn't see his

     face because he was wearing a ski mask, that

     he had a black shirt on and I really didn't

     see, because the counter is high, I really

     didn't see his pants. I described a black

     shirt and the pistol. It was a silver pistol,

     small pistol and that he had left toward the

     rear of the motel, toward Gay Street on foot.

Q.   When he left was he walking or running?

A.   He was running.

Q.   What did the Defendant Huguley do at that

     time? As you were calling 911 and reporting

     it to the police and giving them the

     description?

A.   He was, he was standing there and he said, do

     you want me to follow him and I said well no,

     he's got a gun. And so then I -- after I had

     called the police and had finished the

68

conversation with the police, 911, I gave him his room key.

Q.  Did he ask you for the room key, or do you remember?

A.  To be honest with me I don't remember whether he asked for it or I just gave it to him, but he had already paid for the room so I gave him the key.

Q.  Okay.  Did he stay there until the police arrived?

A.  No.  He went, he got in the car, it was parked right in the driveway, he got in the car and then he, you know, headed back toward where the room would have been.

Q.  Okay.  Now which direction would -- let me use another diagram.

I show you what's marked as State's exhibit number two and ask if you recognize that, please, sir?

61

A.   Yes, sir.

Q.   What's shown in State's exhibit number two?

A.   Well it's the layout of where the Heart of Auburn Motel is and various streets in Auburn.

Q.   Okay. Does that diagram fairly and accurately depict the layout of the Heart of Auburn Motel and some of the streets, that is Gay Street and College Street, Miller and Thatch Avenue?

A.   Yes, sir.


MR. ABBETT: Your Honor, we offer State's exhibit number two.

THE COURT: Admitted.


(Whereupon, the instrument hereinabove referred to and marked for identification as State's exhibit number two was

62

admitted   and   received   into
evidence.)


## DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.   Okay.  If  you would show  on the diagram  Mr.
Carpenter  what  you  were   relating  earlier

before I interrupted you.

A.   These are the rooms  that normally sell, these

are rooms that sell  for $28.00, which was the

room  he had  rented.   And  so  here was  the

office,  he  headed back  toward  these rooms,
back toward the back.

Q.   Okay.  So he  headed in the  same   direction
that the person who was later identified to be

Clark went,  is that correct?

A.   Yes, sir.

Q.   Okay.   Did  the Auburn  Police  later  bring
Dewayne T. Clark back to the motel?

A.   Yes, sir.

63

Q.    Approximately how long after you reported the robbery was it before the Auburn Police Department brought Clark back?

A.    It was just a few minutes because -- I'm not sure exactly how long it was, but it wasn't long at all.

Q.    All right. When they brought him back did he have the ski mask and the gun?

A.    No, sir.

Q.    Were you able to identify him?

A.    I, all I could tell them was he was wearing the same shirt, you know, because he had been wearing a ski mask.

Q.    You were able to identify the shirt?

A.    Yeah, well, it was the same type shirt, yes, sir.

Q.    Okay. Did Officer Ramsey or Sgt. Ramsey, a detective, show you a ski mask and a gun?

A.    Yes, sir.

64

Q.   Were you able to recognize those?

A.   They looked like the ones that he had used.

Q.   I show you what's been previously marked as
     State's exhibit number eighteen which is a ski
     mask, and State's exhibit number nineteen,
     which is a pistol, and ask if you recognize
     those items?

A.   They look like, that looks like the ski mask
     that the robber was wearing and that looks
     like the gun he had.

Q.   Okay. And you previously had been shown these
     by Detective Ramsey, is that correct?

A.   Yes, sir.

Q.   Do you know what happened to Rodrigues Huguley
     after he left in the direction that Clark ran?

A.   Well, when I came into the police station --

     MR. GILLENWATERS: Object, Your Honor, he
     would only know by hearsay. Unless he

65

personally knows.

THE COURT:  Sounds like he was testifying what he saw. Were you fixing to tell us what you saw?

THE WITNESS:  I saw that they -- yes, sir.

THE COURT:  Overrule the objection.


A.   I saw that they had arrested him when I went to the police station to fill out the, to make my statement and they showed me the mask and that sort of thing.

Q.   But you didn't see him anytime after that until you saw him at the police station?

A.   Yes, sir.

Q.   Okay.  Mr. Carpenter, did you ask the Defendant Huguley to wait until the police came because he was there when the robbery occurred?

66

A.   Well no, because he had a room I thought he would just go to his room and so I really didn't ask him to stay. I figured that if the police wanted to talk to him they could, you know -- I knew what room he was in.

Q.   You thought you knew which room he would be in?

A.   Yes, sir.

Q.   But he didn't stay, did he?

A.   No, sir.

Q.   And he asked you if you wanted him to follow the person that came in with the ski mask and the gun?

A.   Yes, sir.

Q.   I believe that's all.


          THE COURT:  Cross examination.


Q.   Just one other question.

Were you scared?

A.    Yes, sir.

Q.    That's all.


## CROSS EXAMINATION


BY MR. GILLENWATERS:

Q.    Let me follow up on that, sir.  You said you

were scared, is that correct?

A.    Yes, sir.

Q.    Did Rodriguez, did he appear to be scared

also?

A.    Yes, sir.

Q.    How could you tell that he was scared?

A.    He was, he backed up and said oh, God, oh,

God.

Q.    Okay.  That's what he said when this person

with the mask and gun came in, is that

correct?

68

A.   Yes, sir.

Q.   All right.   Now, I think you also testified

that you never gave him the change, that the

person who robbed the motel took his $10.00

also, isn't that correct?

A.   Yes, sir.

Q.   And then took monies that belonged to the

Heart of Auburn, is that correct?

A.   Yes, sir.

Q.   All right.  Now, how long was he in the room

or at the desk there with you before this

other individual came in?

A.   I would -- let's see, I'd have to think about

it a minute.  Well, he came in right when I

was changing over the time on the computer

back to the regular time and that took a

couple, took about two or three minutes and

then I went through the process of checking

him in, I think it usually takes about, I mean

69

I would estimate that that takes about five or six minutes. And so I would say he was probably in there somewhere in the nature of eight to ten minutes.

Q.  So eight to ten minutes before the other individual showed up, is that correct?

A.  That's correct.

Q.  All right.  Now, you were changing something on the computer, or changing the date?

A.  Well, the computer doesn't allow me to do the audit until two o'clock unless I tell the computer the wrong time and so I tell it it's two o'clock at midnight so I can do the audit. And then we have to run a back up tape and when that's done I change the time back up and he happened to come in right when that happened.

Q.  All right.  Now when Rodrigues came in, you said he did give you his driver's license, is

that correct?

A. Yes, sir.

Q. All right. And let me show you State's exhibit twenty-five that's previously been admitted.

A. Uh-huh.

Q. You filled that out, is that correct?

A. That's correct.

Q. All right. And that was from information that was on the front of his license, is that correct?

A. That's correct.

Q. All right. And did you look at the picture I.D. on the driver's license?

A. Yes, sir.

Q. And did it, it matched him?

A. Yes, sir.

Q. All right. And was there anything that he had to sign or anything on this?

A. Well normally he would have signed something

71

but because of the confusion I didn't have him sign it.

Q.  Okay.  And he paid you with $40.00, is that correct?

A.  It was $40.00 and a quarter and I was getting his $10.00 and a penny change.

Q.  Okay.  He didn't try to hide his identity to you in any way, did he?

A.  Well, you know, after he gave me the picture I.D., no.

Q.  Okay.  Now while the person who robbed you was there did you see or was there any communications between Mr. Huguley and the person who robbed you?

A.  I didn't see any but I'll be honest with you I was looking at that gun.

Q.  Okay.  The only thing you heard was oh, no, oh, no?

A.  Uh-huh.

72

Q.   All right. But he -- prior to that you were
     dealing with the computer, is that correct?

A.   It was right, what do you mean, right when
     the, the man with the gun came in?

Q.   When Rodrigues first came in, you were dealing
     with the computer?

A.   Yeah, I was -- yeah.

Q.   All right. What was he doing while you were

     dealing with the computer?

A.   Well, I'm typing in the information and as

     far as I know he was just standing there. You
     know, I'm --

Q.   Just standing there?

A.   Yeah, I'm looking at the computer while I'm

     typing in the information.

Q.   All right. Now you saw him drive up and park,

     isn't that correct?

A.   Yeah, I saw the car come up, yeah.

Q.   And he parked right in front of the desk, is

73

that correct?

A. Well, yeah, it's, let's see -- right here

(indicating).

Q. Right in front of the door?

A. Right there is where he would have parked,

yeah (indicating).

Q. Okay.

A. That's where he parked.

Q. You could see his car?

A. Yes, sir.

Q. All right. Did you see him arrive in his car?

A. No, I wasn't paying attention, I just, I mean

I saw a car there after it arrived. I didn't

see him arriving in the car, no.

Q. Okay. And you could see him when he left, is

that correct?

A. Yes.

Q. All right. And he got back in the car and

left and went back toward the room --

74

A.   Yes, sir.

Q.   -- that he had rented, is that correct?

A.   Yes, sir.

Q.   Okay.   Now you didn't ask him to stay, did
     you?

A.   No.

Q.   You had already called the police prior to him
     leaving, isn't that correct?

A.   That's correct.

Q.   All right.   And you did hear him make a
     statement, if you want me to go after him,
     didn't you?

A.   He said do you want me to follow him.

Q.   Okay.   All right.   Thank you, sir.


          THE COURT:   Any other questions of this
     witness?

          MR. ABBETT:   Just a couple.

76

depict the scene as it appeared on that occasion?

A.    Yes, sir.

Q.    Now these were made after you called the police, is that correct?

A.    Yes, sir.

Q.    In fact a police car is shown in one of them?

A.    Yes, sir.


MR. ABBETT:    We offer State's exhibit number three and four.

MR. GILLENWATERS:    No objections, Your Honor.

THE COURT: Admitted.


(Whereupon, the instruments hereinabove referred to and marked for identification as State's exhibit number three

77

and   number   four   were   admitted

and received into evidence.)


REDIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.   If you would, Mr.  Carpenter, come down  where

the jury can see, please, sir.

A.   (Witness complying.)

Q.   I  show  you  what's been  marked  as  State's

exhibit number three and  let me hold it where

the jury  can see  and let  you point  out the

office   area   and  the   driveway   in  that

photograph.

A.   Right  here is the door, you see a little step

right there (indicating), that's the door into

the office and there's a window back behind --

Q.   Can everybody see?

A.   -- and you  see that step  right there in  the

front of the picture?  That's the door, that's

the door, that's where the door is.

78

Q.    And a police car is parked here, is that about
where the Defendant parked on that occasion?

A.    Approximately.

Q.    And I show you now what's marked as State's
exhibit number four and hold it where the jury
can see, could you tell them what's shown in
that photograph, please?

A.    Well, this is a little further back than what
you just saw here looking out this way, and
those are the rooms right there that rent for
$28.00.

Q.    And if you go straight back like you're going
into the photograph you go to Gay Street?

A.    Yes, sir. When you go past these rooms right
here and it's a little catty-cornered, but
it's back that way.

Q.    Okay. Could you relate that to the diagram,
that second picture, number four I believe it
is?

79

A.    Yes, sir.   Those are   the rooms I was pointing

out.   As I said, when you get past these rooms

you go in this direction there's a little road

that goes up through here.

Q.    Right to Gay Street?

A.    Right to Gay Street.

Q.    Okay.   And that's the direction the Defendant

left driving, is that correct?

A.    Yes, sir.

Q.    And can you drive a  car all the  way through

there to Gay Street?

A.    Yes, sir.

Q.    When you said  that -- you hadn't  ever been

robbed; had you ever been robbed before?

A.    No, sir.

Q.    Before that occasion?

You    said  Rodrigues    Huguley  appeared

scared and said  oh, God, oh,  God, you  don't

know  whether  he  was scared  because  he was

38

participating  in  the  robbery  or  he  just
happened to be there, do you?

A.   No, sir.

Q.   That's all.


## RECROSS EXAMINATION


BY MR. GILLENWATERS:

Q.   Sir, you testified when  Mr. Abbett  asked you
     that if  he had picked  up Mr. Clark  and went

     back to  the room that he would  have got away
     with it, isn't that what you said?

A.   Yes, sir, if they  would have caught them then
     I said I didn't think so.

Q.   All  right.   But   now  I  thought you  had
     testified earlier  that you had  his name  and

     his, you knew where he was going to be staying
     at  the hotel and you didn't  think it was any

     problem getting  with him as a witness because

81

you would just tell the police that he was in room such and such and they could go back and interview him, isn't it?

A.   Yes, sir.

Q.   All right.   So you gave Rodrigues Huguley's name as a witness to the police, didn't you?

A.   Yes, sir.

Q.   All right. And they knew what room he was in, isn't that correct?

A.   Yes, sir.

Q.   All right.  And one would assume that if they hadn't caught Mr. Clark they would have went and knocked on that room, wouldn't they?

A.   Yes, sir.

Q.   All right.  And if Mr. Clark had been in that room that wouldn't have been very good, would it?

A.   Yeah, if he had of left himself visible.

Q.   All right.  Thank you, sir.

83

MR. GILLENWATERS:  No further questions.

THE COURT:  You're excused, you can  step

down.


(Witness excused.)


THE COURT:  Next witness.

MR.  ABBETT:   Your  Honor,  could he  be

excused.   He has to be,  he worked last night

and he has to work --

THE COURT:   I said he was  excused.  You

can go.

MR. ABBETT:  Call Officer Horne.


## MICHAEL K. HORNE,

a  witness, after  having  first  being first  duly

sworn  to  speak  the  truth,  the  whole  truth  and

nothing but the truth,  was examined and  testified

84

as follows, to-wit:


## DIRECT EXAMINATION


BY MR. ABBETT:

Q.   Officer Horne, would you speak into the

microphone and speak to the jury, please?

A.   Yes, sir.

Q.   I'm going to ask you some questions about what

you were doing back on July the 24th with the

police department.

Would you state your name, please?

A.   Michael Keith Horne.

Q.   And where are you employed?

A.   Auburn Police Department.

Q.   In what capacity?

A.   Patrolman.

Q.   And were you in uniform and on duty back on

the early morning hours of July the 24th,

85

1995?

A.    Yes, sir.

Q.    Were you in a marked police car?

A.    Yes, sir.

Q.    Did you receive a radio dispatch about a robbery at the Heart of Auburn Motel?

A.    Yes, sir, I did.

Q.    Do you remember about what time it was when you received the radio dispatch?

A.    I believe the call came in at 00:55 hours so it would have been roughly before that or right after that.

Q.    Now when you say 00:55 hours, the jury may not --

A.    It's 12:55 a.m.

Q.    -- know about -- 12:55 a.m.?

A.    Yes, sir.

Q.    All right. What did you do when you received the radio dispatch about the robbery?

86

A.   I proceeded to the area and began to drive several streets in that general vicinity looking for a possible suspect.

Q.   Where were you when you first received the radio dispatch?

A.   I was at Glendean Drug Store checking that business.

Q.   And how far is Glendean Drug Store from the Heart of Auburn Motel?

A.   Two miles maybe, something like that. About two miles.

Q.   So you go directly toward the Heart of Auburn Motel?

A.   No, sir, I came, I came down Dean Road and turned onto Thatch Avenue and began riding the side streets in there, Gay Street, Reese, Casey and those different streets in there.

Q.   Okay. Had you received a description of the person that committed the robbery over your

87

radio?

A.   Yes, sir, I did.

Q.   And had you received a description or a direction of travel when he, that he was leaving the motel after he committed the robbery?

A.   I don't believe so, not at that time, no, sir, but --

Q.   All right.  Just tell the ladies and gentlemen of the jury in your own words what you did as you approached that area of Gay Street and the Heart of Auburn Motel.

A.   Okay.

Q.   And you can refer to the diagram that's up there that's State's exhibit number two.

A.   Yes, sir.

Q.   And I believe we've got a marker here, right here in front of you.

A.   Okay.

88

Q.  Point if you need to use that.

A.  All right.  Thank you.

I come down Thatch Avenue and checked several streets in that general vicinity.

Q.  Okay.  Point out on the diagram where Thatch Avenue is.

A.  This is Thatch right here.

Q.  Okay.

A.  Armstrong is back up this way.  I had ridden in this general vicinity.

Q.  When you say Armstrong are you talking about another police officer?

A.  Oh, no, sir, it's another street, Armstrong Street.

Q.  Okay.

A.  At that time I knew that nobody had gone to the scene yet so I checked with my supervisor and he said go ahead and go to the scene.  And it just so happens that I come down Gay Street

89

and turn onto Miller Street --

Q. All right. Now you're indicating a different

direction that you're coming from.

A. Right. I'm coming down Gay Street traveling

northbound.

Q. Okay. How did you get over here from where

you said you were on Thatch?

A. Off of Armstrong, Casey and --

Q. Okay. You came across this way and then came

back toward the Heart of Auburn from this

direction?

A. Yes, sir.

Q. Okay. Go ahead.

A. So I turned onto Miller Avenue and at this

time that's when I saw a subject that looked

like the person from the description that the

dispatcher had given us.

Q. Okay.

A. And he was generally right about in here.

96

Q.   Okay.  Would you write Clark right there?

A.   Yes, sir.  (Witness complying.)

Q.   Okay.  Is that  where Clark was  located when
     you first saw him or the person that was later
     identified to be Clark?

A.   Yes, sir.

Q.   All right.

A.   Roughly in that area.

Q.   All right.  Now where were you?

A.   I was,  well, when  I saw  him I  attempted to
     tell Auburn where I was.  I told them --

Q.   You mean the dispatcher with your radio?

A.   Yes, sir.  I  tried to tell,  inform dispatch
     along with other  officers riding in  the area
     where I was.  So I parked my patrol car.

Q.   All right.  Draw a block there and an arrow on
     the front showing where you parked your car in
     what direction.

A.   All  right.    It  was   facing   that  way

91

(indicating).

Q.    Okay.

A.    Probably a little bit further down but somewhere in that general vicinity there.

Q.    Okay.

A.    It was at that time that I exited my patrol car and attempted to contact Mr. Clark. He was traveling in an easterly direction on foot, he was running. I parked my patrol car, exited my patrol car --

Q.    Let me ask you something. When you first saw him did he have on a ski mask?

A.    No, sir.

Q.    Did he have a gun? Did you see one?

A.    I did not see one.

Q.    Okay. When you first saw him right here was he walking or running?

A.    He was, he was sort of trotting. You could tell that he was physically tired. He was

92

coming back up the road sort of hunched over a little bit running this way. I got out of the patrol car and I said stop.

Q. And what did Mr. Clark do, the person you later determined to be Clark?

A. He continued to run, he sped up at that time.

Q. All right. He speeded up and continued to run?

A. Yes, sir.

Q. Okay. What occurred next? You get out of your car, right?

A. A brief foot pursuit took place. I got out on him here, out of my patrol car. I believe my words to the Auburn Police Department dispatch was that I've got the subject on, I believe I said Miller Street, Miller Avenue. I began chasing him and asking him to stop, stop, police, stop. We got up to the intersection of Miller Avenue and Gay Street and he turned

93

left and the Taco Bell sits pretty close up in
this area, and he turned left and I was still

behind him.

Q.  Draw a dotted line where he's running there,

please.

A.  Okay.  (Witness complying.)  He made a

lefthand turn traveling northbound.


THE COURT:  Hold on just a second.
Somebody need a break over here?

A JUROR:  Yes, sir, please sir.

THE COURT:  Okay.  Let's take a little
recess and I'll let ya'll step back to the
jury room.


(Whereupon, proceedings were in

a brief recess, after which the

following occurred, to-wit:)

94

THE COURT:  Okay.  Everybody ready?

MR. GILLENWATERS:  Yes, sir.

THE COURT:  Bring the jury back.

(Whereupon, the jury returned to the courtroom and the following proceedings were had in their presence and hearing, to-wit:)

THE COURT:  Anytime ya'll need a break just get my attention, yell at me ladies and gentlemen, for not paying attention to you.  All right.  Go ahead.

MR. ABBETT:  Thank you, Your Honor.

DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.  Officer Horne, I believe when the jury went out you were telling or testifying about Clark

95

running east on Gay Street --

A.    Yes, sir.

Q.    -- and put a dotted line there, is that
correct?

A.    Yes, sir.

Q.    Okay. What happened as you continued to chase
him as he's running east on Gay Street?

A.    I continued to chase him. It was at this time
that a dark vehicle was there. I can't tell
you where it came from, other than the fact
that it was there in front of us.

Q.    All right. Put it on the diagram please, sir.

A.    (Witness complying.)

Q.    You don't -- let me see if I understand you
correctly. You don't know if the vehicle was
parked sitting there, drove up or what?

A.    I have -- no, sir, I sure don't.

Q.    Okay. What happened as the Defendant Clark
ran to this vehicle?

96

A.    Well, as I was chasing him I continued to say,
      halt, police, stop police.    He continued to

      run.  This car came up, it was a dark vehicle.
      And  it slowed down  enough, I remember seeing

      the  taillights, and  it slowed  down  I'd say
      between five  to  ten  miles  an  hour.    The

      subject here who was later identified as Clark
      was saying  open the door man,  open the door.

      I continued  to say stop.    Come on  man, open
      the door,  they're behind me.    And it  was at

      this time that the door opened and he was able
      to enter that vehicle as it continued to  move

      and  it  continued on  down northbound  on Gay
      Street.  And at  this time I was able  to turn

      on    my   walkie-talkie   and  was  able  to
      communicate  to  our  dispatchers  and  to the

      other police  officers in  the area  that this
      person  had entered a vehicle.    I was able to

      give the  tag number  of that vehicle  and the

97

direction of travel of that vehicle.

Q.   Do you remember exactly what Clark said as he

was getting into the vehicle or approaching

the vehicle?

A.   Open the door man, they're behind us.

Q.   Would it help to refresh your recollection to

examine your report?

A.   Yes, sir.

Q.   Okay.

A.   Do I need to say what this is?

Q.   No, you need to tell what was said after you

read that and does it refresh your

recollection?

A.   Yes, sir.

Q.   Okay.  Tell the Court or the jury exactly what

Clark said as he was getting into the vehicle

or trying to get the door open to the vehicle?

A.   As Mr. Clark (sic) was running alongside of

this vehicle he grabbed the door handle, "Man

98

open the door, they're behind us. Open the door, man." And the door opened.

Q. Do you know whether he opened the door or could you see into the vehicle at that time?

A. I could not see into the vehicle. I could see one more person in that vehicle. I, to my recollection he did not lean over and open the door but the door was locked to begin with because you could, I could see him pulling the handle and it did not work and then he opened the door.

Q. The door was locked and then he opened the door?

A. I'm assuming, because the first couple of times he pulled it would not open.

Q. Do you remember the tag number?

A. I want to say it was 12 alpha golf whiskey -- 12AWG, I believe it was a 61, I believe is what it was. It was a Chambers County tag.

99

Q.   12AWG61?

A.   Yes, sir.

Q.   And did you report  that to the other officers that were involved in the --

A.   Yes, sir, I did.

Q.   -- chase and the investigation?

     And after that did you, you were on foot, correct?

A.   Yes, sir.

Q.   Did you go back to your car?

A.   Yes, sir, I did, but  I walked  back  to my patrol car.

Q.   Okay.  And  did you continue to chase  or what did you do at that time?

A.   I  went on to the  scene at that  time.  There was two other black and white patrol cars that were  traveling on  Gay  Street  at that  time going toward the direction of travel that that vehicle had gone.  So I went on to the scene.

100

Q.   I believe that's all.


THE COURT:  Cross.


CROSS EXAMINATION


BY MR. GILLENWATERS:

Q.   Officer Horne --

A.   Yes, sir.

Q.   You said that when you drew the car is

approximately where you first saw it?

A.   Yes, sir.

Q.   All right.  And it was headed north --

A.   North on Gay Street.

Q.   -- on Gay Street?

A.   Yes, sir.

Q.   All right.  Is there a stop sign here?

A.   There's a traffic light.

Q.   There's a traffic light, okay.

101

Do you remember if the traffic light was red or green?

A.  I believe it was red or changing.  I don't remember because when I called in the tag number I started going back toward my vehicle. I told them the direction of travel.

Q.  All right.  And did the vehicle, did it stop for the traffic light up here?

A.  No, sir.

Q.  All right.  Did it turn left or right?

A.  I believe it continued to go straight.

Q.  It continued to go straight.  All right.

A.  As I said I returned to my vehicle.

Q.  All right.

A.  I was going to my car.

Q.  All right.  Is there an annex to the Auburn Police Department in this area?

A.  An annex?

Q.  Or is the Auburn Police Department very close

102

        by?

A.    It's pretty close by, yes, sir.

Q.    Where is it at?

A.    It's at, you have to go on down further, Gay

      Street, get on down toward Glen and it's back

      up at Glen.

Q.    Okay. Up at Glen. How far would you say it

      is from here?

A.    A mile. Something like that.

Q.    A mile?

A.    Mile and a half probably.

Q.    All right. So you go down Gay Street in the

      direction the car was going, is that correct?

A.    Right. Yes, sir.

Q.    To go to the Auburn Police Department?

A.    Correct.

Q.    Okay. And --

A.    And it's not, you understand it's not on Gay

      Street, right?

103

Q.   Yes, sir, I understand  it's off to the right,
     is that --

         Now, you said that  the person, the Clark
     fellow that was running, that he ran after the

     car?  And he was running all the way down Gay
     Street, is that correct?

A.   He was running next to the car, yes, sir.

Q.   How far did he run parallel to the car?

A.   Maybe ten yards, fifteen yards, something like
     that maybe, if that far.

Q.   Okay.  And he was leaning down and pulling  on
     the handle?

A.   Right.

Q.   At the same time, is that correct?

A.   Uh-huh.

Q.   All  right.  And he  was unable to  get in for

     some reason?

A.   Right.

Q.   Okay.  Now,  where about  in relation  to the

134

traffic light there did he get in the vehicle?

A.    Oh, it was a good ways from the traffic  light

now.  You know, this diagram, it indicates not

to  scale, so it's  not just like  here's  the

car and here's the  traffic light.  It's  a --

it's  not  an  incredibly  long  distance  but

it's --

Q.    Just a block?  It appears to be a block.

A.    It's, it's one city block, right.

Q.    One city block.  Okay.

      And, and  you said you heard,  let me in,

man, let me in?

A.    Uh-huh.

Q.    Okay.  And you could see  inside the vehicle,

is that correct?

A.    I could see one subject.

Q.    One subject inside the car?

A.    You know.

Q.    Okay.  And then the  car proceeded on down Gay

105

Street after he got in, is that correct?

A.    Yes, sir.

Q.    Did it then take off at a high rate of speed?

A.    It, yes, sir, it moved along very rapidly.

Q.    It moved along -- did, you said some black and
      whites were in the area, is that correct?

A.    Yes, sir.

Q.    And did they immediately go by you?

A.    It was pretty close, yes, sir.

Q.    All right.    As the car went through the
      intersection some other officers were going in
      the same direction, is that correct?

A.    Right.    They had passed me at that point,
      right.

Q.    They had passed you?

A.    Right.

Q.    Could you still see the --

A.    One of them.

Q.    Could you still see the dark vehicle at the

106

time the officers went by you?

A.    Uh-huh.

Q.    So it was still in your sight?

A.    Right.    And then once they, once they went by

me and once I saw one, I'm going to the car to

go to  the scene to get as much information or

further information.

Q.    All  right.  So the  vehicle was in your sight

and then  the other  officers went by  you and

one  would assume  it was  in their  sight, is

that correct?

A.    Yes, sir.  I would assume.

Q.    Okay.  And did you see them catch up with the

vehicle?

A.    No, sir.

Q.    You did not?

A.    No, sir.

Q.    All right.  So  you went back on you,  back to

your vehicle?

107

A.    Right.  I went back  down on Miller Avenue and
      got my car.

Q.    Okay.  All right.  Thank you, sir.


            THE COURT:  Redirect?


            REDIRECT EXAMINATION


BY MR. ABBETT:

Q.    Just to  make sure we're clear,  Officer, that

      car,  that  dark colored  car  wasn't anywhere

      close to that red light when it stopped?

A.    Oh, no, sir.

Q.    It was  about the  middle  of the  block  like

      you've shown it on the diagram?

A.    Well, you  see, again  it's  not to  scale  so

      you've got several apartments here, you've got

      several  apartments  here, several  houses, so

      it's  not per  se  you know,  very close,  you

108

know, it was a pretty good distance.  I don't,

I couldn't  tell you exactly how far  it is, I

never did measure that  off but it's -- you've

got  Taco Bell and  some other  businesses and

then   you've  got   two   sets   of  apartment

complexes  there,  then   you  get  into  some

duplexes, then you get into  Whittle Dormitory

and then you  get to Thatch Avenue.  So you've

got a, you know, a pretty good stretch.

Q.   That's all.


          MR. GILLENWATERS:  Nothing  further, Your

Honor.

          THE COURT:  You can step down.


                    (Witness excused.)


          MR. ABBETT:  Call Officer M. L. Ricks.

M. L. RICKS,

was called as a witness, having first been duly

sworn to speak the truth, the whole truth and

nothing but the truth, was examined and testified

as follows, to-wit:


### DIRECT EXAMINATION


BY MR. ABBETT:

Q.   State your name for the jury, please?

A.   Michael Leonard Ricks.

Q.   And where are you employed?

A.   City of Auburn, Auburn Police Department.

Q.   In what capacity?

A.   I'm a police officer for the City of Auburn.

Q.   Were you so employed back on July the 24th of

     1995 during the early morning hours?

A.   Yes, sir, I was.

Q.   Were you in uniform then as you are now?

110

A.    Yes, sir, I was.

Q.    Were you in a marked patrol car?

A.    Yes, sir.

Q.    Did you receive a radio dispatch about the

      robbery at the Heart of Auburn Motel?

A.    Yes, sir, I did.

Q.    All right.  And what did you do in response to

      that dispatch,  Officer Ricks?

A.    In responding to that dispatch I went into the

      Gay Street area, which  that's where they said

      a suspect ran.   While  searching that  area

      Officer  Horne  indicated  that  he  see  the

      suspect.   By that time I got in my patrol car

      and started out on --

Q.    Were you on foot at that time?

A.    I had gotten out to talk to some subjects that

      was  in an  apartment  complex.   And when  he

      radioed that he see the suspect 1 got  back in

      my car and  got back  on Gay Street.   He  did

111

indicate that the subject had got into a vehicle and was headed north on Gay. I then began to pursue that vehicle.

Q. Did you follow the vehicle?

A. Yes, sir.

Q. Did he give you the tag number?

A. No, sir, he didn't. Once the vehicle, it was the only vehicle on Gay Street and I asked Officer Horne over the radio was that the vehicle whose taillights was going up Gay Street and he indicated it was.

Q. Okay. Now you're talking about the radio, are you talking about this radio, microphone that you've got on your shoulder?

A. That's what Officer Horne was talking on. I was talking on the radio that's actually in the patrol car.

Q. Okay. All right. What happened as you began to pursue the vehicle that Officer Horne had

112

pointed out to you by use of the radio?

A.  As I began to pursue the vehicle I turned on

my lights and the passenger door of the
vehicle kept opening up as if the person was

trying to get out.  At that time the vehicle
turned into a parking lot of the Methodist

Church across from Burger King on Gay Street.
The passenger of the vehicle jumped out and

started running towards the Methodist Church.
At that time I got out of my vehicle and the

driver got out of the vehicle and he was
standing by the door as I passed by.  I then

chased the passenger which I believe his name
is Dewayne if I'm not mistaken.  And I chased

him to the south side of the Methodist Church.
Once he got to the Methodist Church he tried

to jump over a ten foot wall but he couldn't
get over it and when his feet hit the ground I

then indicated to him he needed to get on the

113

ground. He stretched out on the ground and I placed him under arrest.

Q.    Okay.    And  did that person turn  out to  be Dewayne Clark?

A.    Yes, sir.  Dewayne Clark.

Q.    Okay.  If you're -- if you would use this yard stick and point out  on the diagram, where are you coming from, in  what direction, and where do you first see the dark colored car?

A.    Okay.  I was coming from this area which is an apartment complex is here.    I  was  in  the parking lot.  I came out on Gay Street in this direction.    As I  came out I  believe Officer Horne was standing  somewhere in here  and the car must  have been somewhere along  here.   It was the only car that was on Gay Street at the time.   I then  radioed and asked Officer Horne was it  the car, taillights facing  us, and he said it was.   I  then pursued the vehicle this

114

way.

Q. Okay. Did you have on your blue lights and siren at that time?

A. Yes, sir. I had on my blue lights. I hadn't turned on my siren at the time.

Q. Okay. Describe exactly what the car did, the dark colored car?

A. The dark colored car, once it got here, it applied brakes so the brake lights came on and that gave my patrol car enough time to catch up with it. Once it went through the intersection the brake lights kept coming on and going off, coming on and going off and the vehicle --

Q. Is that when the passenger door was opening?

A. Yes, sir. Yes, sir, and the vehicle was going like it was slowing down and continuing to move. And then it turned into the parking lot here of the Methodist Church.

115

Q.   Okay.   I'd show you what's been previously
     marked as State's exhibit number five and ask

     if you recognize that, please, sir?

A.   Yes, sir, that's the vehicle that they were

     in.

Q.   Now is that a photograph of the vehicle?

A.   Yes, sir, a photograph.

Q.   Does that photograph truly and accurately

     depict the vehicle as you saw it on that

     occasion?

A.   Yes, sir.


          MR. ABBETT:  Okay.   Your Honor, we offer
     State's exhibit number five.

          THE COURT:  Admitted.


                         (Whereupon,     the    instrument

                         hereinabove   referred   to  and

                         marked  for  identification  as

116

State's exhibit number five was
admitted   and   received   into
evidence.)


DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.   Is that where it was parked when Clark  jumped

     out and ran on foot?

A.   Yes, sir.

Q.   Okay.  And where is that shown on the diagram?

A.   Shown on  the diagram  it should  be somewhere

     along in here.

Q.   Would you take  that black marker and  draw  a

     black diagram of where the car was left parked

     at and write getaway car there, please?

A.   (Witness complying.)

Q.   Now as you  approached the car  where did  you

     stop your patrol car?

A.   I stopped my patrol car approximately right in

     here facing in that direction.

117

Q.    And I believe you said the passenger got out
      and ran on foot?

A.    Yes, sir.

Q.    Would you draw a dotted line and show where he

      ran to?

A.    (Witness complying.)

Q.    Is that where he got to a fence?

A.    Yes, sir.  He got to the --

Q.    What did the driver of the car do?

A.    The  driver of the car,  once I got  out of my

      car  he got out and  he stood on  this side of

      the car and he didn't move after I got out and

      I  continued to chase  this individual because

      as I got  out of my car  the back up  unit was

      coming or was pulling into the parking lot.

Q.    There was  another  officer coming  in  behind

      you?

A.    Yes, sir.

Q.    All  right.   Did the  driver of  the car  say

118

anything to you?

A.   No, sir,  he just looked at me  in a surprised

     manner and he put is  hands up like this right

     here (indicating).

Q.   So he held his hands up like this?

A.   Yes, sir.

Q.   Okay.   I   show   you   what's   been   previously

     marked as  State's exhibit number six  and ask

     if you can identify that photograph, please?

A.   Yes,  sir.  This is the fence or the wall that

     that he ran up against next to the side of the

     church.  It should be  this wall here and this

     is the church parking lot.

Q.   Does   that   photograph   truly   and   accurately

     depict   that   wall   as   it   appeared   on   that

     occasion?

A.   Yes, sir.


          MR. ABBETT: We offer number six.

119

MR. GILLENWATERS:  No objection.

THE COURT:  Admitted.

(Whereupon,    the    instrument
hereinabove  referred  to    and
marked  for  identification  as
State's  exhibit  number six was
admitted   and   received  into
evidence.)

**DIRECT EXAMINATION RESUMED BY MR. ABBETT:**

Q.   I show  you State's exhibit number   seven and
ask if you would identify that photograph?  Is
that a closer up view of the wall?

A.   Yes, sir.  Closer to the corner of the wall.

Q.   Okay.  Does that truly  and accurately depict
where the Defendant Clark stopped?

A.   Yes, sir.

Q.   Okay.  Officer Ricks, come down where the jury