120

can see, please, sir.

When Clark got to this wall here what did he do?

A.   Once he got to the wall he reached up and grabbed with both of his hands and tried to pull himself over but he couldn't pull himself over and he dropped back down and when he dropped back down before he could jump back up again I was already up there on him.

Q.   Did you place him under arrest?

A.   Yes, sir, I did.

Q.   Did you search him at that time or pat him down for a weapon?

A.   I patted him down for weapons.

Q.   Did you find any weapons on him?

A.   No weapons at all.

Q.   No weapons at all?

A.   No, sir.

Q.   Okay. You can go back up there.

121

After you placed    Clark under arrest did
he   then lead  you back  towards the  Heart of

Auburn Motel on foot?

A.   No, sir --

Q.   Or direct you back there?

A.   Once I  placed him under arrest,  I placed him

under  arrest where I  stopped him at.   And I
assisted  him to  get up  on his  feet  and we

started walking back towards his car and  then
he made the statement that, I just want  ya'll

to know that --


        MR. GILLENWATERS:  Objection, Your Honor.
        THE COURT:  Sustained.


Q.   Okay.  Don't say what he said.

A.   Okay.

Q.   Did you place handcuffs  on him?

A.   Yes, sir, I did.

122

Q.   Did he then -- did you go back and get in your
     patrol car with him?

A.   Yes, sir.  I read  him the Miranda warning and
     I asked him about the gun.  I asked him did he

     understand the Miranda warning  and he did.  I
     asked him about the gun.

Q.   Okay.  And did he  then lead you back  towards
     the Heart of Auburn Motel?

A.   Yes, sir, he did.

Q.   If you  would show  the  jury on  the  diagram

     where he led you back to.

A.   We  came back  down Gay  Street south  in this

     direction (indicating)  and  he led  me  right
     here to a tree and next to the tree was a pull

     over mask  or hood and inside the hood was the
     gun which he told us that's what it was --


          MR. GILLENWATERS:  Objection.

          THE  COURT:  Sustained.

123

Q.   I show you what's been previously marked as State's exhibits number eleven and twelve and ask if you recognize those photographs, please?

A.   Yes, sir, I do.

Q.   Okay. And what's shown in number eleven?

A.   In number eleven it's showing the hood that the suspect indicated to us and the gun is not visible but this is the hood, a picture of the hood we saw with the gun inside of it.

Q.   Does that photograph truly and accurately depict the way you found it on that occasion?

A.   Yes, sir, it does.

Q.   Okay. And State's exhibit number twelve is a photograph of the same hood or ski mask, is it not?

A.   Yes, sir, it is.

Q.   Is that after you or some other officer had removed the gun and laid it on top of it?

124

A.    This must be after an officer removed it and
      laid it on top.

Q.    Other than that is it in the same condition as
      when you saw it?

A.    Yes, sir, it is.


      MR. ABBETT:    We offer State's exhibit
number twelve.

      THE COURT: Admitted. Number eleven, are
you offering that too?

      MR. ABBETT: We offer number eleven and
twelve.

      THE COURT: Admitted.


                        (Whereupon, the instruments

                        hereinabove referred to and

                        marked for identification as

                        State's exhibits numbers eleven

                        and number twelve, were

125

admitted   and   received   into evidence.)


DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.   Did you  then take the Defendant  to the motel

to  be, that  is  the Defendant  Clark to  the

motel to be viewed by Mr. Carpenter?

A.   Yes, I did.

Q.   And then  after that did  you take him  to the

Auburn Police Department and turn him  over to

Detective Ramsey?

A.   Yes, I did.

Q.   Okay.  And I  believe Officer B. K.  Jones was

with you at the time you found the gun and the

ski mask?

A.   Yes, sir, he was.

Q.   And did he stay there with the gun and the ski

mask?

126

A.   He did.

Q.   I believe that's all.


         THE COURT:  Cross.


                CROSS EXAMINATION


BY MR. GILLENWATERS:

Q.   Officer Ricks, you stated that you got behind
     the vehicle on Gay Street?

A.   Yes, sir.

Q.   That it went approximately a block, is that
     correct?

A.   That's not what I said.

Q.   How far did it go then?

A.   I couldn't begin to say whether it was a block
     or two blocks.

Q.   Well the diagram that's behind you seems to
     indicate that the Methodist Church and the

127

parking lot is a block from this intersection of, what's that, Thatch Avenue and Gay Street.

Is the diagram not correct?

A.    The diagram is correct.

Q.    All right.

A.    Now where he got in the car at I don't know where he got in the car. He was in the car when --

Q.    You didn't see him get in the car?

A.    No, sir, I didn't.

Q.    All right. Where did you first see this dark colored car at?

A.    When I saw this dark colored car it must have been somewhere along in here on Gay Street.

Q.    Okay. So the furtherest that it could have traveled would have been a block and a half then?

A.    Maybe a block and half at the most.

Q.    Maybe a block and a half. Okay. And it went

123

through  the  intersection there   on Thatch and
Gay, is that correct?

A.    Yes, sir.

Q.    Was the light green or red or do you know?

A.    The light was red.

Q.    The light was red?

A.    Yes, sir.

Q.    So it  went through   the   red light,  is   that
correct?

A.    Yes, sir.

Q.    All right.   Then you said   the vehicle turned
its,   had its brake   lights on and that's what
drew your attention to it, is that correct?

A.    No, I didn't say that's what drew my attention
to it.

Q.    But you were able to see it because it had its
brake lights on?

A.    I  was able    to see  the  taillights of  the
vehicle, yes, sir.

129

Q.  All right.  And then it was going through this block here towards the Methodist Church and it was, the driver was hitting his brakes, that's what you said, is that correct?

A.  Yes, sir, the brake lights were going on and off.

Q.  All right.  And he didn't try or attempt to get away from you, did he?

A.  I couldn't say that he was trying to get away. He didn't stop when I turned my red light on.

Q.  He didn't stop --

A.  No.

Q.  -- he pulled over at the next intersection, did he not?

A.  Yes, sir.  Well he pulled over into that parking lot.

Q.  He pulled over in that parking lot.  All right. And you said that Mr. Huguley was the driver of the vehicle, is that correct?

130

A.    Yes, sir.

Q.    All right.  Now did he get out of the vehicle

      and run like Mr. Clark did?

A.    No, sir, he didn't.

Q.    All right.  But he did get out of the vehicle,
      is that correct?

A.    Yes, sir, he did get out of the vehicle.

Q.    And he simply stood there, is that correct?

A.    Yes, sir.

Q.    All right.  So he didn't make,  he didn't try

      to get away from you, did he, sir?

A.    No, sir, he didn't.

Q.    Okay.  And did you search him?

A.    No, sir, I didn't search him.

Q.    You didn't search him.

            Was he later searched by someone?

A.    I  don't  know  whether  he  was  searched  by
      anyone.  I didn't search him.

Q.    All right.  So you detained Mr. Clark, is that

131

correct?

A.   Yes, sir, I did.

Q.   All right.  And you  brought Mr. Clark back to your patrol car?

A.   Yes, sir, I did.

Q.   All right.   Where was Mr. Huguley at when you brought Mr. Clark back to your patrol car?

A.   If  I'm not  mistaken Mr.  Huguley was  either talking  with  Officer   Hillyer  or   Officer Hillyer had placed him in his patrol car.

Q.   All right.  So did he ever leave the scene  of his vehicle and the patrol cars there?

A.   That I can't  truly answer.  The only  thing I can say is he  was standing by the car  when I passed  his car  running.  Now  what happened after I passed his car I don't know.

Q.   All right.  When you came back he was still in the same general area --

A.   Yes, sir --

132

Q.   -- is that correct?

A.   -- he was still in the area when I came back.

Q.   Okay.  Is this a lit area?

A.   It has some lights out there, yes, sir.

Q.   Okay.  So it was a well lit area where he pulled over to?

A.   Yes, sir.

Q.   All right.  Well, did the dark car, did it have tinted windows or anything like that?

A.   I don't recall whether it had tinted windows or not.

Q.   Okay. Because you could see the individuals in the car?

A.   I don't recall seeing the individual in the car or the number of individuals.  What I do recall are the lights coming on on the, the taillights or the brake lights coming on on the vehicle and the passenger door opening.  That's what --

133

Q.   All right.   Do you know what  the speed limit
     is on Gay Street?

A.   Yes, sir, it's twenty-five miles per hour.

Q.   All  right.   Did,  was  the  driver   of  the

     vehicle, was he driving  an excessive rate   of

     speed anytime that you were behind him?

A.   Not during the time that I was behind him.

Q.   All right.  Thank you, sir.


           THE COURT:  Redirect.



               REDIRECT EXAMINATION



BY MR. ABBETT:

Q.   Officer Ricks, do you  know how many times the

     brake lights  came on and  the passenger  door

     came open, do you remember?

A.   I   think  the   passenger   door  came   open

     approximately   four   times    before   the

134

individual actually jumped out.  I'm not sure exactly how many times the brake lights actually came on.

Q.   But  each time the passenger  door came on the brake lights came on?

A.   Yes, sir.

Q.   I believe that's all.


THE   COURT:     Anything  else   of  this witness?

MR. GILLENWATERS:  No, sir.

THE COURT:  You're excused, you may go.


(Witness excused.)


THE COURT:  Next witness.

MR. ABBETT:  Call B. J. Jones, Officer B. J. Jones.

135

## B. J. JONES,

a witness, having first been duly sworn to speak the truth, the whole truth and nothing but the truth, was examined and testified as follows, to-wit:

## DIRECT EXAMINATION

BY MR. ABBETT:

Q.   State your name for the jury, please?

A.   Byron Keith Jones.

Q.   And where are you employed?

A.   Auburn Police Department, City of Auburn.

Q.   In what capacity?

A.   I'm a shift supervisor, sergeant.

Q.   Were you so employed during the early morning hours of July 24th, 1995?

A.   Yes, I was.

Q.   Sergeant, I'd show you what's been previously

136

marked as State's exhibit number eighteen and
nineteen, a ski mask and a gun, and --

A.    Yes, sir.

Q.    -- ask you what your participation was in the
recovery of those items?

A.    I asked where they were --

Q.    Not what you did just where you recovered
them, okay?  Not what somebody told you.

A.    Okay.  They were recovered at a house that is
next to the driveway that leaves the back side
of the Heart of Auburn by an oak tree.  An oak
tree which is like here (indicating) is where
they were recovered at.  I stood by with them
until Detective Ramsey came and got them.

Q.    Okay.  Were you involved in the chase and the
arrest of Clark and the Defendant Rodrigues?

A.    No, sir, I wasn't.  I was on the scene after
they were already taken into custody.

Q.    Okay. Did you stay with the gun and mask until

137

they were collected by Sgt. Ramsey as he did the investigation?

A.   Yes, sir, I did.

Q.   Okay.  And you maintained them in the same condition as they were when you arrived there?

A.   Yes, sir.

Q.   Okay.  I believe that's all.


THE COURT:  Cross examination.

MR. GILLENWATERS:  No questions.

THE COURT:  You're excused.  You may go.


(Witness excused.)


THE COURT:  Next witness.

MR. ABBETT:  We call Officer Bryan Boteet.

138

**BRYAN BOTEET,**

a witness, having first been duly sworn to speak

the truth, the whole truth and nothing but the

truth, was examined and testified as follows, to-

wit:

## DIRECT EXAMINATION

BY MR. ABBETT:

Q.    State your name for the jury, please.

A.    Bryan Boteet.

Q.    And where are you employed?

A.    With the City of Auburn Police Department.

Q.    In what capacity?

A.    I'm a police officer in the patrol division.

Q.    Were you so employed back during the early

      morning hours of July 24th, 1995?

A.    Yes, sir, I was.

Q.    Officer Boteet, did you participate in the

139

arrest of Clark and Rodrigues, the two people
that were charged with the robbery of the

Heart of Auburn Motel?

A.   Not actually in the physical arrest of the two

suspects. By the time I arrived on the scene
Officer Hillyer and Officer Ricks had both of

the suspects in their custody at that time.

Q.   Okay. Did you begin a search of the area

where Defendant Clark was arrested, that is
near the wall behind the United Methodist

building there?

A.   Yes, sir, I did.

Q.   And what did you, if anything did you discover
as you began a search of that area?

A.   I located a lot of U.S. currency in
denominations of twenty dollar bills, ten,

five and one dollar bills located on the
ground kind of scattered out across the area

by an air conditioner behind a house.

148

Q.  Okay.  I would ask you to look at State's exhibit number two, a diagram and show the ladies and gentlemen of the jury on the diagram where you located the money that you just talked about, please?

A.  The area I located it was just down right here, there's a fence that goes right here and Officer Ricks was bringing the suspect back from this area here so I walked, you have to actually walk down through here to get down here because it's about a twenty foot drop off from that fence to the ground and the money was located right about equal with it where the end of that fence was right there.

Q.  Okay.  I how you some photographs that have been previously marked as State's exhibits number eight, nine and ten and ask if you'd take a look at those and -- do you recognize those photographs?

141

A.    Yes, sir.   That depicts the scene  that I saw

and I believe Corporal Detective Register took

these photographs.

Q.    All right.   Do those  photographs truly  and

accurately depict the scene  and the money  as

you saw it on that occasion?

A.    Yes, sir, they do.


MR.   ABBETT:   We offer  State's exhibits

number eight, nine and ten.

THE COURT:   Admitted.


(Whereupon,   the   instruments

hereinabove  referred  to   and

marked  for  identification  as

State's exhibits numbers eight,

nine and ten were  admitted and

received into evidence.)

142

<u>DIRECT EXAMINATION RESUMED BY MR. ABBETT:</u>

Q.   Did you collect the money yourself or turn the

     scene  over to Detective Register  to collect

     the money?

A.   I  just  secured  the  scene  until  Detective

     Register could get there and photograph it and

     then while he was present the two of us picked

     up the money and put it into a, put it into an

     envelope,  counting it  before  we put  it  in

     there.

Q.   Okay.  I believe that's all.


               THE COURT:  Cross.

               MR. GILLENWATERS:   I have no  questions,

     Your Honor.

               THE COURT:  You're excused, you may go.


                    (Witness excused.)

143

THE COURT:  Next witness.

MR.   ABBETT:    Call  Detective  Paul

Register.


**PAUL REGISTER,**

a witness, having first   been duly sworn to  speak

the  truth,  the  whole  truth and  nothing but  the

truth, was  examined and testified as  follows, to-

wit:


**DIRECT EXAMINATION**


BY MR. ABBETT:

Q.    Would you state your name to the jury, please?

A.    Paul Register.

Q.    And where are you employed?

A.    City of Auburn Police Department.

Q.    In what capacity?

A.    Detective.

144

Q.   In that capacity did you participate in the
     investigation and the arrest of Dewayne Clark
     and Rodrigues Huguley?

A.   Yes, I did.

Q.   Okay. Would you tell the ladies and gentlemen
     of the jury about your investigation there
     where the Defendant Clark was arrested and the
     recovery of the money, please?

A.   Yes, sir.  About 1:30 I arrived at Officer
     Boteet's location which was about here
     (indicating) and he indicated or showed me
     where the money was and I photographed the
     money and took it into my possession at that
     time.

Q.   And did you count the money?

A.   Yes, sir, I did.

Q.   How much money did you recover?

A.   At that location there were $231.00 actually
     on the ground.

145

Q. Was there more money that you weren't able to recover?

A. There was a, there was a twenty dollar bill that was inside of an air conditioner. The unit that was on the ground, you couldn't get to it, it was down in the air conditioner unit and there was some more money up on top of the fence back up in the parking lot that I recovered as well.

Q. How much total money did you recover there, Detective Register?

A. $262.00.

Q. All right. I show you what's been marked as State's exhibit number fourteen. Is that a photograph of all the money that you recovered on that occasion?

A. Yes, sir, it is.

Q. Does it truly and accurately depict the money that you recovered?

146

A.   Yes, sir, it does.


     MR.  ABBETT:   We offer number fourteen,
Your Honor.

     THE COURT:  Admitted.


               (Whereupon,   the   instrument

               hereinabove  referred  to   and

               marked  for  identification  as

               State's exhibit number fourteen

               was admitted  and received into

               evidence.)


## DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.   Detective Register, in your capacity in charge

     of the  investigation did you  receive the ski

     mask and  the gun from Detective  Ramsey, that

     is  what's been  previously marked  as State's

     exhibit  number  eighteen   and  nineteen,   I

147

believe?

A.   Yes, I did receive those items.

Q.   Okay.   And what if anything did you do with
them?

A.   I maintained them as evidence.   The gun was
sent to the Alabama Department of -- Alabama
Bureau of Investigation for possible latent
prints and it was returned to me subsequently
later.

Q.   I notice this gun appears to have some kind of
purple stain on it, do you know what that is?

A.   Yes, sir.   It's a process of fingerprint,
where they fume the weapon to see if they can
raise any fingerprints and that commonly
leaves a coloration like that.

Q.   All right.   Were they able to recover any
fingerprints from State's exhibit number
nineteen to your knowledge?

A.   No, sir, they were not.

148

Q. I show you what's marked as State's exhibit number thirteen and ask if you would identify that, please?

A. This is the ski mask as well as the gun and the magazine and a bullet that I recovered, that was given to me by Sgt. Ramsey.

Q. All right. After Sgt. Ramsey gave them to you did you examine the gun and the ski mask?

A. Yes, I did.

Q. Could you describe -- we offer State's exhibit number thirteen.


THE COURT: Admitted.


(Whereupon, the instrument hereinabove referred to and marked for identification as State's exhibit number thirteen was admitted and received into

149

evidence.)


**DIRECT EXAMINATION RESUMED BY MR. ABBETT:**

Q.    Could    you    describe    the    gun    and    your

      examination    of    it    as    you    took    it    into    your

      custody?

A.    Yes, sir.   The gun was a   small caliber Lorsen

      and it had   a magazine and   it was loaded   and

      also had   a round chambered in   the chamber as

      it would be ready to be fired.

Q.    So    to fire    the    weapon    do you    have    some

      experience with firearms?

A.    Yes,   sir.

Q.    How long have you been a police officer?

A.    Roughly seven and a half years.

Q.    As a part of your training as a police officer

      do you have marksmanship training and training

      in firearms?

A.    Yes, sir.

150

Q.   When you examined this pistol do you have an
     opinion as to whether it was ready to fire?

A.   Yes, sir, it was.

Q.   Okay. And how would one fire that pistol in
     the condition it was in on that occasion?

A.   by simply pulling the trigger.

Q.   Okay. Detective Register as you continued
     your investigation did you make some
     photographs of the Pontiac Grand Am that was
     being used by Defendant Clark and Huguley on
     that occasion?

A.   Yes, sir, I did.

Q.   I show you what's been previously marked as
     State's exhibits number fifteen and sixteen.
     Are these views of the car that show the tag
     number and a close up view of the car?

A.   Yes, sir, they are.

Q.   Do those photographs truly and accurately
     depict the car as it appeared on that

151

occasion?

A.    Yes, it does.


MR. ABBETT:    We offer those exhibits,

Your Honor, that is --

THE COURT:  Fifteen and sixteen?

MR. ABBETT:  -- fifteen and sixteen.

THE COURT: Admitted.


(Whereupon,  the  instruments

hereinabove  referred  to  and

marked  for  identification  as

State's  exhibits  numbers

fifteen and number sixteen were

admitted  and  received  into

evidence.)


DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.    I'll show you what's marked as State's exhibit

152

number seventeen and ask you if you can identify that, please?

A.   Yes, sir, this is a photograph of a Nissan pick-up, maroon in color, that I photographed in the City of Lafayette behind the Spectrum Food Store again on the early morning hours of the 24th.

Q.   Do you remember about what time it was when you made that photograph?

A.   It would have been sometime around five, 5:30, something like that.

Q.   In the morning?

A.   Yes, sir.

Q.   Does that photograph truly and accurately depict the Nissan pick-up as it appeared on that occasion?

A.   Yes, sir, it does.

Q.   Did you determine who owned that Nissan pick-up?

153

A.    Yes, sir.

Q.    Who owned it?

A.    Mr. Rodrigues Buguley.

Q.    Okay.   Did you get a certified copy of the

      regis --

           MR. ABBETT:   Your Honor, we offer State's

      exhibit number seventeen.

           THE COURT:   Admitted.

                        (Whereupon,    the    instrument

                        hereinabove  referred   to   and

                        marked   for   identification   as

                        State's        exhibit    number

                        seventeen   was   admitted   and

                        received into evidence.)

      DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.    Did  you  get  a  certified  copy  of  the

154

registration for  that vehicle?

A.    Yes, I did.

Q.    Do you have it with you?

A.    I have it in my folder.

Q.    Would you come get it, please?

A.    Yes.


(Short pause had.)


**DIRECT EXAMINATION RESUMED BY MR. ABBETT:**

Q.    Detective  Register,  you  have   what's  been

      previously  marked  as State's  exhibit number

      twenty-four, is that correct?

A.    Yes, sir.

Q.    Is that  a certified copy of  the registration

      for   the  vehicle,  the   Nissan  truck,  the

      photograph that we just introduced?

A.    Yes, sir, it is.

Q.    Is  it certified  as true  and correct  by the

155

Probate Judge's Office in Lafayette?

A.    Yes, it is.


        MR. ABBETT:  Your Honor, we offer State's

exhibit number twenty-four.

        THE COURT:  Admitted.


                    (Whereupon,    the    instrument

                    hereinabove  referred   to  and

                    marked   for  identification  as

                    State's exhibit number   twenty-

                    four was  admitted and received

                    into evidence.)


        MR.  ABBETT:   Your Honor,  that's all  I

have of Detective Register at this time.   I'm

planning   to  recall   him  later   for  some

additional testimony.

        THE COURT:  Cross examination.

156

## CROSS EXAMINATION

BY MR. GILLENWATERS:

Q.    Detective you said you arrived on the scene

around 1:30, is that correct?

A.    Yes, sir, that's right.

Q.    All right. Where did you go?

A.    I went to this area right here. I came down

Armstrong to Thatch and pulled in here.  I was

contacted by radio and advised where Officer

Boteet was in reference to recovering this

money.  And I went there to recover and

photograph that money.

Q.    All right.  And did you see Rodrigues Huguley

there?

A.    No, he was not at that location.

Q.    He was not there.  Where was he at at this

time?

A.    Actually, it's actually very close to where he

157

was at but it's just that you had to, you go,
there's some steps located right here and

it's, like earlier testified, it's about
twenty feet from this parking lot down to this

area where this money was recovered. So an
individual would have to walk up some steps

and when I got up to the parking lot he was
still there with Officer Hillyer.

Q. All right. So he was with Officer Hillyer at
the time at 1:30, is that correct?

A. I believe so.

Q. All right. Was he in a police vehicle at that
time or --

A. I believe he was seated in the back seat of
Officer Hillyer's vehicle with the door open,
I believe.

Q. And was Officer Hillyer questioning him at
that time?

A. No, sir, not at the time.

158

Q.   He wasn't discussing anything with him?

A.   I believe Officer Hillyer indicated he had

     discussed, he advised Mr. Huguley of his

     rights prior to me arriving there.

Q.   So you understand that Officer Hillyer did

     this, is that correct?

A.   Advised him of his rights?

Q.   Yes.

A.   Yes, sir, on the scene he did.

Q.   Now, you said you went to Lafayette around

     five o'clock, is that correct?

A.   I believe it was sometime around five.

Q.   All right.  And Mr. Huguley's vehicle was

     there in Lafayette, is that correct?

A.   Yes, sir.

Q.   All right.  And that's how you got that

     picture, is that correct?

A.   Correct.

Q.   All right.  And I believe that you said that

159

you came up with a total of $262.00?

A.   That's what I was able to recover.

Q.   And  that  there  was  $20.00  inside  an  air
conditioner?

A.   Correct.

Q.   Now,  you  were here  when  the  night auditor

testified  that  $259.00  was  taken,  is that
correct?

A.   Yes, sir.

Q.   Plus  $10.00  of  Rodrigues'  money  was  also

taken, is that correct?

A.   I believe that's what he said.

Q.   So he said there was a total of $269.00 taken?

A.   If  you add it up  I believe that was what  it

would be, yes, sir.

Q.   All right.  And you only recovered two  sixty-

two plus twenty inside an air conditioner --

A.   Correct.

Q.   -- is that correct?

160

A.    Correct.

Q.    Did you go back to the hotel?

A.    No, sir, I did not.

Q.    You didn't take the pictures there at the hotel?

A.    No, Sgt. Ramsey took those photographs.

Q.    You didn't take any pictures at the hotel?

A.    No, sir, I didn't.

Q.    Did you interview Barry Carpenter?

A.    No, sir, I did not.

Q.    Okay. And you did say that you had submitted the gun to the forensic lab to try to find fingerprints, is that correct?

A.    To ABI.

Q.    To the ABI?

A.    Yes.

Q.    Okay. And it's fair to say that you did not find any fingerprints on that gun that matched Mr. Huguley's, did you?

161

A.    The report said that there were no usable
latent prints.

Q.    All right.   And you submitted the mask also,
is that correct?

A.    No, sir, I've maintained the mask since that
night.

Q.    All right.  You didn't submit the mask to see
if there were any hair or fibers or such as
that?

A.    No, sir.

Q.    Okay.  So the only evidence that you submitted
to any lab for any testing was the gun itself,
is that correct?

A.    That's correct.

Q.    And you said that they were unable to make any
fingerprints matches, is that correct?

A.    Correct.

Q.    Thank you, sir.

162

THE    COURT:    Anything    else    of    this    witness?

MR.    ABBETT:    That's all    at this    time,    Your Honor.

THE COURT:  You can step down.


(Witness excused.)


THE COURT:  We'll take our mid    afternoon    recess at    this    time, ladies    and    gentlemen.

The    Bailiff will take    you downstairs.  Ya'll    can get a coke, coffee, whatever you want    and    we'll come back    in about fifteen minutes    and    start again.


(Whereupon, proceedings were in    a brief recess, after which the    following occurred, to-wit:)

163

THE COURT: Ya'll ready?

MR. GILLENWATERS: Yes, sir.

(Whereupon, the jury returned to the courtroom and the following proceedings were had in their presence and hearing, to-wit:)

THE COURT: Call your next witness.

MR. ABBETT:   Call Billy Ramsey.   Sgt. William Ramsey.

## WILLIAM RAMSEY,

a witness, having first been duly sworn to speak the truth, the whole truth and nothing but the truth, was examined and testified as follows, to-wit:

164

## DIRECT EXAMINATION

BY MR. ABBETT:

Q.   State your name for the jury please.

A.   William Ramsey.

Q.   Where are you employed?

A.   The City of Auburn Police Department.

Q.   In what capacity?

A.   Detective Sergeant.

Q.   In that  capacity did  you participate  in the

     investigation  of the robbery  of the Heart of

     Auburn  Motel, Mr.  Harry  Carpenter, back  on

     July the 24th, 1995?

A.   Yes, sir, I did.

Q.   Specifically, Sgt. Ramsey, did you recover the

     gun and the ski mask?

A.   Yes, sir, I did.

Q.   Would you  point out on the  diagram where you

     recovered them, please?

165

I believe this is the motel area down here.

A.    This is the office at the hotel. You go back out the back parking lot and this is Gay Street, runs north and south. There's a small drive that connects the back of the hotel and there's an area of trees and it was on the second, the base of the second tree.

Q.    And did you take them into your care, custody and control, that is State's exhibits numbers eighteen and nineteen?

A.    Yes, sir, I did.

Q.    Did you turn them over in the same condition as when you picked them up from the ground there to Detective Paul Register?

A.    Yes, sir, I did.


         MR. ABBETT:    We offer eighteen and nineteen.

166

MR. GILLENWATERS:  No objection.

THE COURT:  Admitted.


(Whereupon,    the    instruments

hereinabove  referred  to  and

marked  for  identification  as

State's    exhibits    numbers

eighteen   and   nineteen   were

admitted   and   received   into

evidence.)


MR. ABBETT:  I  believe that's all,  Your

Honor.

THE COURT:  Cross.

MR. GILLENWATERS:  Yes,  sir.

167

## CROSS EXAMINATION

BY MR. GILLENWATERS:

Q.  Did you participate in questioning Mr. Buguley
    at all?

A.  I was  in and out  of the interview  room when
    Detective Register was questioning him.

Q.  All right.   And the questioning  occurred the
    next morning, is that correct?

A.  I --

Q.  Or that same morning, just later in the day?

A.  Yes.

Q.  Okay.  You said you were in and out?

A.  Yes.

Q.  Do you  ever recall going in  and thumping the
    table and telling him he could get twenty-five
    years for this?

A.  Thumping the table?

Q.  Yes.  Or telling  him he could get twenty-five

168

years?

A.    I don't recall that, no, sir.

Q.    You don't recall that?

      Thank you, sir.


      THE COURT:  Anything else?

      MR. ABBETT:  That's all.  Your Honor, we
ask that this officer be excused.  He's got a
dental appointment.

      THE COURT:  You're excused.  You may go.


      (Witness excused.)


      THE COURT:  Next witness.

      MR. ABBETT:  Call Officer Hillyer.


### JODIE HILLYER,

a witness, having first been duly sworn to speak

the truth, the whole truth and nothing but the

169

truth, was examined and testified as follows, to-wit:

### DIRECT EXAMINATION

BY MR. ABBETT:

Q.   State your name for the jury, please?

A.   Jodie Hillyer.

Q.   And where are you employed?

A.   City of Auburn Police Department.

Q.   In what capacity?

A.   As a patrol officer.

Q.   Were you so employed back on July the 24th, 1995?

A.   Yes, sir.

Q.   Were you in inform then as you are now?

A.   Yes, sir.

Q.   Did you respond to the robbery call at the Heart of Auburn Motel?

170

A.   Yes, sir.

Q.   Tell the ladies and gentlemen of the jury what

     you did in your own words.

A.   We responded immediately when the call went

     out.   I was approximately four blocks away

     from the hotel.   We responded to the parking

     lot.   I heard another officer say that he had

     spotted the suspect.   He described getting in

     a vehicle traveling northbound on Gay Street.

     Officer Mike Ricks was in a marked patrol

     unit.   He immediately notified dispatch and

     other officers that he was in pursuit.   I was

     able to follow in behind Officer Ricks

     approximately, I guess three hundred yards

     behind.   Observed the vehicle turning into a

     parking lot at Auburn United Methodist Church

     on Gay Street.   When I turned in the parking

     lot Officer Ricks was in foot pursuit of the

     subject from the vehicle.   I observed another

171

individual standing beside the driver's door.
The driver's door was open. By the time I
exited my vehicle Officer Ricks notified on
the radio that he had taken the subject into
custody and at that time I took the individual
standing beside the vehicle into custody also.

Q.  Was that the Defendant in this case --

A.  Yes, sir.

Q.  -- Rodrigues Huguley?

A.  Mr. Huguley, yes, sir.

Q.  You took him into custody?

A.  Yes, sir.

Q.  As he got out of the vehicle did he say
anything?

A.  Yes, sir. He pointed towards Officer Ricks
and the other subject and said there they go.

Q.  There they go?

A.  Yes, sir.

Q.  Okay. And after you took him into custody did

172

you advise him of his constitutional rights?

A.  Yes, sir, I did.

Q.  Okay. Did you advise him orally or did you use a written form?

A.  Orally from a card provided from the --

Q.  Have you got the card with you?

A.  Yes, sir.

Q.  Will you take it out please?

A.  (Witness complying. Okay. Do you want me to read it?

Q.  Yes, sir. Would you -- did you read from that card to the Defendant Huguley his rights?

A.  Yes, sir.

Q.  Would you read to the jury the rights that you read to him?

A.  Yes, sir. This is the adult statement of rights. It says before we ask you any questions you must understand your rights.

You have the right to remain silent. Anything

173

you say can be used against you in court.  You have the right to talk to a lawyer for  advice before we  ask you  any questions and  to have him  with  you  during  questioning.  If  you cannot afford a lawyer  one will be  appointed for you before  any questioning  if you  wish.

If  you decide to answer questions now without a lawyer present you will still have the right to stop  answering at anytime.  You also have the right  to stop answering at  anytime until you talk to a lawyer.  Do you understand  what I've read to you?

Q.    When you  asked him if he  understood what you had read to him did he reply to you?

A.    Yes, sir.

Q.    What did he say?

A.    He said yes, I want to cooperate.

Q.    He said yes, I want to cooperate?

A.    Yes sir.

175

Q.   Did he  say anything about anybody  pointing a
     gun at him?

A.   Yes, sir.

Q.   What exactly did he say?

A.   He said the guy  had a silver gun  and pointed
     it at me and made me let him in the car.

Q.   The guy had a silver gun and pointed it at him
     and made him let him in the car?

A.   Yes, sir.

Q.   You're sure about that?

A.   Yes, sir.

Q.   And he said he was car jacked?

A.   Yes, sir.

Q.   I believe that's all.


               THE COURT:  Cross examination.

176

## CROSS EXAMINATION

BY MR. GILLENWATERS:

Q.    Officer Hillyer, when you arrived at the scene you said he was standing by the vehicle, is that correct?

A.    Yes, sir.

Q.    Did he attempt to run in any way?

A.    Mr. Huguley, like I said, appeared to be watching Officer Ricks and he saw me pull up. He looked away from the vehicle and he looked back into the vehicle and I was able to contact him then.

Q.    Back into the vehicle? You mean he looked back into his vehicle?

A.    Yes, sir. He was, the door was open and he was standing in the open door.

Q.    Okay.

A.    To the side of the vehicle.

177

Q.   The diagram behind you has Officer Ricks' car
     directly behind --

A.   Yes, sir.

Q.   -- the car.

A.   Right.

Q.   Where did you pull up to, sir?

A.   Directly behind Officer Ricks.

Q.   All right.  And I assume you were off Gay
     Street, is that correct?

A.   Yes, sir, that's not to scale.

Q.   All right.  And you said he was standing by
     the driver's side?

A.   Yes, sir.

Q.   Okay.  And he made a statement as to what
     direction Officer Ricks and the other
     individual went, is that correct?

A.   Yes, sir.  He pointed at them.  I could still
     see them.

Q.   You could see them, is that correct?

178

A.    Yes, sir.

Q.    Is this a well lit area?

A.    Yes, sir. It's a, it's a, I guess a student center and it's well lit twenty-four hours -- well, when it's dark.

Q.    All right. And you said you saw the vehicle pull in off of Gay Street with Officer Ricks' patrol car behind it, is that correct?

A.    Yes, sir.

Q.    Did you see the vehicle prior to that time?

A.    Well, from, I guess from Thatch northbound into the lot was when I --

Q.    All right.

A.    -- saw the vehicle.

Q.    So you saw it for approximately a block then, is that correct?

A.    It's a half a block, I guess.

Q.    All right. Did you see it, the red light there?

179

A.   At Thatch?

Q.   Yes.

A.   Yes, sir.

Q.   Did the vehicle slow down or stop at Thatch at

     the red light?

A.   It was in, it was in the intersection when  I

     saw it and Officer Ricks' emergency equipment

     was activated and like I say I was about three

     hundred yards behind.  I couldn't tell.

Q.   All right.  You couldn't tell if the red light

     --

A.   I couldn't tell if it  had broken the plane of

     the intersection in relation to the light.

Q.   Did you, could you see if the car was, and the

     car that I mean is the one Mr. Huguley was in,

     was it  speeding up, slowing down  or what was

     this car's activities?

A.   The  vehicle, when it  was northbound  when it

     turned into the parking lot  was at a, I would

100

say higher  than normal  rate of  speed, which
was a posted twenty-five.

Q.   All right.   So  you believe that  the vehicle
was  going  faster  than  twenty-five  in that

block?

A.   Yes, sir.

Q.   As you saw it?

Did  you ever  see it  stop or  slow down

during that block that you saw it?

A.   The half  of block from Thatch  to the parking

lot, no, sir.

Q.   All  right.   You  didn't  see  it, its  brake

lights come on three or four times?

A.   Sir, I, again I couldn't see his brake lights.

Q.   You couldn't see --

A.   Okay.   I  could, Officer  Ricks'  emergency

equipment was activated and  he was behind the
vehicle.

Q.   All right.

181

A.    I didn't see Officer Ricks' brake light.

Q.    All right.  You didn't see his brake lights?

A.    No, sir.

Q.    And he was in direct pursuit of the vehicle --

A.    Yes, sir.

Q.    -- is that correct?

      All right.  Could you see the vehicle in
front of Officer Ricks?

A.    Yes, sir, I could see a vehicle.

Q.    All right.  Could you see the passenger side
door?

A.    No, sir.

Q.    Were you by yourself?

A.    Yes, sir.

Q.    All right.  Did you at anytime see any of the
doors on this vehicle open?

A.    No, sir, I didn't.

Q.    Okay.  Is there street lights out there?

A.    Yes, sir.

182

Q.  Okay.  And like you said the parking lot is
    fairly well lit too, is that correct?

A.  Yes, sir.

Q.  All right.  Now, Mr. Huguley did not try to
    run, did he?

A.  No, sir.

Q.  You said you read him his rights and he said
    he would be cooperative, is that correct?

A.  Yes, sir.

Q.  He said he was there when the place was
    robbed, is that correct?

A.  Yes, sir.

Q.  Did he seem upset?

A.  Yes, sir.

Q.  Was he nervous?

A.  Yes, sir.

Q.  Okay.  How long did you talk with him?

A.  I mirandized him, he made statements to me, I
    didn't question Mr. Huguley.  And I placed him

183

in the back of my patrol unit with the windows
up and I shut the door and didn't talk with
him.

Q. How long a period of time was that?

A. Two to three minutes.

Q. Two to three minutes. Did you advise him he
was under arrest?

A. Sir?

Q. Did you advise him he was under arrest?

A. No, sir, I didn't specifically state you're
under arrest.

Q. All right. But you read him his Miranda rights
and he wasn't under arrest then, is that
correct?

A. No, sir, that's not what I said. I said I
didn't advise him that he was under arrest.

Q. All right. Did you handcuff him?

A. Yes, sir.

Q. And you placed him in the back of the vehicle,

184

is that correct?

A.    Yes, sir.

Q.    All right.    By that time had Officer Ricks come back with Dewayne Clark?

A.    Yes, sir.

Q.    Was Dewayne Clark placed in the same vehicle or different vehicle?

A.    No, sir.  Different vehicle.

Q.    Okay.  And they were transported to the Auburn Police Department, is that correct?

A.    Yes, sir.

Q.    All right.    Now where is the Auburn Police Department in relation to the Methodist Church parking lot there?

A.    If you exit the Methodist Church parking lot turn north, the next intersection would be Magnolia, you would turn east on Magnolia and travel two blocks and it's right on the next corner.

135

Q.    All right.   So if you were   leaving the hotel
      and were  going to the   police department that

      would  be  the   correct route  to  the  Auburn
      Police Department, is that not correct?

A.    Yes, sir, that would be one way.

Q.    Well, closest?

A.    Yes, sir, that's a route  you can take to  get
      to the police department?

A.    All right.  Thank you, sir.


          THE COURT:  Other questions?

          MR.  ABBETT:   Yes, sir,  just  a couple,

      Officer Hillyer.


                    REDIRECT EXAMINATION


BY MR. ABBETT:

Q.    When you pulled up there you were right behind

      Officer Ricks, weren't you?

186

A.    I was, when they initially pulled into the parking lot they were out of my sight due to the cleaners.

Q.    You pulled up right after he did?

A.    Yes, sir.  Yes, sir.

Q.    The Defendant, this Defendant Huguley was just getting out of the car as you pulled up?

A.    Yes, sir, he was stepping out.

Q.    When you got out of your car you were armed, you're a police officer and you were armed, weren't you?

A.    Yes, sir.

Q.    Did you have your gun out?

A.    Not when I initially exited the car.

Q.    All right.  Did you take your gun out?

A.    Yes, sir, I did.

Q.    Did you point it at him?

A.    No, sir, I didn't.

Q.    You had it out in your hand?

187

A.   Yes, sir.

Q.   Okay.   Because you were after armed robbery

     suspects?

A.   Yes, sir, due to the nature of the call I had

     it.

Q.   That's all.


## RECROSS EXAMINATION


BY MR. GILLENWATERS:

Q.   Did you tell  Mr. Huguley to  get back in  the

     vehicle?

A.   No,  sir.  Actually I  told him to  get on the

     ground.

Q.   To get on the ground?

A.   Yes, sir.

Q.   Did he get on the ground?

A.   Yes, sir.

Q.   Did you search him?

188

A.   Yes, sir, after he was handcuffed.

Q.   All right.  Did you find any monies?

A.   No, sir.

Q.   Did you find a gun or a weapon of any kind?

A.   No, sir.

Q.   What did you find on Mr. Huguley's person?

A.   A wallet with identification.

Q.   A wallet with identification?

A.   Yes, sir.

Q.   Was that his driver's license?

A.   His driver's license and  I believe it was his
     cousin's or his brother's driver's license.

Q.   Did he have any money?

A.   Not that I recall.

Q.   No money at all?

A.   No, sir, not that I recall.

Q.   Did he have any credit cards?

A.   Yes, sir, he did.

Q.   Do  you know  whose names  those  credit cards

189

were in?

A.   Rodrigues Huguley, the one that I remember

     seeing.  I'm not --

Q.   So he had a credit card in his name?

A.   I'm not sure, credit card, phone card, it was

     something of that nature.

Q.   Did he have an American Express, Mastercard?

A.   I don't recall that. There was some sort of a

     credit card or something.

Q.   But you do recall some Mastercards?

A.   When I say credit cards I just want to clarify

     myself, possibly a South Central Bell phone

     card, something of that nature.

Q.   All right.  You recall that one but do you

     recall a Mastercard?

A.   No, sir, that's what --

Q.   You don't recall that?

A.   No, sir.

Q.   Okay.  Did you take an inventory --

190

MR. ABBETT:   Your  Honor, I object.   It
has  to  have  some  relevance  to  this  case
whether he has a Mastercard or not.

THE COURT:  It's been asked  three times,
I'll sustain on the grounds of repetition.


Q.   Did you take an inventory of his possessions?

A.   No, sir.

Q.   You did not.

          Isn't that  standard  procedure to  do an

inventory of --

A.   Yes, sir, not by me.

Q.   Do you know if anybody did that?

A.   No, sir, I don't.

Q.   But  that  is  standard  procedure  of  Auburn
Police Department?

A.   Once a  subject is  placed under  arrest, yes,
sir.

Q.   Okay.  So there should  be an inventory of his

191

possessions, is that not correct?

A.    Yes, sir, in the jail.

Q.    If standard procedure was followed?

A.    Yes, sir.  As far as I know.

Q.    Thank you.


## FURTHER REDIRECT EXAMINATION


BY MR. ABBETT:

Q.    Did I  understand you correctly to  say he had

someone's driver's license other than his own?

A.    Yes, sir, he  did.  It was  a driver's license

without a photograph on it.

Q.    A driver's license without a photograph?

A.    Yes, sir.

Q.    It wasn't in his name?

A.    No, sir.  He,  I don't remember if he  said it

was his  brother or  cousin  that was  in  the

military.

192

Q.   That's all.


        THE   COURT:     Anything  else   of   this

witness?

        MR. GILLENWATERS:  No, sir.

        THE COURT:   You can step  down.   You're

excused.


                (Witness excused.)


        THE COURT:  Next witness.

        MR. ABBETT:  Call Billy Asberry.


                **VOLUME ONE CONCLUDED**

193

# C E R T I F I C A T E

STATE OF ALABAMA          )

LEE COUNTY                )


I, Willie T. Bennett, Official Court Reporter
at Opelika, Alabama, do hereby certify that I
reported in shorthand the proceedings and testimony
in the foregoing styled cause at the time and place
stated in the caption hereof; that I later reduced
my shorthand notes to typewriting; or the same was
done under my supervision; that the foregoing pages
beginning with the word "Proceedings", where the
same appears in the center of the page, following
the style of the case, the caption and the
appearances, contain a full, true and correct
transcript of VOLUME ONE of the proceedings and
testimony as therein set out.

I FURTHER CERTIFY that I have placed in the
Court File all of the exhibits offered in said

194

trial in the order offered, which fact is certified to the Clerk of the Court.

I FURTHER CERTIFY that I have on this date notified counsel for the parties of the filing of this transcript in the Office of the Clerk of the 37th Judicial Circuit of Alabama, Law Division.

THIS ___18ᵗʰ___ day of February, 1996.

William T. Bernard

OFFICIAL COURT REPORTER

FILED

MAR 18 1996

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK