COURT OF CRIMINAL APPEALS NO._____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

## FROM

### CIRCUIT COURT OF ____LEE____ COUNTY, ALABAMA

CIRCUIT COURT NO.   CC 95 741_____

CIRCUIT JUDGE   HON ROBERT M HARPER_____

Type of Conviction / Order Appealed From:   ROBBERY I_____

Sentence Imposed:   22 YEARS IN PENITENTIARY AND COSTS_____

Defendant Indigent:   ☐ YES   ☒ NO

RODRIQUES G HUGULEY_____

**NAME OF APPELLANT**

CHARLES S CONLEY_____
(Appellant's Attorney)                    (Telephone No.)
315 SOUTH BAINBRIDGE ST_____
(Address)
MONTGOMERY        AL      36104_____
(City)            (State)            (Zip Code)

**V.**

## STATE OF ALABAMA_____

(State represented by Attorney General)
**NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.**

_____

_____

(For Court of Criminal Appeals Use Only)



I N D E X

CASE ACTION SUMMARY ------------------------------------------------ 002

INDICTMENT ------------------------------------------------------- 005

DISCOVERY ORDER -------------------------------------------------- 006

REQUEST OF DEFENDANT FOR PRODUCTION BY STATE --------------------- 007

MOTION FOR CONTINUANCE ------------------------------------------- 010

WRITTEN REQUEST FOR DISCOVERY ------------------------------------ 012

STRIKE LIST ------------------------------------------------------ 013

DEFENDANT'S REQUESTED JURY CHARGE #1 ----------------------------- 016

LIST OF ADMITTED EVIDENCE ---------------------------------------- 017

STATE'S EXHIBIT NO. 1 - NO. 27 ----------------------------------- 018

ORDER ------------------------------------------------------------ 045

MOTION FOR NEW TRIAL --------------------------------------------- 046

ORDER ------------------------------------------------------------ 048

NOTICE OF APPEAL ------------------------------------------------- 049

MOTION FOR EXTENSION OF TIME ------------------------------------- 051

CLERK'S CERTIFICATE OF COMPLETION -------------------------------- 052

ACS0370   A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CIRCUIT CRIMINAL         CASE: CC 95 000741.00

JUDGE: RMH

THE CIRCUIT COURT OF        LEE    COUNTY
ST.TE OF ALABAMA                VS       HUGULEY RODRIGUES G
                                         7308 CO RD 82
CASE: CC 95 000741.00
                                         LANETT, AL  36863 0000

DOB: 07/06/77  RACE: B  SEX:  M        HT:  0 00  WT: 000  HR:        EYE:
SSN: 257332906   ALIAS NAMES:

CHARGE1: ROBBERY 1ST                  CODE1: ROB1 LIT: ROBBERY I        TYPE: F
CHARGE2:                              CODE2:                           TYPE:
CHARGE3:                              CODE3:                           TYPE:
MORE?:          OFFENSE DATE:         AGENCY/OFFICER: MAPD    REGISTE

DATE WAR/CAP ISS:                     DATE ARRESTED: 07/24/95
DATE    INDICTED: 07/28/95            DATE    FILED: 08/02/95
DATE    RELEASED:                     DATE  HEARING:
        BOND AMOUNT:    $100,000.00             SURETIES:

DATE 1: 08/10/95 DESC:  ARRG          TIME:  0900 A
DATE 2: 08/25/95 DESC:  TRAL          TIME:  0900 A

DEF/ATY: Gillenwaters,      ~R        TYPE:                       TYPE:
PROSECUTOR: MYERS, RONALD L

OTH CSE: 0000000000      CHK/TICKET NO:                    GRAND JURY: 245
COURT REPORTER                SID NO: 000000000
DEF STATUS: BOND         DEMAND:                           OPID: LEW

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|---|---|
| 8-2-95 | DISCOVERY ORDER |
| 8-4-95 | NOTICE OF ARRAIGNMENT TO DEFENDANT AND SURETIES |
| 8-10-95 | On this day the defendant, with his attorney, Hon. _____ makes application for Youthful Offender Treatment. Hearing on said application is hereby set for _August 11_, 19_95_, at _9:00_ A. M. |
| | |
| 8-11-95 | After investigation and examination of the defendant by this Court, defendant's application of Youthful Offender Treatment is hereby _denied_. |
| | The Defendant in open court accompanied by attorney of record, and being duly arraigned does plead not guilty. The Defendant is granted five (5) days to file motions or special pleas. This case is set for trial on the _25_ day of _August_, 19_95_, at _9:00_ A.M. Pending trial, defendant is remanded to jail/released on present bond. |
| 8-11-95 | Motion for Continuance |
| 8-11-95 | Request of Defendant for Production by State |
| 8-15-95 | STATE'S MOTION FOR DISCOVERY |

| State of Alabama<br>Unified Judicial System<br><br>Form C-7 Rev 2/79 | CASE ACTION SUMMARY<br>CONTINUATION | Case Number<br><br>CC 95-741<br><br>ID    YR    Number |
|---|---|---|

**Style:**  State v. Rodriques G. Huguley        Page Number ____ of ____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 8-29-95 | Defendant having been arraigned upon an indictment on a charge of Robbery I and having plead not guilty, issue joined on said plea. Trial of this cause was conducted on the ___29th___ day of ___August___, 19 95, said jurors do say:<br><br>We, the jury, find the Defendant, Rodriques Huguley, guilty of Robbery I as charged in the indictment.<br>Kyle R. Hildreth, Foreman<br><br>It is the judgment of the Court that Defendant is guilty and sentencing hearing is set for October 26, 1995, at 8:00 A.M.  Defendant is remanded to jail until date of such hearing.<br><br>FILED SEP 05 '95 IN OFFICE |
| 9-28-95 | Order that the hearing in this case is continued to November 2, 1995, at 8:00 a. |
| 11/2/95 | Defendant's Application for Probation is denied.<br><br>It is the sentence of the Court that the Defendant be imprisoned in the penitentiary of the State of Alabama for a term of ___2-2___ years on which he is given credit for ___6 00___ days in pretrial confinement; pay a fine in the amount of $_____; pay court costs; reimburse fees for court-appointed counsel in the amount of $_____; pay restitution of $_____ to the Circuit Clerk; pay a Victim Compensation Assessment (Section 15-23-17) in the amount of $ ___50.00___.  All payments shall be paid by $50.00 per month as a condition of release at time of release.<br><br>THIS DEFENDANT IS NOT ELIGIBLE FOR CLASS I STATUS UNDER SECTION 14-9-41, CODE OF ALABAMA 1975.  THIS OFFENSE DID/DID NOT OCCUR ON OR AFTER MAY 19, 1980.<br>FILED NOV 07 '95 IN OFFICE |
| 11-8-95 | Prison transcript |
| 11-13-95 | Motion for New Trial |
| 11-16-95 | Order Denying Motion for New Trial |
|  | C    104 |
| 12-27-95 | Notice of Appeal |
| 12-27-95 | Notice of Appeal to the Alabama Court of Criminal Appeals |
| 1-11-96 | Docketing Statement -- Reporter's Transcript order |

State of Alabama
Unified Judicial System

Form C-7 Rev. 2/79

CASE ACTION SUMMARY
CONTINUATION

Case Number

CC95-741
IO   YR   Number

Style:
State vs. Rodriques G. Huguley                    Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|------|-------------------------------|
| 3-15-96 | Motion for Extension of Time -- Order Granting 28 day extension. |

VOL 059 PAGE 15

INDICTMENT

CC95-741

# THE STATE OF ALABAMA, LEE COUNTY

Circuit Court, _____ Summer _____ Term, 19 95 _____

The Grand Jury of said County charge that before the finding of this Indictment _____

Rodrigues G. Huguley, alias Rodregues Gomez Huguley, alias Rock, alias Dokie, whose true christian name is otherwise unknown to the Grand Jury, did, in the course of committing a theft of lawful paper currency of the United States of America, the exact denominations of which are unknown to the Grand Jury, the property of Heart of Auburn Motel Corporation, a corporation, use force or threaten the imminent use of force against the person of Harry Carpenter, with intent to overcome his physical resistance or physical power of resistance or to compel acquiescence to the taking of or escaping with the said property, while the said Rodrigues G. Huguley, or another participant, to-wit: Dewayne P. Clark, alias, was armed with a deadly weapon or dangerous instrument, to-wit: a pistol, in violation of §13A-8-41 of the Code of Alabama,

against the peace and dignity of the State of Alabama.

_____
District Attorney of the 37th Judicial Circuit

Sec. 15-8-150, Code 1975.

SID#

D0A  07/24/95

No. __CC95-741__

# THE STATE OF ALABAMA
## LEE COUNTY
### CIRCUIT COURT

Summer _____ Term, 19 _95_

THE STATE
vs.

Rodrigues G. Huguley, alias

Rodregues Gomez Huguley, alias

Rock, alias

Ookie

## INDICTMENT

Robbery First Degree

§13A-8-41

No Prosecutor

### WITNESSES:
Cpl. Paul Register, APD
Sgt. William Ramsey, APD
Off. M.K Horne, APD
Off. M.L. Ricks, APD
Off. J.H. Hillyer, APD
Off. Brian Boetig, APD
Ken Wesson, c/o Heart of Auburn,
Billy Asberry, 106 2nd St., NE Lafayette, AL
Harry Carpenter, 233 W. Glenn Ave, Apt #10, Auburn, AL
Beth Fisk, 314 S. Lafayette St., Lafayette, AL
Dewayne Clakrk, 1366 County Rd 261, 343 South College St., Auburn, AL
Five Pts., AL

Sec. 15-8-70, Code 1975.

Grand Jury No. ___245___

A TRUE BILL

_____
Foreman Grand Jury

Filed in open Court on the 28th day of July, 19 95
in the presence of the Grand Jury.
_____ Clerk

Presented to the presiding Judge in open Court by the Foreman of the Grand Jury, in the presence of ___17___ other Grand Jurors, and filed by order of Court this 28th day of July, 19 95
_____ Clerk

Bailfixed at $ 100,000.00
this 1st day of Aug, 19 95
_____ Judge Presiding

**HARPER**

## THE STATE OF ALABAMA
COUNTY

Circuit Court, _____ Term, 19 __

To the Sheriff of said County:

I hereby certify that this is a true and complete copy of the Indictment presented to the Court by the Grand Jury of said County.

against _____

charged with _____ together with all endorsements on said Indictment, and that the trial is set for _____

19 ___, and you will serve this copy of the indictment on _____

or _____ his counsel.

Witness my hand, this ___, 19 ___
_____ Clerk

I hereby certify that I have received above stated copy of Indictment from the Circuit Court Clerk of said County, and served same on _____ at ___ o'clock ___ M., ___ 19
_____, Sheriff
_____, D.S.

006

IN THE CIRCUIT COURT OF LEE COUNTY, ALABAMA

STATE OF ALABAMA.,                          *
                                            *
v.                                          *    CASE NO. CC  95 741
                                            *
 Rodrigues G Huguley             ,          *
        Defendant.                          *

### DISCOVERY ORDER

The State and Defense are hereby ordered to comply with the Discovery provisions as set forth in Rule 16, Alabama Rules of Criminal Procedure, without necessity for the filing of specific discovery motions as follows:

1. Upon written request of either the State or Defense, directed to the other, the parties shall make available to each other all Discovery as provided in Rule 16.

2. Said written requests shall be served on the opposing party, and a copy filed with the Circuit Clerk, a reasonable time prior to the scheduled trial of this case.

3. Upon receipt of such written request, the party upon whom such request is made shall comply with same a reasonable time prior to the scheduled trial of this case.

4. Any disagreements between the parties concerning the discovery matters are to be submitted to the Court for resolution upon written motion of either party a reasonable time prior to trial.

Done and Ordered this 2nd day of August , 19 95 .


James T. Gullage, Circuit Judge          Robert M. Harper, Circuit Judge

IN THE CIRCUIT COURT OF LEE COUNTY
AT OPELIKA, ALABAMA

FILED
AUG 1 1 1995

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

| | | |
|---|---|---|
| STATE OF ALABAMA | ) | |
| | ) | |
| VS. | ) | CASE NO. CC-95-741 |
| | ) | |
| RODRIQUES HUGULEY | ) | |
| DEFENDANT | ) | |

## REQUEST OF DEFENDANT FOR PRODUCTION BY STATE

Defendant, RODRIQUES HUGULEY, hereby requests the State of Alabama:

1.    To produce and permit the defendant to inspect and copy any written or recorded statements made by the defendant to any law enforcement officer, official or employee which are within the possession, custody, or control of the State of Alabama, the existence of which is known to the district attorney.

2.    To produce and permit the defendant to inspect and copy any written or recorded statements made by a co-defendant or accomplice, which is in the possession, custody or control of the State, the existence of which is known to the district attorney and which the State intends to offer into evidence at trial.

3.    To disclose the defendant the substance of any oral statement made by the defendant before or after to any law enforcement officer, official or employee which the State intends to offer into evidence at trial.

4.    To disclose to the defendant the substance of any oral statements made by a co-defendant or accomplice before or after arrest to a law enforcement officer, official or employee, which the State intends to offer into evidence.

5.    To produce and to permit the defendant to analyze, inspeect, and copy or photograph each of the following which are within the possession, custoody or control of the State and which are material to the defendant's defense:   boooks, documents, photographs, objects, and controlled substances.

6    To produce and to permit the defendant to analyze, inspeect, and copy or photograph each of the following which re within the possession, custoody or control of the State and which are intended for use by the State as evidence at trial:   books, documents, photographs, objects, and controlled substances.

7.    To produce and to permit the defendant to analyze, inspeect, and copy or photograph each of the following which re within the possession, custoody or control of the State and which were obtained from or belonged to the defendant:   boooks, documents, photographs, objects, and controlled substances.

8.    To produce and permit the defendant to inspect and copyy the names and addresses of qualified mental health professionals who have personailliy examined the defendant or any evidence in this case.

9.    To provide and permit the defendant to inspect and copyy the following results or reports made in connection with this case, which are withimn the possession, custody or control of the State, and whose existence is known to the district attorney: Physical or mental examinations and scientific tests, experiments or comparisons, including all written reports or statements made by an appointeed mental health professional in connection with the case.

10.    To permit the defendant to enter _____

_____.

Inspection of these premises and objects is requested because they are material to the preparation of the defendant's defense or are intended for use by the State as evidence at trial.

DONE this the 10th day of August, 1995.

Respectfully submitted,

CHARLES R. GILLENWATERS - GIL002
Attorney for Defendant

Counsel's Address:

126 Marshall Street
Alexander City, AL 35010
(205) 234-5018

## Certificate of Service

I hereby certify that I have served a copy of the foregoing document on each of the following by sending a copy of same by first class U.S. Mail, postage prepaid and properly addressed to: RON MYER, DISTRICT ATTORNEY FOR LEE COUNTY, BOX 2524, OPELIKA, ALABAMA 36803, on this the 10th day of August, 1995.

Of Counsel

010

IN THE CIRCUIT COURT OF LEE COUNTY
AT OPELIKA

F I L E D

STATE OF ALABAMA,                    )
                                     )          AUG 1 1 1995
        Plaintiff,                   )
                                     )             IN OFFICE
                                     )        CORINNE T. HURST
VS.                                  )          CIRCUIT CLERK
                                     )
                                     )          CASE NO: CC-95-741
RODRIQUES HUGULEY,                   )
                                     )
        Defendant.                   )

## MOTION FOR CONTINUANCE

COMES NOW Charles R. Gillenwaters, Attorney for the Defendant, RODRIQUES HUGULEY, and respectfully request a Continuance in the above-styled matter. In support of said Motion, the Defendant offers the following:

1. Defendant's attorney, Charles R. Gillenwaters, has a previously scheduled capital murder trial, State v. Shontai Smith, in Dadeville, Alabama, before Judge Dale Segrest, scheduled the week of August 28, 1995.

2. Further, the alleged incident occurred on July 25, 1995, and the Defendant was arrested that same time.

3. Defendant's attorney has not had sufficient time between the incident and date trial is set to investigate the case and properly prepare for trial, particularly in light of the fact he has to represent another defendant in the capital murder case.

DONE this the 11th day of August, 1995.

Charles R. Gillenwaters - GIL002
Attorney for Defendant

Counsel's Address:

126 Marshall Street
Alexander City, Alabama  35010
205-234-5018

<u>Certificate of  Service</u>

    I hereby certify that I have served a copy of the foregoing document on Ron
Myer, District Attorney for Lee County, Box 2524, Opelika, Alabama 36803, by
sending a copy of same by first class U.S. Mail, postage prepaid on this the 11th
day of August, 1995.

Of Counsel

STATE OF ALABAMA,                         *          IN THE CIRCUIT COURT
                                          *
              PLAINTIFF,                  *          LEE COUNTY, ALABAMA
                                          *
       VS.                                *
                                          *
Rodrigues G. Huguley, alias              *
                                          *
              DEFENDANT.                   *          CASE NO. CC-95-741

### WRITTEN REQUEST FOR DISCOVERY

       COMES NOW, the State of Alabama, by and through its Chief
Assistant District Attorney, Nick Abbett, and by this document,
makes written request of the defendant for all items of discovery
as provided by Alabama Rules of Criminal Procedures, Rule 16.
       DONE this date, August 15, 1995.

                              _____
                              Nick Abbett
                              Chief Assistant District Attorney

### CERTIFICATE OF SERVICE

       I hereby certify that I have served a copy of the
foregoing Written Request for Discovery upon the attorney for the
defendant, Rodrigues G. Huguley, alias, that being the Honorable
Charles Gillenwaters, 103 Marshall St., Alex City, AL 35010, by
placing a copy of the same in the U. S. Mail postage prepaid, on
this the 15th day of August, 1995.

                              _____
                              Nick Abbett
                              Chief Assistant District Attorney

FILED
AUG 1 5 1995
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

STRIKE LIST

For the Week of <u>August 28, 1995</u>                    i    013

1. Joseph M. Aderholdt D
2. William W. Arthur S
~~Vernon A. Brady~~
~~Gregory Ray Brooks~~
5. Gary D. Burch S
6. Scott J. Chandler S
7. Dennis L. Collier excused
~~George Cumberledge, Sr.~~
~~Michael A. Cook~~
~~James Christopher Cummins~~
~~Danny Wayne Deese~~
~~Ollie M. Edwards~~
13. Bill English, Jr.
14. Mark Ferguson
15. Ellis M. Fetner
~~William R. Fields~~
~~Gary Michael Green~~
~~Kenneth Wayne Green~~
19. Ronald Greer excused
~~Donald Wayne Griffith~~
~~Robert Don Haynes~~
~~William George Heard~~
~~John Michael Heard~~
24. Kyle R. Hildreth
25. Derek J. Howard S
~~James Eric Hubbard~~
~~Barry D. Jones, II~~
~~William George Lamberson~~

30. Toni L. Lazzara
~~James L. Livingston~~
32. Robert F. Lumpkin, Sr. D
33. Zanetta O. McCoy
34. Stephen L. McFarland excused
~~William L. McDonald~~
36. Cheryl E. Morgan
~~James Jeffrey Morgan~~
~~Jimmy Dale Owens~~
~~Thomas Charles Perry~~
41. Walter L. Pierce
~~Robert Allen Rogers, Jr.~~
~~Timothy J. Pritchard~~
~~Gregory Paul Rudder~~
~~Andrew H. Sanders~~
46. Michael D. Schnatterly D
47. Wayne Shell D
50. Virgil A. Spratlin
51. Elijah E. Stokley, Jr. D
52. Donald R. Street S
53. Steven S. Sykes S
~~George James Teeter~~
55. Brittany R. Turvey
56. Darcy W. Wernette D
58. Cathy P. Wright
59. Mark A. Yancey

8/28/95
State of Alabama v. Rodriquez G. Hingulay
CC 95-741  Robbery I

STRIKE LIST

For the Week of <u>August 28, 1995</u>

_(handwritten top right: 014)_

1. ~~Joseph H. Adewaldt~~
2. William W. Arthur
3. ~~Karen R. Brady~~
4. ~~Ervin R. Brown~~
5. ~~Gary O. Burch~~
6. ~~Scott J. Chandler~~
7. Dennis L. Collier *excused*
8. ~~Jerry A. Conn~~
9. ~~Dustin H. Cote~~
10. ~~Christina C. Cummins~~
11. ~~Helen J. Donald~~
12. ~~Olive J. Pierce~~
13. ~~Eddie Engeboldt, Jr.~~
14. ~~Mark Ferguson~~
15. ~~Billy H. Foster~~
16. ~~William P. Fuller~~
17. ~~Anna Jean Godwin~~
18. ~~Michael B. Gose~~
19. Ronald Greer *excused*
20. ~~Richard D. Guy~~
21. ~~Margie L. Harris~~
22. ~~Cathy Hawkins~~
23. Mary M. Heard
24. ~~Kyle R. Hffreth~~
25. ~~Derek J. Howard~~
26. ~~Fora Howell~~
27. ~~Barry D. Jones, II~~
28. ~~...~~
29. ~~Wilbur Lambert~~

30. ~~Joel Lacosta~~
31. ~~James D. Leonard~~
32. ~~Robert P. Lumpkin, Sr.~~
33. ~~Lawrence E. McCoy~~
34. ~~Stephen D. McFarland~~
35. ~~William R. McMillan~~
36. ~~Cheryl C. Morgan~~
37. ~~Joyce Newman~~
38. ~~Joyce Nix~~
39. ~~John D. Hofmann, Jr.~~
40. ~~Gloria A. Robins~~
41. ~~Anthony Pierce~~
42. ~~George A. Payson~~
43. ~~Albert A. Prescott, Jr.~~
44. ~~Timothy J. Priestland~~
45. Dorothy A. Quigley — S
46. Denise H. Rudder — D
47. ~~Robert C. Samac~~
48. ~~Michael D. Schwartz~~
49. ~~Wayne Street~~
50. ~~Gregory A. Sparklin~~
51. ~~Brian D. Stahlman, Jr.~~
52. ~~James A. Stewart~~
53. ~~Randy A. Taylor~~
54. ~~Jeff W. Thacker~~
55. ~~Brian L. Posey~~
56. ~~Jason J. Wanamaker~~
57. ~~Rebecca Wahlmar~~
58. ~~Cathy Wright~~
59. ~~Barbara Yancy~~

_(handwritten at bottom:)_

8/28/95

State of Ala. v. Radriguis G. Hunley

CC 95-741  Robbery I

82

## FURTHER REDIRECT EXAMINATION

BY MR. ABBETT:

Q.    Couldn't anybody identify him, could they?

A.    No, sir.

Q.    That's all.


            THE COURT:      Anything  else  of  this

witness?

            MR. ABBETT:  Just one other question.


Q.    This Defendant  didn't produce a  picture I.D.

      until you asked for it, did he?

A.    No, sir.

Q.    He first  produced an I.D. that  didn't have a

      picture, didn't he?

A.    Yes, sir.

Q.    That's all.

83

MR. GILLENWATERS: No further questions.

THE COURT: You're excused, you can step

down.


(Witness excused.)


THE COURT: Next witness.

MR. ABBETT: Your Honor, could he be

excused. He has to be, he worked last night

and he has to work --

THE COURT: I said he was excused. You

can go.

MR. ABBETT: Call Officer Horne.


MICHAEL K. HORNE,

a witness, after having first being first duly

sworn to speak the truth, the whole truth and

nothing but the truth, was examined and testified

as follows, to-wit:


### DIRECT EXAMINATION


BY MR. ABBETT:

Q.    Officer Horne, would   you  speak  into  the

      microphone and speak to the jury, please?

A.    Yes, sir.

Q.    I'm going to ask you some questions about what

      you were doing back on  July the 24th with the

      police department.

           Would you state your name, please?

A.    Michael Keith Horne.

Q.    And where are you employed?

A.    Auburn Police Department.

Q.    In what capacity?

A.    Patrolman.

Q.    And were  you in uniform  and on duty  back on

      the  early  morning  hours of  July  the 24th,

85

1995?

A.    Yes, sir.

Q.    Were you in a marked police car?

A.    Yes, sir.

Q.    Did you receive a radio dispatch about a
      robbery at the Heart of Auburn Motel?

A.    Yes, sir, I did.

Q.    Do you remember about what time it was when

      you received the radio dispatch?

A.    I believe the call came in at 00:55 hours so

      it would have been roughly before that or
      right after that.

Q.    Now when you say 00:55 hours, the jury may not
      --

A.    It's 12:55 a.m.

Q.    -- know about -- 12:55 a.m.?

A.    Yes, sir.

Q.    All right. What did you do when you received

      the radio dispatch about the robbery?

86

A.    I  proceeded to   the area   and began   to drive
      several   streets   in  that    general   vicinity

      looking for a possible suspect.

Q.    Where were   you   when you   first received   the

      radio dispatch?

A.    I   was   at Glendean   Drug Store   checking that

      business.

Q.    And how far   is Glendean Drug   Store from   the

      Heart of Auburn Motel?

A.    Two miles   maybe, something like that.    About

      two miles.

Q.    So you go directly toward the Heart of   Auburn

      Motel?

A.    No, sir, I   came, I   came down   Dean Road   and

      turned onto Thatch Avenue and began riding the

      side   streets   in   there,   Gay   Street, Reese,

      Casey and those different streets in there.

Q.    Okay.    Had you received a   description of the

      person   that committed   the robbery   over your

87

radio?

A.   Yes, sir, I did.

Q.   And had you received a description or a direction of travel when he, that he was leaving the motel after he committed the robbery?

A.   I don't believe so, not at that time, no, sir, but --

Q.   All right. Just tell the ladies and gentlemen of the jury in your own words what you did as you approached that area of Gay Street and the Heart of Auburn Motel.

A.   Okay.

Q.   And you can refer to the diagram that's up there that's State's exhibit number two.

A.   Yes, sir.

Q.   And I believe we've got a marker here, right here in front of you.

A.   Okay.

88

Q.   Point if you need to use that.

A.   All right.  Thank you.

         I  come down  Thatch  Avenue and  checked
     several streets in that general vicinity.

Q.   Okay.  Point out on the  diagram where Thatch
     Avenue is.

A.   This is Thatch right here.

Q.   Okay.

A.   Armstrong  is back up this way.  I had ridden
     in this general vicinity.

Q.   When  you say Armstrong  are you talking about
     another police officer?

A.   Oh,  no, sir,  it's another  street, Armstrong
     Street.

Q.   Okay.

A.   At  that time I  knew that nobody  had gone to
     the scene yet so  I checked with my supervisor
     and he said go ahead and go to the scene.  And
     it just so happens that I come down Gay Street

and turn onto Miller Street --

Q.    All right.  Now you're indicating a  different

      direction that you're coming from.

A.    Right.    I'm coming  down Gay Street traveling

      northbound.

Q.    Okay.    How did you   get over here   from where

      you said you were on Thatch?

A.    Off of Armstrong, Casey and --

Q.    Okay.  You came across this way and  then came

      back   toward the  Heart  of  Auburn from  this

      direction?

A.    Yes, sir.

Q.    Okay.  Go ahead.

A.    So  I turned  onto Miller  Avenue and  at this

      time that's  when I saw a  subject that looked

      like the person from the description that  the

      dispatcher had given us.

Q.    Okay.

A.    And he was generally right about in here.

Q.   Okay.  Would you write Clark right there?

A.   Yes, sir.  (Witness complying.)

Q.   Okay.  Is that where Clark was located when

     you first saw him or the person that was later

     identified to be Clark?

A.   Yes, sir.

Q.   All right.

A.   Roughly in that area.

Q.   All right.  Now where were you?

A.   I was, well, when I saw him I attempted to

     tell Auburn where I was.  I told them --

Q.   You mean the dispatcher with your radio?

A.   Yes, sir.  I tried to tell, inform dispatch

     along with other officers riding in the area

     where I was.  So I parked my patrol car.

Q.   All right.  Draw a block there and an arrow on

     the front showing where you parked your car in

     what direction.

A.   All right.    It was facing that way

(indicating).

Q.    Okay.

A.    Probably a little bit further down but somewhere in that general vicinity there.

Q.    Okay.

A.    It was at that time that I exited my patrol car and attempted to contact Mr. Clark. He was traveling in an easterly direction on foot, he was running. I parked my patrol car, exited my patrol car --

Q.    Let me ask you something. When you first saw him did he have on a ski mask?

A.    No, sir.

Q.    Did he have a gun? Did you see one?

A.    I did not see one.

Q.    Okay. When you first saw him right here was he walking or running?

A.    He was, he was sort of trotting. You could tell that he was physically tired. He was

coming back up the road sort of hunched over a little bit running this way. I got out of the patrol car and I said stop.

Q.   And what did Mr. Clark do, the person you later determined to be Clark?

A.   He continued to run, he sped up at that time.

Q.   All right. He speeded up and continued to run?

A.   Yes, sir.

Q.   Okay. What occurred next? You get out of your car, right?

A.   A brief foot pursuit took place. I got out on him here, out of my patrol car. I believe my words to the Auburn Police Department dispatch was that I've got the subject on, I believe I said Miller Street, Miller Avenue. I began chasing him and asking him to stop, stop, police, stop. We got up to the intersection of Miller Avenue and Gay Street and he turned

left and the Taco Bell sits pretty close up in

this area, and he turned left and I was still

behind him.

Q.  Draw a dotted line where he's running there,

please.

A.  Okay.    (Witness complying.)    He made a

lefthand turn traveling northbound.


        THE COURT:    Hold on just a second.

Somebody need a break over here?

        A JUROR:  Yes, sir, please sir.

        THE COURT:    Okay.  Let's take a little

recess and I'll let ya'll step back to the

jury room.


                    (Whereupon, proceedings were in

                    a brief recess, after which the

                    following occurred, to-wit:)

94

THE COURT: Okay. Everybody ready?

MR. GILLENWATERS: Yes, sir.

THE COURT: Bring the jury back.


(Whereupon, the jury returned

to the courtroom and the

following proceedings were had

in their presence and hearing,

to-wit:)


THE COURT: Anytime ya'll need a break

just get my attention, yell at me ladies and

gentlemen, for not paying attention to you.

All right. Go ahead.

MR. ABBETT: Thank you, Your Honor.


DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.   Officer Horne, I believe when the jury went

out you were telling or testifying about Clark

running east on Gay Street --

A.    Yes, sir.

Q.    -- and put a dotted line there, is that
      correct?

A.    Yes, sir.

Q.    Okay.  What happened as you continued to chase
      him as he's running east on Gay Street?

A.    I continued to chase him.  It was at this time
      that a dark vehicle was there.  I can't tell
      you where it came from, other than the fact
      that it was there in front of us.

Q.    All right.  Put it on the diagram please, sir.

A.    (Witness complying.)

Q.    You don't -- let me see if I understand you
      correctly.  You don't know if the vehicle was
      parked sitting there, drove up or what?

A.    I have -- no, sir, I sure don't.

Q.    Okay.  What happened as the Defendant Clark
      ran to this vehicle?

96

A.   Well, as I was chasing him I continued to say,
     halt, police, stop police.   He continued to
     run.   This car came up, it was a dark vehicle.
     And  it slowed down  enough, I remember seeing
     the  taillights, and  it slowed  down  I'd say
     between five  to  ten  miles  an  hour.    The
     subject here who was later identified as Clark
     was saying  open the door man,  open the door.
     I continued  to say stop.   Come on  man, open
     the door,  they're behind me.   And it  was at
     this time that the door opened and he was able
     to enter that vehicle as it continued to  move
     and  it  continued on  down northbound  on Gay
     Street.  And at  this time I was able  to turn
     on   my   walkie-talkie   and  was   able   to
     communicate  to  our  dispatchers  and  to the
     other police  officers in  the area  that this
     person  had entered a vehicle.   I was able to
     give the  tag number  of that vehicle  and the

direction of travel of that vehicle.

Q. Do you remember exactly what Clark said as he was getting into the vehicle or approaching the vehicle?

A. Open the door man, they're behind us.

Q. Would it help to refresh your recollection to examine your report?

A. Yes, sir.

Q. Okay.

A. Do I need to say what this is?

Q. No, you need to tell what was said after you read that and does it refresh your recollection?

A. Yes, sir.

Q. Okay. Tell the Court or the jury exactly what Clark said as he was getting into the vehicle or trying to get the door open to the vehicle?

A. As Mr. Clark (sic) was running alongside of this vehicle he grabbed the door handle, "Man

98

open the door, they're behind us. Open the door, man." And the door opened.

Q.    Do you know whether he opened the door or could you see into the vehicle at that time?

A.    I could not see into the vehicle. I could see one more person in that vehicle. I, to my recollection he did not lean over and open the door but the door was locked to begin with because you could, I could see him pulling the handle and it did not work and then he opened the door.

Q.    The door was locked and then he opened the door?

A.    I'm assuming, because the first couple of times he pulled it would not open.

Q.    Do you remember the tag number?

A.    I want to say it was 12 alpha golf whiskey -- 12AWG, I believe it was a 61, I believe is what it was. It was a Chambers County tag.

Q.   12AWG61?

A.   Yes, sir.

Q.   And did you report that to the other officers that were involved in the --

A.   Yes, sir, I did.

Q.   -- chase and the investigation?

And after that did you, you were on foot, correct?

A.   Yes, sir.

Q.   Did you go back to your car?

A.   Yes, sir, I did, but I walked back to my patrol car.

Q.   Okay. And did you continue to chase or what did you do at that time?

A.   I went on to the scene at that time. There was two other black and white patrol cars that were traveling on Gay Street at that time going toward the direction of travel that that vehicle had gone. So I went on to the scene.

100

Q.   I believe that's all.


          THE COURT:  Cross.


          CROSS EXAMINATION


BY MR. GILLENWATERS:

Q.   Officer Horne --

A.   Yes, sir.

Q.   You said that when you drew the car is

     approximately where you first saw it?

A.   Yes, sir.

Q.   All right.  And it was headed north --

A.   North on Gay Street.

Q.   -- on Gay Street?

A.   Yes, sir.

Q.   All right.  Is there a stop sign here?

A.   There's a traffic light.

Q.   There's a traffic light, okay.

101

Do you remember if the traffic light was
red or green?

A.   I believe it was red or changing.   I don't
remember because when I called in the tag
number I started going back toward my vehicle.
I told them the direction of travel.

Q.   All right.  And did the vehicle, did it stop
for the traffic light up here?

A.   No, sir.

Q.   All right.  Did it turn left or right?

A.   I believe it continued to go straight.

Q.   It continued to go straight.  All right.

A.   As I said I returned to my vehicle.

Q.   All right.

A.   I was going to my car.

Q.   All right.  Is there an annex to the Auburn
Police Department in this area?

A.   An annex?

Q.   Or is the Auburn Police Department very close

162

by?

A.    It's pretty close by, yes, sir.

Q.    Where is it at?

A.    It's at, you have to go on down further, Gay

Street, get on down toward Glen and it's back

up at Glen.

Q.    Okay. Up at Glen. How far would you say it

is from here?

A.    A mile. Something like that.

Q.    A mile?

A.    Mile and a half probably.

Q.    All right. So you go down Gay Street in the

direction the car was going, is that correct?

A.    Right. Yes, sir.

Q.    To go to the Auburn Police Department?

A.    Correct.

Q.    Okay. And --

A.    And it's not, you understand it's not on Gay

Street, right?

193

Q.   Yes, sir, I understand  it's off to the right,
     is that --

          Now, you said that  the person, the Clark
     fellow that was running, that he ran after the

     car?   And he was running all the way down Gay
     Street, is that correct?

A.   He was running next to the car, yes, sir.

Q.   How far did he run parallel to the car?

A.   Maybe ten yards, fifteen yards, something like
     that maybe, if that far.

Q.   Okay.  And he was leaning down and pulling  on
     the handle?

A.   Right.

Q.   At the same time, is that correct?

A.   Uh-huh.

Q.   All  right.  And he  was unable to  get in for
     some reason?

A.   Right.

Q.   Okay.  Now,  where about  in relation  to the

164

            traffic light there did he get in the vehicle?

A.   Oh, it was a good ways from the traffic light

now. You know, this diagram, it indicates not

to scale, so it's not just like here's the

car and here's the traffic light. It's a ---

it's not an incredibly long distance but

it's --

Q.   Just a block? It appears to be a block.

A.   It's, it's one city block, right.

Q.   One city block. Okay.

     And, and you said you heard, let me in,

man, let me in?

A.   Uh-huh.

Q.   Okay. And you could see inside the vehicle,

is that correct?

A.   I could see one subject.

Q.   One subject inside the car?

A.   You know.

Q.   Okay. And then the car proceeded on down Gay

105

Street after he got in, is that correct?

A.   Yes, sir.

Q.   Did it then take off at a high rate of speed?

A.   It, yes, sir, it moved along very rapidly.

Q.   It moved along -- did, you said some black and whites were in the area, is that correct?

A.   Yes, sir.

Q.   And did they immediately go by you?

A.   It was pretty close, yes, sir.

Q.   All right.   As the car went through the intersection some other officers were going in the same direction, is that correct?

A.   Right.   They had passed me at that point, right.

Q.   They had passed you?

A.   Right.

Q.   Could you still see the --

A.   One of them.

Q.   Could you still see the dark vehicle at the

186

time the officers went by you?

A.    Uh-huh.

Q.    So it was still in your sight?

A.    Right.   And then once they, once they went by

me and once I saw one, I'm going to the car to

go to  the scene to get as much information or

further information.

Q.    All  right.  So the  vehicle was in your sight

and then  the other  officers went by  you and

one  would assume  it was  in their  sight, is

that correct?

A.    Yes, sir.  I would assume.

Q.    Okay.   And did you see them catch up with the

vehicle?

A.    No, sir.

Q.    You did not?

A.    No, sir.

Q.    All right.  So  you went back on you,  back to

your vehicle?

107

A.    Right.  I went back down on Miller Avenue and
      got my car.

Q.    Okay.  All right.  Thank you, sir.


            THE COURT:  Redirect?


            REDIRECT EXAMINATION


BY MR. ABBETT:

Q.    Just to make sure we're clear, Officer, that
      car, that dark colored car wasn't anywhere
      close to that red light when it stopped?

A.    Oh, no, sir.

Q.    It was about the middle of the block like
      you've shown it on the diagram?

A.    Well, you see, again it's not to scale so
      you've got several apartments here, you've got
      several apartments here, several houses, so
      it's not per se you know, very close, you

188

know, it was a pretty good distance.  I don't,
I couldn't  tell you exactly how far  it is, I

never did measure that  off but it's -- you've
got  Taco Bell and  some other  businesses and

then  you've  got  two  sets  of  apartment
complexes  there,  then  you  get  into  some

duplexes, then you get into  Whittle Dormitory
and then you  get to Thatch Avenue.  So you've

got a, you know, a pretty good stretch.

Q.    That's all.


        MR. GILLENWATERS:  Nothing  further, Your

Honor.

        THE COURT:  You can step down.


            (Witness excused.)


        MR. ABBETT:  Call Officer M. L. Ricks.

189

### M. L. RICKS,

was called as a witness, having first been duly

sworn to speak the truth, the whole truth and

nothing but the truth, was examined and testified

as follows, to-wit:


### DIRECT EXAMINATION


BY MR. ABBETT:

Q.   State your name for the jury, please?

A.   Michael Leonard Ricks.

Q.   And where are you employed?

A.   City of Auburn, Auburn Police Department.

Q.   In what capacity?

A.   I'm a police officer for the City of Auburn.

Q.   Were you so employed back on July the 24th of

     1995 during the early morning hours?

A.   Yes, sir, I was.

Q.   Were you in uniform then as you are now?

110

A.    Yes, sir, I was.

Q.    Were you in a marked patrol car?

A.    Yes, sir.

Q.    Did you receive a radio dispatch about the
      robbery at the Heart of Auburn Motel?

A.    Yes, sir, I did.

Q.    All right. And what did you do in response to
      that dispatch, Officer Ricks?

A.    In responding to that dispatch I went into the
      Gay Street area, which that's where they said
      a suspect ran. While searching that area
      Officer Horne indicated that he see the
      suspect. By that time I got in my patrol car
      and started out on --

Q.    Were you on foot at that time?

A.    I had gotten out to talk to some subjects that
      was in an apartment complex. And when he
      radioed that he see the suspect I got back in
      my car and got back on Gay Street. He did

111

indicate that the subject had got into a vehicle and was headed north on Gay. I then began to pursue that vehicle.

Q. Did you follow the vehicle?

A. Yes, sir.

Q. Did he give you the tag number?

A. No, sir, he didn't. Once the vehicle, it was the only vehicle on Gay Street and I asked Officer Horne over the radio was that the vehicle whose taillights was going up Gay Street and he indicated it was.

Q. Okay. Now you're talking about the radio, are you talking about this radio, microphone that you've got on your shoulder?

A. That's what Officer Horne was talking on. I was talking on the radio that's actually in the patrol car.

Q. Okay. All right. What happened as you began to pursue the vehicle that Officer Horne had

113

ground. He stretched out on the ground and I
placed him under arrest.

Q.   Okay. And did that person turn out to be
Dewayne Clark?

A.   Yes, sir. Dewayne Clark.

Q.   Okay. If you're -- if you would use this yard
stick and point out on the diagram, where are
you coming from, in what direction, and where
do you first see the dark colored car?

A.   Okay. I was coming from this area which is an
apartment complex is here. I was in the
parking lot. I came out on Gay Street in this
direction. As I came out I believe Officer
Horne was standing somewhere in here and the
car must have been somewhere along here. It
was the only car that was on Gay Street at the
time. I then radioed and asked Officer Horne
was it the car, taillights facing us, and he
said it was. I then pursued the vehicle this

114

way.

Q.   Okay. Did you have on your blue lights and
     siren at that time?

A.   Yes, sir. I had on my blue lights. I hadn't
     turned on my siren at the time.

Q.   Okay. Describe exactly what the car did, the
     dark colored car?

A.   The dark colored car, once it got here, it
     applied brakes so the brake lights came on and
     that gave my patrol car enough time to catch
     up with it.    Once it went through the
     intersection the brake lights kept coming on
     and going off, coming on and going off and the
     vehicle --

Q.   Is that when the passenger door was opening?

A.   Yes, sir. Yes, sir, and the vehicle was going
     like it was slowing down and continuing to
     move. And then it turned into the parking lot
     here of the Methodist Church.

115

Q.    Okay.  I'd show you what's been previously

marked as State's exhibit number five and ask

if you recognize that, please, sir?

A.    Yes, sir, that's the vehicle that they were

in.

Q.    Now is that a photograph of the vehicle?

A.    Yes, sir, a photograph.

Q.    Does that photograph truly and accurately

depict the vehicle as you saw it on that

occasion?

A.    Yes, sir.


     MR. ABBETT:  Okay.  Your Honor, we offer

State's exhibit number five.

        THE COURT:  Admitted.


                    (Whereupon,    the    instrument

                    hereinabove    referred    to    and

                    marked    for    identification    as

116

(State's exhibit number five was
admitted    and    received    into
evidence.)


DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.    Is that where it was parked when Clark  jumped

      out and ran on foot?

A.    Yes, sir.

Q.    Okay.  And where is that shown on the diagram?

A.    Shown on  the diagram  it should  be somewhere

      along in here.

Q.    Would you take  that black marker and  draw  a

      black diagram of where the car was left parked

      at and write getaway car there, please?

A.    (Witness complying.)

Q.    Now as you  approached the car  where did  you

      stop your patrol car?

A.    I stopped my patrol car approximately right in

      here facing in that direction.

117

Q.    And I believe you said the passenger got out

      and ran on foot?

A.    Yes, sir.

Q.    Would you draw a dotted line and show where he

      ran to?

A.    (Witness complying.)

Q.    Is that where he got to a fence?

A.    Yes, sir. He got to the --

Q.    What did the driver of the car do?

A.    The driver of the car, once I got out of my

      car he got out and he stood on this side of

      the car and he didn't move after I got out and

      I continued to chase this individual because

      as I got out of my car the back up unit was

      coming or was pulling into the parking lot.

Q.    There was another officer coming in behind

      you?

A.    Yes, sir.

Q.    All right. Did the driver of the car say

118

anything to you?

A.    No, sir,  he just looked at me  in a surprised

manner and he put is  hands up like this right

here (indicating).

Q.    So he held his hands up like this?

A.    Yes, sir.

Q.    Okay.   I   show   you   what's   been   previously

marked as   State's exhibit number six   and ask

if you can identify that photograph, please?

A.    Yes,  sir.   This is the fence or the wall that

that he ran up against next to the side of the

church.   It should be   this wall here and this

is the church parking lot.

Q.    Does   that   photograph   truly   and   accurately

depict   that   wall   as   it   appeared   on   that

occasion?

A.    Yes, sir.


              MR. ABBETT:   We offer number six.

119

MR. GILLENWATERS:  No objection.

THE COURT:  Admitted.


(Whereupon,    the    instrument

hereinabove  referred  to  and

marked  for  identification  as

State's exhibit  number six was

admitted  and  received  into

evidence.)


DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.   I show  you State's exhibit number  seven and

ask if you would identify that photograph?  Is

that a closer up view of the wall?

A.   Yes, sir.  Closer to the corner of the wall.

Q.   Okay.  Does that truly  and accurately depict

where the Defendant Clark stopped?

A.   Yes, sir.

Q.   Okay.  Officer Ricks, come down where the jury

128

can see, please, sir.

When Clark got to this wall here what did he do?

A.   Once he got to the wall he reached up and grabbed with both of his hands and tried to pull himself over but he couldn't pull himself over and he dropped back down and when he dropped back down before he could jump back up again I was already up there on him.

Q.   Did you place him under arrest?

A.   Yes, sir, I did.

Q.   Did you search him at that time or pat him down for a weapon?

A.   I patted him down for weapons.

Q.   Did you find any weapons on him?

A.   No weapons at all.

Q.   No weapons at all?

A.   No, sir.

Q.   Okay. You can go back up there.

121

After you placed  Clark under arrest did
he  then lead  you back  towards the  Heart of
Auburn Motel on foot?

A.   No, sir --

Q.   Or direct you back there?

A.   Once I  placed him under arrest,  I placed him
under  arrest where I  stopped him at.   And I
assisted  him to  get up  on his  feet  and we
started walking back towards his car and  then
he made the statement that, I just want  ya'll
to know that --

        MR. GILLENWATERS:  Objection, Your Honor.
        THE COURT:  Sustained.

Q.   Okay.  Don't say what he said.

A.   Okay.

Q.   Did you place handcuffs  on him?

A.   Yes, sir, I did.

122

Q.    Did he then -- did you go back and get in your
      patrol car with him?

A.    Yes, sir.  I read him the Miranda warning and
      I asked him about the gun.  I asked him did he

      understand the Miranda warning and he did.  I
      asked him about the gun.

Q.    Okay.  And did he then lead you back towards
      the Heart of Auburn Motel?

A.    Yes, sir, he did.

Q.    If you would show the jury on the diagram
      where he led you back to.

A.    We came back down Gay Street south in this

      direction (indicating) and he led me right
      here to a tree and next to the tree was a pull

      over mask or hood and inside the hood was the
      gun which he told us that's what it was --


            MR. GILLENWATERS:  Objection.

            THE COURT:  Sustained.

123

Q.   I show you what's been previously marked as
State's exhibits number eleven and twelve and
ask if you recognize those photographs,
please?

A.   Yes, sir, I do.

Q.   Okay. And what's shown in number eleven?

A.   In number eleven it's showing the hood that
the suspect indicated to us and the gun is not
visible but this is the hood, a picture of the
hood we saw with the gun inside of it.

Q.   Does that photograph truly and accurately
depict the way you found it on that occasion?

A.   Yes, sir, it does.

Q.   Okay. And State's exhibit number twelve is a
photograph of the same hood or ski mask, is it
not?

A.   Yes, sir, it is.

Q.   Is that after you or some other officer had
removed the gun and laid it on top of it?

124

A.    This must be after an officer removed it and
      laid it on top.

Q.    Other than that is it in the same condition as
      when you saw it?

A.    Yes, sir, it is.


            MR. ABBETT:    We offer State's exhibit
      number twelve.

            THE COURT:  Admitted.  Number eleven, are
      you offering that too?

            MR. ABBETT:  We offer number eleven and
      twelve.

            THE COURT:  Admitted.


                        (Whereupon,   the   instruments
                        hereinabove   referred   to   and

                        marked   for   identification   as
                        State's exhibits numbers eleven

                        and    number    twelve,    were

125

admitted    and    received    into
evidence.)

DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.    Did you   then take the Defendant  to the motel

      to  be, that  is  the Defendant  Clark  to  the

      motel to be viewed by Mr. Carpenter?

A.    Yes, I did.

Q.    And then  after that did  you take him  to the

      Auburn Police Department and turn him  over to

      Detective Ramsey?

A.    Yes, I did.

Q.    Okay.  And I  believe Officer B. K.  Jones was

      with you at the time you found the gun and the

      ski mask?

A.    Yes, sir, he was.

Q.    And did he stay there with the gun and the ski

      mask?

126

A.   He did.

Q.   I believe that's all.


                THE COURT:  Cross.


                CROSS EXAMINATION


BY MR. GILLENWATERS:

Q.   Officer Ricks, you stated that  you got behind

     the vehicle on Gay Street?

A.   Yes, sir.

Q.   That it  went approximately  a block, is  that

     correct?

A.   That's not what I said.

Q.   How far did it go then?

A.   I couldn't begin to say whether it was a block

     or two blocks.

Q.   Well  the diagram that's  behind you  seems to

     indicate that  the  Methodist Church  and  the

127

parking lot is a block from this intersection

of, what's that, Thatch Avenue and Gay Street.

Is the diagram not correct?

A.   The diagram is correct.

Q.   All right.

A.   Now where he got in the car at I don't know

where he got in the car. He was in the car

when --

Q.   You didn't see him get in the car?

A.   No, sir, I didn't.

Q.   All right. Where did you first see this dark

colored car at?

A.   When I saw this dark colored car it must have

been somewhere along in here on Gay Street.

Q.   Okay. So the furtherest that it could have

traveled would have been a block and a half

then?

A.   Maybe a block and half at the most.

Q.   Maybe a block and a half. Okay. And it went

123

through the intersection there on Thatch and
Gay, is that correct?

A.   Yes, sir.

Q.   Was the light green or red or do you know?

A.   The light was red.

Q.   The light was red?

A.   Yes, sir.

Q.   So it went through the red light, is that
correct?

A.   Yes, sir.

Q.   All right.  Then you said the vehicle turned
its, had its brake lights on and that's what
drew your attention to it, is that correct?

A.   No, I didn't say that's what drew my attention
to it.

Q.   But you were able to see it because it had its
brake lights on?

A.   I was able to see the taillights of the
vehicle, yes, sir.

129

Q.    All right.  And then it was going through this
      block here towards the Methodist Church and it
      was, the driver was hitting his brakes,
      that's what you said, is that correct?

A.    Yes, sir, the brake lights were going on and
      off.

Q.    All right. And he didn't try or attempt to
      get away from you, did he?

A.    I couldn't say that he was trying to get away.
      He didn't stop when I turned my red light on.

Q.    He didn't stop --
A.    No.

Q.    -- he pulled over at the next intersection,
      did he not?

A.    Yes, sir.  Well he pulled over into that
      parking lot.

Q.    He pulled over in that parking lot.  All
      right. And you said that Mr. Huguley was the
      driver of the vehicle, is that correct?

130

A.   Yes, sir.

Q.   All right.  Now did he get out of the vehicle

     and run like Mr. Clark did?

A.   No, sir, he didn't.

Q.   All right.  But he did get out of the vehicle,

     is that correct?

A.   Yes, sir, he did get out of the vehicle.

Q.   And he simply stood there, is that correct?

A.   Yes, sir.

Q.   All right.  So he didn't make, he didn't try

     to get away from you, did he, sir?

A.   No, sir, he didn't.

Q.   Okay.  And did you search him?

A.   No, sir, I didn't search him.

Q.   You didn't search him.

          Was he later searched by someone?

A.   I don't know whether he was searched by

     anyone.  I didn't search him.

Q.   All right.  So you detained Mr. Clark, is that

131

correct?

A.   Yes, sir, I did.

Q.   All right.  And you brought Mr. Clark back to your patrol car?

A.   Yes, sir, I did.

Q.   All right.  Where was Mr. Huguley at when you brought Mr. Clark back to your patrol car?

A.   If I'm not mistaken Mr. Huguley was either talking with Officer Hillyer or Officer Hillyer had placed him in his patrol car.

Q.   All right.  So did he ever leave the scene of his vehicle and the patrol cars there?

A.   That I can't truly answer.  The only thing I can say is he was standing by the car when I passed his car running.  Now what happened after I passed his car I don't know.

Q.   All right.  When you came back he was still in the same general area --

A.   Yes, sir --

132

Q.   -- is that correct?

A.   -- he was still in the area when I came back.

Q.   Okay.  Is this a lit area?

A.   It has some lights out there, yes, sir.

Q.   Okay.  So  it was  a well  lit area  where he
     pulled over to?

A.   Yes, sir.

Q.   All right.  Well,  did the  dark car, did  it
     have tinted  windows  or anything like that?

A.   I don't  recall whether it had  tinted windows
     or not.

Q.   Okay.  Because you  could see the  individuals
     in the car?

A.   I  don't recall  seeing the individual  in the
     car or the number  of individuals.  What I  do
     recall are the  lights coming on  on the,  the
     taillights or  the brake  lights coming  on on
     the  vehicle and  the passenger  door opening.
     That's what --

133

Q.    All right.  Do you know what the speed limit
      is on Gay Street?

A.    Yes, sir, it's twenty-five miles per hour.

Q.    All right.  Did, was the driver of the
      vehicle, was he driving an excessive rate of
      speed anytime that you were behind him?

A.    Not during the time that I was behind him.

Q.    All right.  Thank you, sir.


              THE COURT:  Redirect.


                REDIRECT EXAMINATION


BY MR. ABBETT:

Q.    Officer Ricks, do you know how many times the
      brake lights came on and the passenger door
      came open, do you remember?

A.    I think the passenger door came open
      approximately four times before the

134

individual actually jumped out.  I'm not sure

exactly   how   many   times   the   brake   lights

actually came on.

Q.   But  each time the passenger  door came on the

brake lights came on?

A.   Yes, sir.

Q.   I believe that's all.


     THE   COURT:     Anything   else   of   this

witness?

          MR. GILLENWATERS:  No, sir.

          THE COURT:  You're excused, you may go.


               (Witness excused.)


          THE COURT:  Next witness.

          MR. ABBETT:  Call B. J. Jones, Officer B.

J. Jones.

135

## B. J. JONES,

a witness, having first been duly sworn to speak

the truth, the whole truth and nothing but the

truth, was examined and testified as follows, to-

wit:


## DIRECT EXAMINATION


BY MR. ABBETT:

Q.    State your name for the jury, please?

A.    Byron Keith Jones.

Q.    And where are you employed?

A.    Auburn Police Department, City of Auburn.

Q.    In what capacity?

A.    I'm a shift supervisor, sergeant.

Q.    Were you so employed during the early  morning

      hours of July 24th, 1995?

A.    Yes, I was.

Q.    Sergeant, I'd show you what's  been previously

136

marked as State's exhibit number  eighteen and

nineteen, a ski mask and a gun, and --

A.    Yes, sir.

Q.    -- ask you what your participation was in  the

recovery of those items?

A.    I asked where they were --

Q.    Not  what  you did  just  where you  recovered

them, okay?  Not what somebody told you.

A.    Okay.  They were recovered at a house  that is

next to the driveway that leaves the back side

of the Heart of Auburn by an oak tree.  An oak

tree which  is like here (indicating) is where

they  were recovered at.  I stood by with them

until Detective Ramsey came and got them.

Q.    Okay.  Were you involved in the chase and the

arrest of Clark and the Defendant  Rodriguss?

A.    No, sir, I wasn't.  I was on the  scene after

they were already taken into custody.

Q.    Okay. Did you stay with the gun and mask until

137

they were collected by Sgt. Ramsey as he did
the investigation?

A.    Yes, sir, I did.

Q.    Okay. And you maintained them in the same
condition as they were when you arrived
there?

A.    Yes, sir.

Q.    Okay. I believe that's all.


        THE COURT:  Cross examination.

        MR. GILLENWATERS:  No questions.

        THE COURT:  You're excused. You may go.


                (Witness excused.)


        THE COURT:  Next witness.

        MR. ABBETT:    We call Officer Bryan
Botest.

### BRYAN BOTEET,

a witness, having first been duly sworn to speak

the truth, the whole truth and nothing but the

truth, was examined and testified as follows, to-

wit:


### DIRECT EXAMINATION


BY MR. ABBETT:

Q.   State your name for the jury, please.

A.   Bryan Boteet.

Q.   And where are you employed?

A.   With the City of Auburn Police Department.

Q.   In what capacity?

A.   I'm a police officer in the patrol division.

Q.   Were you so employed back during the early

     morning hours of July 24th, 1995?

A.   Yes, sir, I was.

Q.   Officer Boteet, did you participate in the

159

arrest of Clark and Rodrigues, the two people
that were charged with the robbery of the
Heart of Auburn Motel?

A. Not actually in the physical arrest of the two
suspects. By the time I arrived on the scene
Officer Hillyer and Officer Ricks had both of
the suspects in their custody at that time.

Q. Okay. Did you begin a search of the area
where Defendant Clark was arrested, that is
near the wall behind the United Methodist
building there?

A. Yes, sir, I did.

Q. And what did you, if anything did you discover
as you began a search of that area?

A. I located a lot of U.S. currency in
denominations of twenty dollar bills, ten,
five and one dollar bills located on the
ground kind of scattered out across the area
by an air conditioner behind a house.

146

Q.    Okay.  I would ask  you to  look at  State's

exhibit  number two,  a  diagram and  show the

ladies  and  gentlemen  of  the  jury  on  the

diagram where  you located the money that  you

just talked about, please?

A.    The area  I located  it  was just  down right

here, there's a fence that goes right here and

Officer  Ricks was  bringing the  suspect back

from  this area here so I  walked,  you have to

actually walk  down through  here to  get down

here because it's about a twenty foot drop off

from that fence  to the ground  and the  money

was located right  about equal  with it  where

the end of that fence was right there.

Q.    Okay.  I how  you some photographs  that have

been  previously  marked  as State's  exhibits

number eight,  nine and  ten and ask  if you'd

take  a look at those and  -- do you recognize

those photographs?

141

A.    Yes, sir.    That depicts the scene   that I saw

      and I believe Corporal Detective Register took

      these photographs.

Q.    All right.    Do those  photographs truly  and

      accurately depict the scene  and the money  as

      you saw it on that occasion?

A.    Yes, sir, they do.


         MR.  ABBETT:    We offer  State's exhibits

      number eight, nine and ten.

            THE COURT:  Admitted.


                        (Whereupon,   the   instruments

                        hereinabove   referred   to   and

                        marked   for   identification  as

                        State's exhibits numbers eight,

                        nine and ten were  admitted and

                        received into evidence.)

142

DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.    Did you collect the money yourself or turn the

      scene   over to Detective Register  to collect

      the money?

A.    I  just   secured   the   scene   until  Detective

      Register could get there and photograph it and

      then while he was present the two of us picked

      up the money and put it into a, put it into an

      envelope,  counting it  before  we put  it  in

      there.

Q.    Okay.  I believe that's all.


            THE COURT:  Cross.

            MR. GILLENWATERS:    I have no  questions,

      Your Honor.

            THE COURT:  You're excused, you may go.


                  (Witness excused.)

143

THE COURT:  Next witness.

MR.  ABBETT:      Call  Detective  Paul

Register.


## PAUL REGISTER,

a witness, having first  been duly sworn to  speak

the  truth, the  whole  truth and  nothing but  the

truth, was  examined and testified as  follows, to-

wit:


## DIRECT EXAMINATION


BY MR. ABBETT:

Q.    Would you state your name to the jury, please?

A.    Paul Register.

Q.    And where are you employed?

A.    City of Auburn Police Department.

Q.    In what capacity?

A.    Detective.

144

Q.   In that capacity did you participate in the
     investigation and the arrest of Dewayne Clark
     and Rodrigues Huguley?

A.   Yes, I did.

Q.   Okay. Would you tell the ladies and gentlemen
     of the jury about your investigation there
     where the Defendant Clark was arrested and the
     recovery of the money, please?

A.   Yes, sir. About 1:30 I arrived at Officer
     Boteet's location which was about here
     (indicating) and he indicated or showed me
     where the money was and I photographed the
     money and took it into my possession at that
     time.

Q.   And did you count the money?

A.   Yes, sir, I did.

Q.   How much money did you recover?

A.   At that location there were $231.00 actually
     on the ground.

145

Q.    Was there more money  that you weren't able to
      recover?

A.    There was  a, there  was a twenty  dollar bill
      that was inside  of an air  conditioner.  The

      unit that was  on the ground, you couldn't get
      to it, it was down in the air conditioner unit

      and there was some more money up on top of the
      fence back  up  in  the  parking  lot  that  I

      recovered as well.

Q.    How much  total money  did you  recover there,

      Detective Register?

A.    $262.00.

Q.    All right.   I show you what's been  marked as
      State's  exhibit number  fourteen.  Is  that a

      photograph of all the money that you recovered
      on that occasion?

A.    Yes, sir, it is.

Q.    Does it truly and accurately depict  the money

      that you recovered?

146

A.    Yes, sir, it does.


          MR.  ABBETT:    We offer  number fourteen,

     Your Honor.

          THE COURT:  Admitted.


                    (Whereupon,     the    instrument

                    hereinabove   referred   to    and

                    marked   for   identification   as

                    State's  exhibit  number  fourteen

                    was  admitted  and received into

                    evidence.)


DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.    Detective Register, in your capacity in charge

     of the  investigation did you  receive the ski

     mask and  the gun from Detective  Ramsey, that

     is  what's been  previously marked  as State's

     exhibit  number  eighteen   and  nineteen,   I

147

believe?

A.    Yes, I did receive those items.

Q.    Okay.   And what if anything did you do with
      them?

A.    I maintained them as  evidence.  The  gun was
      sent to the  Alabama Department of -- Alabama

      Bureau  of  Investigation for  possible latent
      prints and it was  returned to me subsequently

      later.

Q.    I notice this gun appears to have some kind of

      purple stain on it, do you know what that is?

A.    Yes,  sir.    It's a  process  of fingerprint,

      where  they fume the weapon to see if they can
      raise  any  fingerprints  and    that  commonly

      leaves a coloration like that.

Q.    All right.   Were  they  able to  recover  any

      fingerprints   from State's   exhibit  number
      nineteen to your knowledge?

A.    No, sir, they were not.

148

Q.   I show you what's marked as State's exhibit
     number thirteen and ask if you would identify
     that, please?

A.   This is the ski mask as well as the gun and
     the magazine and a bullet that I recovered,
     that was given to me by Sgt. Ramsey.

Q.   All right. After Sgt. Ramsey gave them to you
     did you examine the gun and the ski mask?

A.   Yes, I did.

Q.   Could you describe -- we offer State's exhibit
     number thirteen.


          THE COURT:  Admitted.


                    (Whereupon,      the     instrument
                    hereinabove    referred    to   and
                    marked   for   identification   as
                    State's exhibit number thirteen
                    was admitted and received into

149

(evidence.)


DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.   Could   you   describe   the   gun   and   your

     examination  of it  as you  took it  into your

     custody?

A.   Yes, sir.   The gun was a  small caliber Lorsen

     and it had  a magazine and  it was loaded  and

     also had  a round chambered in  the chamber as

     it would be ready to be fired.

Q.   So  to fire  the  weapon   do you  have  some

     experience with firearms?

A.   Yes,  sir.

Q.   How long have you been a police officer?

A.   Roughly seven and a half years.

Q.   As a part of your training as a police officer

     do you have marksmanship training and training

     in firearms?

A.   Yes, sir.

158

Q.   When you examined this pistol do you have an
     opinion as to whether it was ready to fire?

A.   Yes, sir, it was.

Q.   Okay.  And how would one fire that pistol in
     the condition it was in on that occasion?

A.   by simply pulling the trigger.

Q.   Okay.  Detective Register as you continued
     your investigation did you make some
     photographs of the Pontiac Grand Am that was
     being used by Defendant Clark and Buguley on
     that occasion?

A.   Yes, sir, I did.

Q.   I show you what's been previously marked as
     State's exhibits number fifteen and sixteen.
     Are these views of the car that show the tag
     number and a close up view of the car?

A.   Yes, sir, they are.

Q.   Do those photographs truly and accurately
     depict the car as it appeared on that

151

occasion?

A.    Yes, it does.


        MR. ABBETT:    We offer those exhibits,

Your Honor, that is --

        THE COURT:  Fifteen and sixteen?

        MR. ABBETT:  -- fifteen and sixteen.

        THE COURT:  Admitted.


                (Whereupon,    the    instruments

                hereinabove  referred  to  and

                marked  for  identification  as

                State's    exhibits    numbers

                fifteen and number sixteen were

                admitted  and  received  into

                evidence.)


DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.    I'll show you what's marked as State's exhibit

152

number seventeen and ask you if you can identify that, please?

A.    Yes, sir, this is a photograph of a Nissan pick-up, maroon in color, that I photographed in the City of Lafayette behind the Spectrum Food Store again on the early morning hours of the 24th.

Q.    Do you remember about what time it was when you made that photograph?

A.    It would have been sometime around five, 5:30, something like that.

Q.    In the morning?

A.    Yes, sir.

Q.    Does that photograph truly and accurately depict the Nissan pick-up as it appeared on that occasion?

A.    Yes, sir, it does.

Q.    Did you determine who owned that Nissan pick-up?

153

A.    Yes, sir.

Q.    Who owned it?

A.    Mr. Rodrigues Huguley.

Q.    Okay.  Did you get a certified copy of the

regis --

        MR. ABBETT:  Your Honor, we offer State's

exhibit number seventeen.

        THE COURT:  Admitted.

                (Whereupon,      the    instrument

                hereinabove   referred    to   and

                marked   for   identification   as

                State's          exhibit    number

                seventeen    was    admitted    and

                received into evidence.)

DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.    Did    you   get    a   certified    copy    of   the

154

registration for  that vehicle?

A.    Yes, I did.

Q.    Do you have it with you?

A.    I have it in my folder.

Q.    Would you come get it, please?

A.    Yes.


                    (Short pause had.)


DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.    Detective  Register,  you  have   what's  been

      previously  marked  as State's   exhibit number

      twenty-four, is that correct?

A.    Yes, sir.

Q.    Is that  a certified copy of  the registration

      for   the  vehicle,  the   Nissan  truck,  the

      photograph that we just introduced?

A.    Yes, sir, it is.

Q.    Is  it certified  as true  and correct  by the

155

Probate Judge's Office in Lafayette?

A.    Yes, it is.


        MR. ABBETT:  Your Honor, we offer State's

exhibit number twenty-four.

        THE COURT:  Admitted.


                    (Whereupon,    the   instrument

                    hereinabove  referred   to  and

                    marked   for  identification  as

                    State's exhibit number  twenty-

                    four was  admitted and received

                    into evidence.)


        MR.  ABBETT:   Your Honor,  that's  all  I

have of Detective Register at this time.   I'm

planning   to  recall   him  later   for  some

additional testimony.

        THE COURT:  Cross examination.

156

## CROSS EXAMINATION

BY MR. GILLENWATERS:

Q.   Detective you said you arrived on the scene

     around 1:35, is that correct?

A.   Yes, sir, that's right.

Q.   All right. Where did you go?

A.   I went to this area right here. I came down

     Armstrong to Thatch and pulled in here. I was

     contacted by radio and advised where Officer

     Boteet was in reference to recovering this

     money. And I went there to recover and

     photograph that money.

Q.   All right. And did you see Rodrigues Huguley

     there?

A.   No, he was not at that location.

Q.   He was not there. Where was he at at this

     time?

A.   Actually, it's actually very close to where he

was at but it's just that you had to, you go,

there's some steps located right here and

it's, like earlier testified, it's about

twenty feet from this parking lot down to this

area where this money was recovered. So an

individual would have to walk up some steps

and when I got up to the parking lot he was

still there with Officer Hillyer.

Q.   All right. So he was with Officer Hillyer at

     the time at 1:30, is that correct?

A.   I believe so.

Q.   All right. Was he in a police vehicle at that

     time or --

A.   I believe he was seated in the back seat of

     Officer Hillyer's vehicle with the door open,

     I believe.

Q.   And was Officer Hillyer questioning him at

     that time?

A.   No, sir, not at the time.

159

Q.   He wasn't discussing anything with him?

A.   I believe Officer Hillyer indicated he had

     discussed, he advised Mr. Huguley of his

     rights prior to me arriving there.

Q.   So you understand that Officer Hillyer did

     this, is that correct?

A.   Advised him of his rights?

Q.   Yes.

A.   Yes, sir, on the scene he did.

Q.   Now, you said you went to Lafayette around

     five o'clock, is that correct?

A.   I believe it was sometime around five.

Q.   All right.  And Mr. Huguley's vehicle was

     there in Lafayette, is that correct?

A.   Yes, sir.

Q.   All right.   And that's how you got that

     picture, is that correct?

A.   Correct.

Q.   All right.   And I believe that you said that

159

you came up with a total of $262.00?

A.   That's what I was able to recover.

Q.   And that there was $20.00 inside an air
     conditioner?

A.   Correct.

Q.   Now, you were here when the night auditor
     testified that $259.00 was taken, is that
     correct?

A.   Yes, sir.

Q.   Plus $10.00 of Rodrigues' money was also
     taken, is that correct?

A.   I believe that's what he said.

Q.   So he said there was a total of $269.00 taken?

A.   If you add it up I believe that was what it
     would be, yes, sir.

Q.   All right. And you only recovered two sixty-
     two plus twenty inside an air conditioner --

A.   Correct.

Q.   -- is that correct?

168

A.   Correct.

Q.   Did you go back to the hotel?

A.   No, sir, I did not.

Q.   You didn't take the pictures there at the hotel?

A.   No, Sgt. Ramsey took those photographs.

Q.   You didn't take any pictures at the hotel?

A.   No, sir, I didn't.

Q.   Did you interview Harry Carpenter?

A.   No, sir, I did not.

Q.   Okay. And you did say that you had submitted the gun to the forensic lab to try to find fingerprints, is that correct?

A.   To ABI.

Q.   To the ABI?

A.   Yes.

Q.   Okay. And it's fair to say that you did not find any fingerprints on that gun that matched Mr. Huguley's, did you?