Ladies and gentlemen, I have just a few questions. Does anyone, the Judge asked you if anyone is related to the Defendant Mr. Huguley, does anyone know the Defendant Rodrigues Huguley or the co-defendant in this case Dewayne T. Clark? Does anyone know either one of those people?

No answer.

Anyone know any member of the Defendant or the co-defendant's family, if you know?

(No response.)

MR. ABBETT: Anyone ever sought or retained Mr. Charles Gillenwaters for legal advice or representation, that is yourself or any close family member or have any kind of business relationship or social relationship

16

with Charles Gillenwaters, the attorney for
the Defendant?

(No response.)

MR. ABBETT:    Anyone because of moral  or
religious  beliefs not want to sit in judgment
of their fellow man?

(No response.)

MR. ABBETT:    Anyone  know of any  reason
they wouldn't want to sit on the trial of this
case?

(No response.)

MR.  ABBETT:    Ladies  and  gentlemen,
Alabama law treats everybody that participates

in a crime the same, that is each one is considered a principal. If a persons aids or abets in the commission of an offense they're treated as a principal in Alabama. Does anyone have a problem with that premise of law?

(No response.)

MR. ABBETT:   That's all the questions I have.

THE COURT:   Mr. Gillenwaters?

MR. GILLENWATERS:   I too just have a few questions.   I need to ask you about some witnesses that may or may not testify in this case.   Do any of you know a Paul Register who is employed by the Auburn Police Department? Paul Register?

18

(No response.)


MR. GILLENWATERS:    No one knows   him, is that correct?

Are you related to him in any way?


(No response.)


MR. GILLENWATERS:    What about   a William Ramsey?    Do any   of   you   know  Sgt.   William Ramsey that   works    at   the   Auburn    Police Department?


(One response.)


MR.   GILLENWATERS:   Anyone   else know Mr. Ramsey?


(Two responses.)

19

MR. GILLENWATERS:   Does anybody know Officer M. K. Horne of the Auburn Police Department?

(Three responses.)

MR. GILLENWATERS: Okay.  Anyone else? What about an Officer M. L. Ricks?

(Two responses.)

MR. GILLENWATERS:   What about Officer J. H. Hillyer?  Anybody know Officer Hillyer?

(One response.)

MR. GILLENWATERS:  Anyone else? Officer  Bryan  Botek,  I'm  sure  I'm saying that wrong.

A VOICE IN THE AUDIENCE:  Boteet.

MR. GILLENWATERS:  Boteet?

A VOICE IN THE AUDIENCE:  Boteet.

MR. GILLENWATERS:   Anybody know  Officer

Boteet?

No one knows him?  Okay.

What  about  a  Harry  Carpenter,  I

believe the Judge asked you about him.


(One response.)


A VENIRE MEMBER:  Is that Jodie Hillyer?

MR. GILLENWATERS:  Yes.

A VENIRE MEMBER:  I know him.

MR. GILLENWATERS:  And your name?

A VENIRE MEMBER:  Michael Guy.

MR. GILLENWATERS:  Michael Guy?

Anyone else know Mr. Carpenter?

(No response.)

MR. GILLENWATERS:  Any  of  you know  a Billy  Asberry  that  lives  in  Lafayette, Alabama?

(No response.)

MR.  GILLENWATERS:     No  one  knows  Mr. Asberry?

Or a Beth Fisk?  Any of you know --

(One response.)

MR.  GILLENWATERS:  Anybody  know  a  Ken Wesson?  I  believe he's  an employee  of the Heart of Auburn.

(One response.)

MR. GILLENWATERS:  Anybody else  know Mr. Wesson?

Have any of you  ever worked for the Heart of Auburn Motel?

(No response.)

MR. GILLENWATERS:  Have any of you worked in  that  type  of  industry, as  a  clerk  or receptionist at a hotel or  motel?  Any of you ever been in that type of business?

(No response.)

MR.  GILLENWATERS:     No  one,  is  that correct?

Thank you.

THE  COURT:  All  right.   Mr. McFarland, let  me get  you  to come  up  just  a  minute,

23

please.

(Whereupon, the following proceedings were had at the bench, inside the presence of the jury venire but out of its hearing, to-wit:)

THE COURT: What do you know about this case?

VENIRE MEMBER McFARLAND: Mr. Carpenter is a student of mine and we've discussed the case quite a bit.

THE COURT: You have?

VENIRE MEMBER McFARLAND: Yes, sir.

THE COURT: Then I think I'll excuse you from this case. We'll take Mr. McFarland off this case. But you need to stick around, you may end up on that case next door. Thank you.

A.   Yes, sir.  Those are  the rooms I was pointing

     out.  As I said, when you get past these rooms

     you go in this direction there's a little road

     that goes up through here.

Q.   Right to Gay Street?

A.   Right to Gay Street.

Q.   Okay.  And that's the direction the Defendant

     left driving, is that correct?

A.   Yes, sir.

Q.   And can  you drive a  car all the  way through

     there to Gay Street?

A.   Yes, sir.

Q.   When  you said  that -- you hadn't  ever been

     robbed; had you ever been robbed before?

A.   No, sir.

Q.   Before that occasion?

        You    said  Rodrigues  Huguley  appeared

     scared and said  oh, God, oh,  God, you  don't

     know  whether  he  was scared  because  he was

(Whereupon, the following proceedings were had in the presence and hearing of the jury venire.)

THE COURT: If anyone else has any responses that they want to make if you'll get ready we'll bring you up.

(Whereupon, the following proceedings were had at the bench, inside the presence of the jury venire but out of its hearing, to-wit:)

THE COURT: Yes, ma'am, your name?

A VENIRE MEMBER: Kathy Hawkins.

THE COURT: Ms. Hawkins?

VENIRE MEMBER HAWKINS: This is a very

negative thing but since I don't know the answer to this. My mother's name is Melba Hall and it is possible that she does some work for Mr. Gillenwaters.

MR. GILLENWATERS: I know Ms. Hall. I know your mother, yes. She used to work for Tom Mann?

VENIRE MEMBER HAWKINS: Yes.

MR. GILLENWATERS: Okay.

THE COURT: I appreciate you telling us. Thank you.

This is Mr. John D. Norman?

VENIRE MEMBER NORMAN: Yes, sir. Mr. Gillenwaters asked if anybody knew Mr. Keith Horne, Officer Horne in Auburn. His mother or stepmother is my brother's ex-wife but I don't even know him. I speak to him but I thought I didn't want to jeopardize the jury.

THE COURT: Okay. Thank you.

MR. GILLENWATERS:  What the name?

THE COURT:  Norman.

All    right.    Anything    else,
gentlemen?

MR. ABBETT:  No.

MR. GILLENWATERS:  I don't think so.

(Whereupon,    the    following

proceedings  were  had  in  the

jury    venire's    presence    and

hearing, to-wit:)

THE COURT:  All right.  Anybody else have
any responses, ladies and gentlemen?

(No response.)

THE  JURY:  All right.  Now  ladies and
gentlemen,  they're  still selecting  the jury

next door and we can't begin the selection process until they get through because we don't know which twelve of you are going to be on that jury. So I'm going to let you go back downstairs to the jury assembly room. As soon as they get the jury selected for the case over there they'll come get you and then we'll start the selection process over here. When we get through with that then we'll come get you. And then those of you not selected on those two juries, you'll be through for the day and we'll be through with all that way before lunch, I can assure you. So we'll do it as quick as we can but right now we'll let you go back downstairs and please stay in the vicinity of the jury room so we can find you.

(Whereupon, proceedings were in

a brief recess, after which the

28

following occurred, to-wit:)


MR. ABBETT: We ask that the victim Harry Carpenter be excused from the rule.

THE COURT: All right.    The rule is requested.  If you've got any witnesses they need to wait outside.

> (Whereupon, the jury venire returned to the courtroom and the following proceedings were had in their presence and hearing, to-wit:)

THE COURT: Now ladies and gentlemen, as your names are called please come around and have a seat in the jury box.

> (Whereupon, the Clerk called

the jury to the box.)

THE COURT:  Raise  your right  hands and
take  the following  oath, please,  ladies and
gentlemen.

(Jury duly sworn.)

THE COURT:  I'm going to ask you  to step
back in  the jury room  for just a  minute and
we'll get your right back out and get started.

(Whereupon,  the  jury  retired
from  the  courtroom  and  the
Court  dismissed  the  remaining
jury  venire  members,  after
which  the  following occurred,
to-wit:)

39

THE COURT:   All right.   Now on the record.   The juror that came up to me a minute ago and pointed out that she knows the lady in the  back of the  courtroom from  somewhere, a book store or someplace, is she -- who is she?

MR. GILLENWATERS:  She's  the Defendant's mother, Your Honor.

THE COURT:   All right.   If there's any problem with  that we'll talk to  her and see, but otherwise --

MR. ABBETT:   I've got a  problem with it because I asked that question.

MR.  GILLENWATERS:   I thought  you asked about --

THE COURT:  Well, of course sometimes --

MR. ABBETT:   I asked if anybody knew  the Defendant.

THE COURT:   Huh?

MR. ABBETT:   I  asked if anybody knew the

Defendant or any member of the Defendant's family.

THE COURT: Okay. Now a lot of times people don't know folks by names they have to

see them in person and I'm not sure she was pointed out to any of the jurors as being kin

to the Defendant, so we'll bring them back in and find out about that.

After we get through instructing the jury I'll tell her to wait here a minute and

I'll ask her some questions.

I think we'll do the opening

statements after lunch.

(Whereupon, the jury returned to the courtroom and the

following proceedings were had in their presence and hearing,

to-wit:)

32

THE COURT:    All right.    Ladies and gentlemen, how many of you have never served on a jury before, let me see a show of hands?

All right most of you.  Let me tell you a few things about what we're going to be doing.  We're not going to actually start this case until after lunch.  I'm going to give you these few instructions and let you go and then we'll come back after lunch and get started.

This is a criminal case of course. Your job is going to be to determine the guilt or the innocence of the Defendant after you hear all the evidence. So as you listen to the evidence just keep in mind that's going to be your job to determine whether he is guilty or not guilty of the charge.  If you should find the Defendant guilty the matter of punishment would be strictly up to the Court

and you would have no role in that at all.

Let me tell you how we operate.

There will be an opening statement. Opening statements that will be made to begin the case, that's a statement made by the lawyers just to tell you a little bit about what the case is about. Following that then you'll hear testimony of witnesses and receive evidence. When that's over with the lawyers will make their closing arguments to you and then I'll tell you what the law is that you apply to what you've heard.

Frequently during the trial of criminal cases there are objections or things that have to be taken up outside your presence. When that occurs I'll send you out of the courtroom and take those matters up. I know it gets to be a nuisance sometimes for that to take place where you're going and

34

coming all the time but that's what the law
says we have to do and that's the way we'll be
doing it.

You're free to take notes during the
trial and we've provided pads and pencils for
you. The first thing you need to do is write
your name on those pads because we're going to
take those up when you go to lunch and give
them back to you when you come back. Now
nobody will read anything that you've written
on the pads so don't worry about that. And
should the case go into tomorrow then we'll
take up the pads at the end of the day and
give them back to you in the morning.

There are thirteen of you there,
one of you will be an alternate. We do that
so that if somebody gets sick or has a family
emergency then we can proceed on with the
necessary twelve.

35

During breaks that occur here in the building I'd ask you to sort of stay together with the Bailiff. The reason for that is there may be witnesses out in the hallways who are discussing the case and I wouldn't want any of you to overhear what they're talking about. So try to stay together during the breaks.

Now you'll be free to go your separate ways during the lunch hour and should the case go into tomorrow you'll be free to go your separate ways.

Because of that you need to remember that oath that I gave you a little while ago and that is that you would decide this case based on the evidence and the testimony that you hear in this courtroom and not from any other source. It wouldn't be fair to either side for you to let anybody talk to you about

the case or for you to talk to anybody about
the case and I trust that that won't take
place.

Now I try to call recesses about
every hour and fifteen minutes or every hour
and a half. You're the first jury that's been
sitting in that box since we had it remodeled
this weekend. It used to be real tight and
we've gotten in there and spread those chairs
out a little bit so that it's not quite as
cramped as it was. That end seat there,
you're going to be strattling the post, you
may want to go for that other seat back there
if that gets to be uncomfortable. But we've
had complaints from jurors over the last seven
or eight years and the main complaint is the
fact the jury boxes are too tight. So we hope
that that will do something about that
complaint, at least in this courtroom. The

one in Judge Guilage's courtroom is still the old way but it will be remodeled in about a week or so.

All right. Now I'm going to let ya'll go to lunch right now and when we come back then we'll begin the case with opening statements and I've got some other cases set right at one, so I don't need you back until 1:15. Now when you come back please come back to the jury room that's right here behind you, here on the second floor and as you go out you can see where it is relative to the front door. And when all of you get back then we'll begin the case at that time and I need to ask you to stay just a minute and let me follow up on what you told me about.

All right. The rest of you may go right out that door and we'll see you back at 1:15.

(Whereupon, all jury members retired from the courtroom except Juror Wright, who remained to be questioned by the Court as follows, to-wit:)

THE COURT: What is your name?

JUROR WRIGHT: Kathy Wright.

THE REPORTER: I'm sorry, Judge, I can't hear. Kathy what?

THE COURT: Wright.

THE REPORTER: Wright?

THE COURT: Let me ask you something. Okay. This is Kathy Wright, a juror in this case.

Ms. Wright you indicated to me just a minute ago that you knew the lady sitting in the back of the courtroom?

JUROR WRIGHT: Right.

THE COURT: Do you know her personally or just by sight?

JUROR WRIGHT: Well, I knew her from the book store. She used to work in the AU Book Store.

THE COURT: Okay. You know her name?

JUROR WRIGHT: I think her name is Annie.

THE COURT: Annie? You don't know her as the mother of this Defendant?

JUROR WRIGHT: No.

THE COURT: Did you have a close relationship with her when she worked there?

JUROR WRIGHT: No.

THE COURT: Do you consider yourself a close friend?

JUROR WRIGHT: No.

THE COURT: Is the fact that she is the mother of the Defendant, would that make it difficult or uncomfortable for you to serve as

42

a juror in this case?

JUROR WRIGHT: No.

THE COURT: You can put that aside and judge this case strictly on the facts and the evidence and put aside that personal relationship?

JUROR WRIGHT: Uh-huh.

THE COURT: Anything by either side?

MR. ABBETT: No, sir.

MR. GILLENWATERS: No, sir.

THE COURT: All right. Thank you very much for telling me that. You can go with the others and we'll see you back at 1:15.

> (Whereupon, Juror Wright retired from the courtroom and the following proceedings were had out of the presence and hearing of all jury members,

41

to-wit:)

          THE   COURT:   All   right.   We'll be   in
recess until 1:15.


                    (Noon recess.)

42

AFTERNOON SESSION

THE COURT:  Everybody ready to go?

MR. ABBETT:  Yes, sir.

THE COURT:  Ten minutes a side for opening statements.

Bring them on back.

(Whereupon, the jury returned to the courtroom and the following proceedings were had in their presence and hearing, to-wit:)

THE COURT:  All right.  Ya'll don't have to sit in the same seat every time, ladies and gentlemen.  You can move around as we come and go.

All right.  Opening statements.

(Whereupon, both attorneys made

their opening statements to the

jury, after which the following

occurred, to-wit:)


THE COURT:  Call your first witness.


## STATE'S EVIDENCE


MR. ABBETT:  We call Harry Carpenter.

THE   COURT:   Raise   your   right   hand,

please.


(Witness duly sworn.)


THE COURT:  Have a seat up here.


## HARRY CARPENTER,

a witness, having first  been duly sworn  to speak

44

the truth, the whole truth and nothing but the

truth, was examined and testified as follows, to-

wit:

### DIRECT EXAMINATION

BY MR. ABBETT:

Q.   Would you state your name to the jury, please

     sir?

A.   Harry Carpenter, III.

Q.   And where are you employed?

A.   Heart of Auburn Motel.

Q.   In what capacity, please?

A.   Night auditor.

Q.   And were you so employed back on Monday, the

     early morning hours of Monday, July 24th,

     1995?

A.   Yes, sir.

Q.   Mr. Carpenter, how did you come to be employed

with the Heart of Auburn Motel?

A.    I'm a graduate student at Auburn University

      and assistanceship isn't enough money to live

      on and I had been doing it before and I just

      went and asked for the job because I had

      experience as a night auditor.

Q.    How long had you been employed back on July

      the 24th?

A.    Since mid January.

Q.    And what are you majoring in at Auburn

      University?

A.    History of technology.

Q.    And how far along are you in your studies?

A.    I finished one year toward my Ph.D.

Q.    Working on your doctorate?

A.    Yes, sir.

Q.    And what's an assistanceship?

A.    It's where you assist the professors and you

      get a stipend and a waiver of out of state

fees.

Q.  Mr. Carpenter, I'd like to ask you to just tell, I'm going to ask you some questions about what occurred during those early morning hours, and I'd just like for you to tell the jury what happened. If you would just begin with where the person first came in to register about 12:45 or whatever time you remember exactly that they came in.

A.  Well, it was around 1:00 o'clock Mr. Buguley came in and he wanted to rent a room and he handed me, you know, I said are you going to pay cash. He said yes. I said I'll need to see I.D. and he handed an I.D. that didn't have a picture. I said you've got to have a picture I.D. So then he handed me his driver's license and --

Q.  He handed you some other kind of I.D. first?

A.  It was like a driver's license without a

47

picture.

Q. All right, sir.

A. And I said no, I've got to have a picture I.D. And so then he handed me one, his driver's license and I took down the information, I checked the date because he was just barely eighteen I noticed but he was eighteen.

Q. Do you remember the first I.D. that he handed you was in his name or do you remember?

A. I didn't even look at it. When I saw it didn't have a picture I said I've got to have a picture. So I didn't even look at it.

Q. Okay. Go ahead.

A. And then I put in the information and was checking him in and he gave me, like it was, the total was $30.24. He gave me $40.00 and a quarter and I was getting his change when the man with the ski mask came in --

THE COURT: You need to talk a little bit louder for us.

THE WITNESS: I'm sorry.

A.   Then the man with the ski mask came in.

Q.   Let me stop you just a minute.  Let me show you what's been previously marked as State's exhibit number twenty-five and ask if you can identify that, please?

A.   Yes, this is what we fill out when a guest checks in and has the, with all the information, address and driver's license number and how much the cost of the room was plus tax and then what I took in.

Q.   All right.  Is that what you filled out on that occasion when this person that told you that his name was Rodrigues Huguley and presented an Alabama driver's license?

A.   Yes, sir.

49

MR. ABBETT: Your Honor, we offer State's exhibit number twenty-five.

MR. GILLENWATERS: No objection, Your Honor.

THE COURT: Admitted.

(Whereupon, the instrument hereinabove referred to and marked for identification as State's exhibit number twenty-five was admitted and received into evidence.)

DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.    Okay. As you, as this person, the person that was checking in on that occasion, is he present in the courtroom?

A.    Yes, sir.

Q.    Would you point him out, please?

56

A.   It's the Defendant there (indicating).

Q.   Are you pointing to the Defendant right here,

Rodrigues Huguley?

A.   Yes, sir.  Uh-huh.

Q.   Does he appear the same today as he did back

on that occasion?

A.   Oh, no, he didn't, his hair is shorter and

he's wearing glasses.   He wasn't wearing

glasses that evening.

Q.   Are you sure about the identification?

A.   Yes, sir.

Q.   I show you what's been previously marked as

State's exhibit number twenty-six and ask if

you recognize that, please?

A.   Yes, sir, that's what he looked like that

night.


     THE COURT:   You're mumbling, I can't

understand you.

THE WITNESS:  I'm sorry.

THE COURT:  I know you're not used to doing this but you need to try to speak good and clear for us in that mike.  He's got to write this down.

THE WITNESS:  Okay.


Q.  Is that a photograph, sir?

A.  Yes, sir.

Q.  Is it a photograph of the Defendant Mr. Huguley?

A.  Yes, sir.

Q.  Does it truly and accurately depict the way he appeared on the night of the robbery?

A.  Yes, sir.


MR. ABBETT:  Your Honor, we offer State's exhibit number twenty-six.

THE COURT:  Admitted.

52

MR. GILLENWATERS:  No objection.

(Whereupon,    the    instrument
hereinabove  referred    to    and

marked    for    identification    as
Defendant's    exhibit    number

twenty-six    was    admitted    and
received into evidence.)


DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.    All right, Mr. Carpenter, if    you    would    go
ahead with your testimony,    I believe you    are

to the point where a person came in with a ski
mask.

A.    This man came in with a ski mask    and he had a
pistol and    it was silver colored    and he held

it, and he    pointed it toward    my head and    he
said give me, give me the cash.

Q.    Okay.

A.    And he threw a bag at me.

Q.    Let me ask you to do something right now.

Would you look behind you on the board here.

We've marked a diagram that's State's exhibit

number one.  Would you take a look at that

diagram, please, sir?

A.    Yes, sir.

Q.    Does that diagram fairly and accurately depict

the office area of the Heart of Auburn Motel?

A.    Yes, sir.

Q.    All right.  Is the Heart of Auburn Motel in

Lee County, Alabama?

A.    Yes, sir.

Q.    Okay.  Would you point out where you, just

draw a little block and put your own name by

the block and show where you were?

A.    (Witness complying.)

Q.    Does that diagram fairly and accurately depict

the office area there?

54

A.    Yes, sir.

          MR. ABBETT:    We offer State's exhibit
number one, Your Honor.

          THE COURT: Admitted.

                    (Whereupon,    the    instrument
                    hereinabove  referred  to  and

                    marked  for  identification  as
                    State's exhibit  number one was

                    admitted   and   received   into
                    evidence.)


DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.    Okay.  Now if you  would show the  ladies and
      gentlemen of the jury on the diagram where the

      door  is  located  and  just  where  different
      things are located in the office area, please,

      sir.

55

A.   Well, this is a B, where it says B is the side
     door that's the door that most people would

     enter from and C is a back door that if a
     guest, we have an ice machine that's in the

     lobby and that's mainly where the guests would
     come in that wanted to use the ice machine.

Q.   Okay. Where was Rodrigues Huguley as he was
     registering for a room?

A.   He would have been about right here.

Q.   Okay. Would you draw an X there or a delta,
     draw a delta and write Huguley beside it,
     would you?

A.   (Witness complying.)

Q.   Okay. If you would use the diagram and show
     the jury how the person with the ski mask came
     in and what they did, please, sir.

     You can speak loudly without the
     microphone.

A.   Okay. He just came in through this door and

was standing about right  here and was holding

the pistol and said give me your cash.

Q.    Was he holding the pistol pointed at you?

A.    Yes, sir.

Q.    Show the jury while you're standing how he was

doing that, please, sir.

A.    Like this (indicating).

Q.    Over the counter at you?

A.    Yes, sir.

Q.    Okay.  And what did he say?

A.    Give me the cash.

Q.    And what did you do?

A.    When he, he threw a bag at me and  I picked up

the bag and I gave him the cash.

Q.    And was that, how much cash did you give him?

You can sit back down.

A.    $259.00.

Q.    And was that in United States currency?

A.    Yes, sir.

57

Q.   And was that the property of the Heart of
     Auburn Motel Corporation?

A.   Yes, sir.

Q.   Except for --

A.   The $10.00 in change that I was about to give,
     give back $10.00 and a penny change.

Q.   To Rodrigues Huguley?

A.   To -- yes, sir.

Q.   Okay.  Tell the ladies and  gentlemen in your
     own words the  best you can  describe it,  Mr.

     Carpenter, of what happened as the person came

     in and pointed the pistol at you and  demanded

     the  money.  Just  go ahead in  your own words

     about,  in  a   narrative  form   about  what

     happened.

A.   Well  he came in and he pointed a pistol at me

     and said give me   the cash and he   threw this

     little  clear plastic bag  like you  would get

     maybe if you bought something at a drug store,

a little bag. And I picked it up off the floor, he threw it over the counter, I picked it off the floor and I was giving him -- and when I had put all the bills in I started to put the change in and he said no, I just want the cash. So then I handed it to him and he ran out the door here (indicating) and headed straight back toward Gay Street.

Q. Can you go through that way, through the motel property to Gay Street?

A. Yes, sir.

Q. What did you do at that point?

A. I called 911.

Q. Okay. And did you report the robbery to the Auburn Police Department?

A. Yes, sir.

Q. Did you give them a description of the person that robbed you?

A. Yes, sir.

59

Q.   What did you tell them?

A.   It was a black man, I said I didn't see his

     face because he was wearing a ski mask, that

     he had a black shirt on and I really didn't

     see, because the counter is high, I really

     didn't see his pants.  I described a black

     shirt and the pistol.  It was a silver pistol,

     small pistol and that he had left toward the

     rear of the motel, toward Gay Street on foot.

Q.   When he left was he walking or running?

A.   He was running.

Q.   What did the Defendant Huguley do at that

     time?  As you were calling 911 and reporting

     it to the police and giving them the

     description?

A.   He was, he was standing there and he said, do

     you want me to follow him and I said well no,

     he's got a gun.  And so then I -- after I had

     called the police and had finished the

68

conversation with the police, 911, I gave him his room key.

Q.    Did he ask you for the room key, or do you remember?

A.    To be honest with me I don't remember whether he asked for it or I just gave it to him, but he had already paid for the room so I gave him the key.

Q.    Okay. Did he stay there until the police arrived?

A.    No. He went, he got in the car, it was parked right in the driveway, he got in the car and then he, you know, headed back toward where the room would have been.

Q.    Okay. Now which direction would -- let me use another diagram.

      I show you what's marked as State's exhibit number two and ask if you recognize that, please, sir?

A.    Yes, sir.

Q.    What's shown in State's exhibit number two?

A.    Well  it's the  layout of  where the  Heart of
      Auburn  Motel  is  and  various  streets    in
      Auburn.

Q.    Okay.  Does that diagram fairly and accurately
      depict the layout of the Heart of Auburn Motel
      and some of  the streets, that  is Gay  Street
      and College Street, Miller and Thatch Avenue?

A.    Yes, sir.


            MR. ABBETT:  Your Honor, we offer State's
      exhibit number two.

            THE COURT:  Admitted.


                        (Whereupon,     the    instrument
                        hereinabove  referred  to    and
                        marked  for   identification  as
                        State's exhibit  number two was

62

admitted   and   received   into
evidence.)


DIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.   Okay.   If   you would show   on the diagram   Mr.
     Carpenter   what   you   were   relating   earlier
     before I interrupted you.

A.   These are the rooms   that normally sell, these
     are rooms that sell   for $28.00, which was the
     room  he had   rented.   And   so   here was   the
     office,  he  headed back   toward   these rooms,
     back toward the back.

Q.   Okay.   So he   headed in the   same   direction
     that the person who was later identified to be
     Clark went,  is that correct?

A.   Yes,  sir.

Q.   Okay.   Did   the Auburn   Police   later   bring
     Dewayne T. Clark back to the motel?

A.   Yes,  sir.

Q.   Approximately how long after you reported the
     robbery  was  it  before  the  Auburn  Police
     Department brought Clark back?

A.   It was just  a few minutes because --  I'm not
     sure exactly  how long  it was, but  it wasn't
     long at all.

Q.   All right.  When they brought him  back did he
     have the ski mask and the gun?

A.   No, sir.

Q.   Were you able to identify him?

A.   I, all I  could tell them  was he was  wearing
     the same shirt, you know, because he had  been
     wearing a ski mask.

Q.   You were able to identify the shirt?

A.   Yeah, well,  it was the same  type shirt, yes,
     sir.

Q.   Okay.   Did Officer  Ramsey or Sgt.  Ramsey, a
     detective, show you a ski mask and a gun?

A.   Yes, sir.

64

Q.   Were you able to recognize those?

A.   They looked like the ones that he had used.

Q.   I show you what's been previously marked as State's exhibit number eighteen which is a ski mask, and State's exhibit number nineteen, which is a pistol, and ask if you recognize those items?

A.   They look like, that looks like the ski mask that the robber was wearing and that looks like the gun he had.

Q.   Okay. And you previously had been shown these by Detective Ramsey, is that correct?

A.   Yes, sir.

Q.   Do you know what happened to Rodrigues Huguley after he left in the direction that Clark ran?

A.   Well, when I came into the police station --

     MR. GILLENWATERS: Object, Your Honor, he would only know by hearsay. Unless he

personally knows.

THE COURT:  Sounds like he was testifying

what he saw.  Were you fixing to tell us what

you saw?

THE WITNESS:  I saw that they -- yes,

sir.

THE COURT:  Overrule the objection.

A.    I saw that they had arrested him when I went

to the police station to fill out the, to make

my statement and they showed me the mask and

that sort of thing.

Q.    But you didn't see him anytime after that

until you saw him at the police station?

A.    Yes, sir.

Q.    Okay.    Mr. Carpenter, did you ask the

Defendant Huguley to wait until the police

came because he was there when the robbery

occurred?

A.   Well no, because he had a room I thought he
     would just go to his room and so I really
     didn't ask him to stay. I figured that if the
     police wanted to talk to him they could, you
     know -- I knew what room he was in.

Q.   You thought you knew which room he would be
     in?

A.   Yes, sir.

Q.   But he didn't stay, did he?

A.   No, sir.

Q.   And he asked you if you wanted him to follow
     the person that came in with the ski mask and
     the gun?

A.   Yes, sir.

Q.   I believe that's all.


             THE COURT:  Cross examination.


Q.   Just one other question.

Were you scared?

A.    Yes, sir.

Q.    That's all.


CROSS EXAMINATION


BY MR. GILLENWATERS:

Q.    Let me follow up on that, sir.  You  said you

      were scared, is that correct?

A.    Yes, sir.

Q.    Did Rodrigues,  did  he  appear  to  be  scared

      also?

A.    Yes, sir.

Q.    How could you tell that he was scared?

A.    He  was, he  backed up  and said oh,  God, oh,

      God.

Q.    Okay.    That's what  he said when  this person

      with  the  mask  and  gun  came  in,  is  that

      correct?

68

A.    Yes, sir.

Q.    All right.   Now, I think  you also  testified

      that you   never gave him the  change, that the

      person  who robbed the  motel took  his $18.00

      also, isn't that correct?

A.    Yes, sir.

Q.    And then   took monies  that  belonged to  the

      Heart of Auburn, is that correct?

A.    Yes, sir.

Q.    All right.   Now, how long was he in  the room

      or  at the  desk  there with  you before  this

      other individual came in?

A.    I  would -- let's see, I'd have to think about

      it  a minute. Well,  he came in  right when I

      was  changing over  the time  on the  computer

      back  to the regular  time  and  that took  a

      couple, took  about two or three   minutes and

      then  I went through  the process  of checking

      him in, I think it usually takes about, I mean

59

I would estimate that that takes about five or
six minutes. And so I would say he was
probably in there somewhere in the nature of
eight to ten minutes.

Q.   So eight to ten minutes before the other
individual showed up, is that correct?

A.   That's correct.

Q.   All right. Now, you were changing something
on the computer, or changing the date?

A.   Well, the computer doesn't allow me to do the
audit until two o'clock unless I tell the
computer the wrong time and so I tell it it's
two o'clock at midnight so I can do the audit.
And then we have to run a back up tape and
when that's done I change the time back up and
he happened to come in right when that
happened.

Q.   All right. Now when Rodrigues came in, you
said he did give you his driver's license, is

70

that correct?

A.   Yes, sir.

Q.   All right. And let me show you State's exhibit
     twenty-five that's previously been admitted.

A.   Uh-huh.

Q.   You filled that out, is that correct?

A.   That's correct.

Q.   All right. And that was from information that
     was on the front of his license, is that
     correct?

A.   That's correct.

Q.   All right. And did you look at the picture
     I.D. on the driver's license?

A.   Yes, sir.

Q.   And did it, it matched him?

A.   Yes, sir.

Q.   All right. And was there anything that he had
     to sign or anything on this?

A.   Well normally he would have signed something

71

but because of the confusion I didn't have
him sign it.

Q. Okay. And he paid you with $40.00, is that
correct?

A. It was $40.00 and a quarter and I was getting
his $10.00 and a penny change.

Q. Okay. He didn't try to hide his identity to
you in any way, did he?

A. Well, you know, after he gave me the picture
I.D., no.

Q. Okay. Now while the person who robbed you was
there did you see or was there any
communications between Mr. Huguley and the
person who robbed you?

A. I didn't see any but I'll be honest with you I
was looking at that gun.

Q. Okay. The only thing you heard was oh, no,
oh, no?

A. Uh-huh.

Q.   All right. But he -- prior to that you were
     dealing with the computer, is that correct?

A.   It was right, what do you mean, right when
     the, the man with the gun came in?

Q.   When Rodrigues first came in, you were dealing
     with the computer?

A.   Yeah, I was -- yeah.

Q.   All right. What was he doing while you were
     dealing with the computer?

A.   Well, I'm typing in the information and as
     far as I know he was just standing there. You
     know, I'm --

Q.   Just standing there?

A.   Yeah, I'm looking at the computer while I'm
     typing in the information.

Q.   All right. Now you saw him drive up and park,
     isn't that correct?

A.   Yeah, I saw the car come up, yeah.

Q.   And he parked right in front of the desk, is

73

that correct?

A.    Well, yeah, it's, let's see -- right here

(indicating).

Q.    Right in front of the door?

A.    Right there is where he would have parked,

yeah (indicating).

Q.    Okay.

A.    That's where he parked.

Q.    You could see his car?

A.    Yes, sir.

Q.    All right.  Did you see him arrive in his car?

A.    No, I wasn't paying attention, I just, I mean

I saw a car there after it arrived.  I didn't

see him arriving in the car, no.

Q.    Okay.  And you could see him when he left, is

that correct?

A.    Yes.

Q.    All right.  And he got back in the car and

left and went back toward the room --

74

A.   Yes, sir.

Q.   -- that he had rented, is that correct?

A.   Yes, sir.

Q.   Okay.  Now you didn't ask him to stay, did

     you?

A.   No.

Q.   You had already called the police prior to him

     leaving, isn't that correct?

A.   That's correct.

Q.   All right.  And you did hear him make a

     statement, if you want me to go after him,

     didn't you?

A.   He said do you want me to follow him.

Q.   Okay.  All right.  Thank you, sir.


          THE COURT:   Any other questions of this

     witness?

          MR. ABBETT:  Just a couple.

## REDIRECT EXAMINATION

BY MR. ABBETT:

Q. If he had followed after him and picked him up in that car and gone to the room the police wouldn't have caught him, would they?

A. No, sir.

Q. Okay. I'll show you what's been previously been marked as State's exhibits number three and four and ask if you recognize those, please, those photographs?

A. Yes, sir, that's the driveway by the office.

Q. Okay. And do those photographs, those two photographs show the office area and the driveway and the area that leads towards Gay Street there at the Heart of Auburn?

A. Yes, sir, it's, well, back behind these set of buildings is where the -- goes to Gay Street.

Q. Do those two photographs truly and accurately

depict the scene as it appeared on that occasion?

A.   Yes, sir.

Q.   Now these were made after you called the police, is that correct?

A.   Yes, sir.

Q.   In fact a police car is shown in one of them?

A.   Yes, sir.


          MR. ABBETT:    We offer State's exhibit number three and four.

          MR. GILLENWATERS:   No objections, Your Honor.

          THE COURT:  Admitted.


                    (Whereupon, the instruments hereinabove referred to and marked for identification as State's exhibit number three

and   number  four   were  admitted

and  received into evidence.)


REDIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.   If you would, Mr.  Carpenter, come down  where
     the jury can see, please, sir.

A.   (Witness complying.)

Q.   I  show  you  what's been  marked  as  State's
     exhibit number three and  let me hold it where
     the jury  can see  and let  you point  out the
     office   area   and   the    driveway   in   that
     photograph.

A.   Right  here is the door, you see a little step
     right there (indicating), that's the door into
     the office and there's a window back behind --

Q.   Can everybody see?

A.   -- and you  see that step  right there in  the
     front of the picture?  That's the door, that's
     the door, that's where the door is.

78

Q.    And a police car is parked here, is that about
      where the Defendant parked on that occasion?

A.    Approximately.

Q.    And I show you now what's marked as State's
      exhibit number four and hold it where the jury
      can see, could you tell them what's shown in
      that photograph, please?

A.    Well, this is a little further back than what
      you just saw here looking out this way, and
      those are the rooms right there that rent for
      $28.00.

Q.    And if you go straight back like you're going
      into the photograph you go to Gay Street?

A.    Yes, sir. When you go past these rooms right
      here and it's a little catty-cornered, but
      it's back that way.

Q.    Okay. Could you relate that to the diagram,
      that second picture, number four I believe it
      is?

38

participating in the robbery or he just happened to be there, do you?

A.   No, sir.

Q.   That's all.


## RECROSS EXAMINATION


BY MR. GILLENWATERS:

Q.   Sir, you testified when Mr. Abbett asked you that if he had picked up Mr. Clark and went back to the room that he would have got away with it, isn't that what you said?

A.   Yes, sir, if they would have caught them then I said I didn't think so.

Q.   All right.   But now I thought you had testified earlier that you had his name and his, you knew where he was going to be staying at the hotel and you didn't think it was any problem getting with him as a witness because

you would just tell the police that he was in

room such and such and they could go back and

interview him, isn't it?

A. Yes, sir.

Q. All right. So you gave Rodrigues Huguley's

name as a witness to the police, didn't you?

A. Yes, sir.

Q. All right. And they knew what room he was in,

isn't that correct?

A. Yes, sir.

Q. All right. And one would assume that if they

hadn't caught Mr. Clark they would have went

and knocked on that room, wouldn't they?

A. Yes, sir.

Q. All right. And if Mr. Clark had been in that

room that wouldn't have been very good, would

it?

A. Yeah, if he had of left himself visible.

Q. All right. Thank you, sir.

162

THE    COURT:    Anything    else    of    this witness?

MR.    ABBETT:    That's    all    at    this    time, Your Honor.

THE COURT:  You can step down.


(Witness excused.)


THE COURT:  We'll take our mid  afternoon recess at  this  time, ladies  and  gentlemen. The  Bailiff will take  you downstairs. Ya'll can get a coke, coffee, whatever you want  and we'll come back  in about fifteen minutes  and start again.


(Whereupon, proceedings were in

a brief recess, after which the

following occurred, to-wit:)

163

THE COURT: Ya'll ready?

MR. GILLENWATERS: Yes, sir.

(Whereupon, the jury returned
to the courtroom and the
following proceedings were had
in their presence and hearing,
to-wit:)

THE COURT: Call your next witness.

MR. ABBETT: Call Billy Ramsey. Sgt.
William Ramsey.

WILLIAM RAMSEY,

a witness, having first been duly sworn to speak
the truth, the whole truth and nothing but the
truth, was examined and testified as follows, to-
wit:

164

## DIRECT EXAMINATION

BY MR. ABBETT:

Q.   State your name for the jury please.

A.   William Ramsey.

Q.   Where are you employed?

A.   The City of Auburn Police Department.

Q.   In what capacity?

A.   Detective Sergeant.

Q.   In that capacity did you participate in the investigation of the robbery of the Heart of Auburn Motel, Mr. Harry Carpenter, back on July the 24th, 1995?

A.   Yes, sir, I did.

Q.   Specifically, Sgt. Ramsey, did you recover the gun and the ski mask?

A.   Yes, sir, I did.

Q.   Would you point out on the diagram where you recovered them, please?

165

        I believe this is the motel area down
here.

A.    This is the office at the hotel. You go back
      out the back parking lot and this is Gay
      Street, runs north and south. There's a small
      drive that connects the back of the hotel and
      there's an area of trees and it was on the
      second, the base of the second tree.

Q.    And did you take them into your care, custody
      and control, that is State's exhibits numbers
      eighteen and nineteen?

A.    Yes, sir, I did.

Q.    Did you turn them over in the same condition
      as when you picked them up from the ground
      there to Detective Paul Register?

A.    Yes, sir, I did.


        MR. ABBETT:    We offer eighteen and
nineteen.

166

MR. GILLENWATERS: No objection.

THE COURT: Admitted.

(Whereupon, the instruments hereinabove referred to and marked for identification as State's exhibits numbers eighteen and nineteen were admitted and received into evidence.)

MR. ABBETT: I believe that's all, Your Honor.

THE COURT: Cross.

MR. GILLENWATERS: Yes, sir.

167

## CROSS EXAMINATION

BY MR. GILLENWATERS:

Q.  Did you participate in questioning Mr. Ruguley

at all?

A.  I was in and out of the interview room when

Detective Register was questioning him.

Q.  All right. And the questioning occurred the

next morning, is that correct?

A.  I --

Q.  Or that same morning, just later in the day?

A.  Yes.

Q.  Okay. You said you were in and out?

A.  Yes.

Q.  Do you ever recall going in and thumping the

table and telling him he could get twenty-five

years for this?

A.  Thumping the table?

Q.  Yes. Or telling him he could get twenty-five

168

years?

A.    I don't recall that, no, sir.

Q.    You don't recall that?

            Thank you, sir.


            THE COURT:  Anything else?

            MR. ABBETT:  That's  all.  Your Honor, we

ask that this  officer be excused.  He's got a

dental appointment.

            THE COURT:  You're excused.  You may go.


                    (Witness excused.)


            THE COURT:  Next witness.

            MR. ABBETT:  Call Officer Hillyer.


                    JODIE HILLYER,

a witness, having  first been duly  sworn to  speak

the  truth, the  whole  truth and  nothing but  the

169

truth, was examined and testified as follows, to-wit:

## DIRECT EXAMINATION

BY MR. ABBETT:

Q.    State your name for the jury, please?

A.    Jodie Hillyer.

Q.    And where are you employed?

A.    City of Auburn Police Department.

Q.    In what capacity?

A.    As a patrol officer.

Q.    Were you so employed back on July the 24th, 1995?

A.    Yes, sir.

Q.    Were you in inform then as you are now?

A.    Yes, sir.

Q.    Did you respond to the robbery call at the Heart of Auburn Motel?

170

A.  Yes, sir.

Q.  Tell the ladies and gentlemen of the jury what

you did in your own words.

A.  We responded immediately when the call went

out.  I was approximately four blocks away

from the hotel. We responded to the parking

lot. I heard another officer say that he had

spotted the suspect.  He described getting in

a vehicle traveling northbound on Gay Street.

Officer Mike Ricks was in a marked patrol

unit.  He immediately notified dispatch and

other officers that he was in pursuit. I was

able to follow in behind Officer Ricks

approximately, I guess three hundred yards

behind.  Observed the vehicle turning into a

parking lot at Auburn United Methodist Church

on Gay Street. When I turned in the parking

lot Officer Ricks was in foot pursuit of the

subject from the vehicle. I observed another

171

individual standing beside the driver's door. The driver's door was open. By the time I exited my vehicle Officer Ricks notified on the radio that he had taken the subject into custody and at that time I took the individual standing beside the vehicle into custody also.

Q.   Was that the Defendant in this case --

A.   Yes, sir.

Q.   -- Rodrigues Huguley?

A.   Mr. Huguley, yes, sir.

Q.   You took him into custody?

A.   Yes, sir.

Q.   As he got out of the vehicle did he say anything?

A.   Yes, sir.   He pointed towards Officer Ricks and the other subject and said there they go.

Q.   There they go?

A.   Yes, sir.

Q.   Okay.  And after you took him into custody did

172

you advise him of his constitutional rights?

A.   Yes, sir, I did.

Q.   Okay. Did you advise him orally or did you use a written form?

A.   Orally from a card provided from the --

Q.   Have you got the card with you?

A.   Yes, sir.

Q.   Will you take it out please?

A.   (Witness complying.  Okay.  Do you want me to read it?

Q.   Yes, sir.  Would you -- did you read from that card to the Defendant Huguley his rights?

A.   Yes, sir.

Q.   Would you read to the jury the rights that you read to him?

A.   Yes, sir.  This is the adult statement of rights.  It says before we ask you any questions you must understand your rights. You have the right to remain silent.  Anything

you say can be used against you in court. You
have the right to talk to a lawyer for advice
before we ask you any questions and to have
him with you during questioning. If you
cannot afford a lawyer one will be appointed
for you before any questioning if you wish.
If you decide to answer questions now without
a lawyer present you will still have the right
to stop answering at anytime. You also have
the right to stop answering at anytime until
you talk to a lawyer. Do you understand what
I've read to you?

Q.  When you asked him if he understood what you
    had read to him did he reply to you?

A.  Yes, sir.

Q.  What did he say?

A.  He said yes, I want to cooperate.

Q.  He said yes, I want to cooperate?

A.  Yes sir.

174

Q. Did he -- did you ask him questions or did he then make a statement to you?

A. He made statements then.

Q. What did he say to you?

A. He said that he was car jacked.

Q. He said he was car jacked?

A. Yes, sir.

Q. Was that his words?

A. Yes, sir.

Q. Was that his exact words, he was car jacked?

A. Yes, sir. That, his initials words were he was car jacked.

Q. All right. What else did he say to you?

A. Said that he was just in there when the place got robbed. I had not made any statements toward him about a robbery but he told me he was in there when the place --

Q. He was in there when the place was robbed?

A. Yes, sir.

175

Q.   Did he  say anything about anybody  pointing a
     gun at him?

A.   Yes, sir.

Q.   what exactly did he say?

A.   He said the guy  had a silver gun  and pointed
     it at me and made me let him in the car.

Q.   The guy had a silver gun and pointed it at him
     and made him let him in the car?

A.   Yes, sir.

Q.   You're sure about that?

A.   Yes, sir.

Q.   And he said he was car jacked?

A.   Yes, sir.

Q.   I believe that's all.


          THE COURT:  Cross examination.

176

## CROSS EXAMINATION

BY MR. GILLENWATERS:

Q.   Officer   Billyer,   when you   arrived   at   the

     scene you said he was standing by the vehicle,

     is that correct?

A.   Yes, sir.

Q.   Did he attempt to run in any way?

A.   Mr.   Huguley,   like   I   said,   appeared   to be

     watching Officer Ricks and he saw me pull  up.

     He looked away from  the vehicle and he looked

     back into   the   vehicle   and   I   was   able   to

     contact him then.

Q.   Back   into the   vehicle?   You mean   he looked

     back into his vehicle?

A.   Yes,  sir.  He was,  the door was  open and he

     was standing in the open door.

Q.   Okay.

A.   To the side of the vehicle.

177

Q.    The diagram behind you has Officer Ricks' car
      directly behind --

A.    Yes, sir.

Q.    -- the car.

A.    Right.

Q.    Where did you pull up to, sir?

A.    Directly behind Officer Ricks.

Q.    All right.    And I assume you were off Gay
      Street, is that correct?

A.    Yes, sir, that's not to scale.

Q.    All right.    And you said he was standing by
      the driver's side?

A.    Yes, sir.

Q.    Okay.    And he made a statement as to what
      direction Officer Ricks and the other
      individual went, is that correct?

A.    Yes, sir.    He pointed at them.    I could still
      see them.

Q.    You could see them, is that correct?

178

A.    Yes, sir.

Q.    Is this a well lit area?

A.    Yes, sir.  It's a, it's a, I guess a student

      center and it's well lit twenty-four hours --

      well, when it's dark.

Q.    All right.  And you said you saw the vehicle

      pull in off of Gay Street with Officer Ricks'

      patrol car behind it, is that correct?

A.    Yes, sir.

Q.    Did you see the vehicle prior to that time?

A.    Well, from, I guess from Thatch northbound

      into the lot was when I --

Q.    All right.

A.    -- saw the vehicle.

Q.    So you saw it for approximately a block then,

      is that correct?

A.    It's a half a block, I guess.

Q.    All right.  Did you see it, the red light

      there?

179

A.   At Thatch?

Q.   Yes.

A.   Yes, sir.

Q.   Did the vehicle slow down or stop at Thatch at

     the red light?

A.   It was in, it was in the intersection when  I

     saw it and Officer Ricks' emergency equipment

     was activated and like I say I was about three

     hundred yards behind.  I couldn't tell.

Q.   All right.  You couldn't tell if the red light

     --

A.   I couldn't tell if it  had broken the plane of

     the intersection in relation to the light.

Q.   Did you, could you see if the car was, and the

     car that I mean is the one Mr. Huguley was in,

     was it  speeding up, slowing down  or what was

     this car's activities?

A.   The  vehicle, when it  was northbound  when it

     turned into the parking lot  was at a, I would

188

say higher than normal rate of speed, which
was a posted twenty-five.

Q.    All right.   So you believe that the vehicle
was going faster than twenty-five in that
block?

A.    Yes, sir.

Q.    As you saw it?
        Did you ever see it stop or slow down
during that block that you saw it?

A.    The half of block from Thatch to the parking
lot, no, sir.

Q.    All right.   You didn't see it, its brake
lights come on three or four times?

A.    Sir, I, again I couldn't see his brake lights.

Q.    You couldn't see ---

A.    Okay.   I could, Officer Ricks' emergency
equipment was activated and he was behind the
vehicle.

Q.    All right.

121

A.    I didn't see Officer Ricks' brake light.

Q.    All right.  You didn't see his brake lights?

A.    No, sir.

Q.    And he was in direct pursuit of the vehicle --

A.    Yes, sir.

Q.    -- is that correct?

      All right.  Could you see the vehicle in front of Officer Ricks?

A.    Yes, sir, I could see a vehicle.

Q.    All right.  Could you see the passenger side door?

A.    No, sir.

Q.    Were you by yourself?

A.    Yes, sir.

Q.    All right.  Did you at anytime see any of the doors on this vehicle open?

A.    No, sir, I didn't.

Q.    Okay.  Is there street lights out there?

A.    Yes, sir.

182

Q.   Okay.  And like you  said the parking  lot is

     fairly well lit too, is that correct?

A.   Yes, sir.

Q.   All  right.  Now, Mr. Huguley did  not try to

     run, did he?

A.   No, sir.

Q.   You said you read him  his rights and he  said

     he would be cooperative, is that correct?

A.   Yes, sir.

Q.   He said  he  was  there  when  the  place  was

     robbed, is that correct?

A.   Yes, sir.

Q.   Did he seem upset?

A.   Yes, sir.

Q.   Was he nervous?

A.   Yes, sir.

Q.   Okay.  How long did you talk with him?

A.   I mirandized him, he made statements to me,  I

     didn't question Mr. Huguley.  And I placed him

183

in the back of my patrol unit with the windows

up and I shut the door and didn't talk with

him.

Q. How long a period of time was that?

A. Two to three minutes.

Q. Two to three minutes. Did you advise him he

was under arrest?

A. Sir?

Q. Did you advise him he was under arrest?

A. No, sir, I didn't specifically state you're

under arrest.

Q. All right. But you read him his Miranda rights

and he wasn't under arrest then, is that

correct?

A. No, sir, that's not what I said. I said I

didn't advise him that he was under arrest.

Q. All right. Did you handcuff him?

A. Yes, sir.

Q. And you placed him in the back of the vehicle,

184

is that correct?

A. Yes, sir.

Q. All right. By that time had Officer Ricks come back with Dewayne Clark?

A. Yes, sir.

Q. Was Dewayne Clark placed in the same vehicle or different vehicle?

A. No, sir. Different vehicle.

Q. Okay. And they were transported to the Auburn Police Department, is that correct?

A. Yes, sir.

Q. All right. Now where is the Auburn Police Department in relation to the Methodist Church parking lot there?

A. If you exit the Methodist Church parking lot turn north, the next intersection would be Magnolia, you would turn east on Magnolia and travel two blocks and it's right on the next corner.

185

Q. All right.  So if you were leaving the hotel and were going to the police department that would be the correct route to the Auburn Police Department, is that not correct?

A. Yes, sir, that would be one way.

Q. Well, closest?

A. Yes, sir, that's a route you can take to get to the police department?

A. All right.  Thank you, sir.


THE COURT:  Other questions?

MR. ABBETT:  Yes, sir, just a couple, Officer Hillyer.


REDIRECT EXAMINATION


BY MR. ABBETT:

Q. When you pulled up there you were right behind Officer Ricks, weren't you?

186

A.   I was, when they initially pulled into the
     parking lot they were out of my sight due to

     the cleaners.

Q.   You pulled up right after he did?

A.   Yes, sir.  Yes, sir.

Q.   The Defendant, this Defendant Huguley was just

     getting out of the car as you pulled up?

A.   Yes, sir, he was stepping out.

Q.   When you got out of your car you were armed,

     you're a police officer and you were armed,

     weren't you?

A.   Yes, sir.

Q.   Did you have your gun out?

A.   Not when I initially exited the car.

Q.   All right.  Did you take your gun out?

A.   Yes, sir, I did.

Q.   Did you point it at him?

A.   No, sir, I didn't.

Q.   You had it out in your hand?

187

A.   Yes, sir.

Q.   Okay.   Because you were  after armed  robbery

     suspects?

A.   Yes,  sir, due to the nature of the call I had

     it.

Q.   That's all.


                    RECROSS EXAMINATION


BY MR. GILLENWATERS:

Q.   Did you tell  Mr. Buguley to  get back in  the

     vehicle?

A.   No,  sir.  Actually I  told him to  get on the

     ground.

Q.   To get on the ground?

A.   Yes, sir.

Q.   Did he get on the ground?

A.   Yes, sir.

Q.   Did you search him?

188

A.    Yes, sir, after he was handcuffed.

Q.    All right.  Did you find any monies?

A.    No, sir.

Q.    Did you find a gun or a weapon of any kind?

A.    No, sir.

Q.    What did you find on Mr. Huguley's person?

A.    A wallet with identification.

Q.    A wallet with identification?

A.    Yes, sir.

Q.    Was that his driver's license?

A.    His driver's license and  I believe it was his

      cousin's or his brother's driver's license.

Q.    Did he have any money?

A.    Not that I recall.

Q.    No money at all?

A.    No, sir, not that I recall.

Q.    Did he have any credit cards?

A.    Yes, sir, he did.

Q.    Do  you know  whose names  those  credit cards

were in?

A.    Rodrigues Huguley, the one that I remember

      seeing. I'm not --

Q.    So he had a credit card in his name?

A.    I'm not sure, credit card, phone card, it was

      something of that nature.

Q.    Did he have an American Express, Mastercard?

A.    I don't recall that. There was some sort of a

      credit card or something.

Q.    But you do recall some Mastercards?

A.    When I say credit cards I just want to clarify

      myself, possibly a South Central Bell phone

      card, something of that nature.

Q.    All right. You recall that one but do you

      recall a Mastercard?

A.    No, sir, that's what --

Q.    You don't recall that?

A.    No, sir.

Q.    Okay. Did you take an inventory --

190

MR. ABBETT:  Your Honor, I object.  It has to have some relevance to this case whether he has a Mastercard or not.

THE COURT:  It's been asked three times, I'll sustain on the grounds of repetition.

Q.   Did you take an inventory of his possessions?

A.   No, sir.

Q.   You did not.

     Isn't that standard procedure to do an inventory of --

A.   Yes, sir, not by me.

Q.   Do you know if anybody did that?

A.   No, sir, I don't.

Q.   But that is standard procedure of Auburn Police Department?

A.   Once a subject is placed under arrest, yes, sir.

Q.   Okay.  So there should be an inventory of his

possessions, is that not correct?

A.   Yes, sir, in the jail.

Q.   If standard procedure was followed?

A.   Yes, sir.  As far as I know.

Q.   Thank you.


### FURTHER REDIRECT EXAMINATION


BY MR. ABBETT:

Q.   Did I  understand you correctly to  say he had

     someone's driver's license other than his own?

A.   Yes, sir, he  did.  It was  a driver's license

     without a photograph on it.

Q.   A driver's license without a photograph?

A.   Yes, sir.

Q.   It wasn't in his name?

A.   No, sir.  He,  I don't remember if he  said it

     was his  brother or  cousin  that was  in  the

     military.

192

Q.    That's all.


          THE   COURT:     Anything   else   of   this

witness?

          MR. GILLENWATERS:   No, sir.

          THE COURT:   You can step   down.   You're

excused.


                    (Witness excused.)


          THE COURT:   Next witness.

          MR. ABBETT:   Call Billy Asberry.


                    VOLUME ONE CONCLUDED

193

## C E R T I F I C A T E

STATE OF ALABAMA        )

LEE COUNTY              )


I, Willie T. Bennett, Official Court Reporter at Opelika, Alabama, do hereby certify that I reported in shorthand the proceedings and testimony in the foregoing styled cause at the time and place stated in the caption hereof; that I later reduced my shorthand notes to typewriting; or the same was done under my supervision; that the foregoing pages beginning with the word "Proceedings", where the same appears in the center of the page, following the style of the case, the caption and the appearances, contain a full, true and correct transcript of VOLUME ONE of the proceedings and testimony as therein set out.

I FURTHER CERTIFY that I have placed in the Court File all of the exhibits offered in said

194

trial in the order offered, which fact is certified
to the Clerk of the Court.

I FURTHER CERTIFY that I have on this date
notified counsel for the parties of the filing of

this transcript in the Office of the Clerk of the
37th Judicial Circuit of Alabama, Law Division.

THIS _18th_ day of February, 1996.



OFFICIAL COURT REPORTER

F I L E D

MAR 1 8 1996

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK