COURT OF CRIMINAL APPEALS NO._____

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

## CIRCUIT COURT OF _____LEE_____ COUNTY, ALABAMA

CIRCUIT COURT NO. __CC 95 741__

CIRCUIT JUDGE __HON ROBERT M HARPER__

Type of Conviction / Order Appealed From: __ROBBERY I__

Sentence Imposed: __22 YEARS IN PENITENTIARY AND COSTS__

Defendant Indigent:  ☐ YES  ☒ NO

__RODRIQUES G HUGULEY__

NAME OF APPELLANT

__CHARLES S CONLEY__
(Appellant's Attorney)                    (Telephone No.)
__315 SOUTH BAINBRIDGE ST__
(Address)
__MONTGOMERY__          __AL__   __36104__
(City)              (State)    (Zip Code)

V.

## STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

VOLUME TWO
STATE OF ALABAMA
IN THE CIRCUIT COURT FOR THE COUNTY OF LEE
THIRTY-SEVENTH JUDICIAL CIRCUIT
CRIMINAL

THE STATE OF ALABAMA,

      PLAINTIFF,

  VS.            CASE NO. CC-95-741

RODRIGUES G. HUGULEY,

      DEFENDANT

REPORTER'S OFFICIAL TRANSCRIPT ON APPEAL

Before:

        HON. ROBERT M. HARPER, Circuit Judge, and

        a jury, in the Courtroom Number Four of

        the Lee County Justice Center located at

        Opelika, Alabama, on the 28th of

        August, 1995, and being concluded on the

        next day.

A P P E A R A N C E S

    HON. RONALD L. MYERS, District Attorney for

the 37th Judicial Circuit of Alabama, and HON.

VANCE NICHOLAS ABBETT, Assistant District Attorney

for the 37th Judicial Circuit of Alabama, Opelika,

Alabama, appearing for the State of Alabama.

    HON. CHARLES R. GILLENWATERS, Attorney at Law,

appearing for the Defendant.

196

(Whereupon, Volume Two resumes

with the Direct Examination of

Billy Asberry by Mr. Abbett as

follows, to-wit:)


<u>BILLY ASBERRY</u>,

a witness, having first been duly sworn to speak

the truth, the whole truth and nothing but the

truth, was examined and testified as follows, to-

wit:


<u>DIRECT EXAMINATION</u>


BY MR. ABBETT:

Q.   State your name to the jury, please.

A.   My name is Billy Ray Asberry.

@Q.  And where do you live, Mr. Asberry?

A.   106   Second   Street,   Northeast,   that's

     Lafayette.

197

Q.   In Lafayette, Alabama?

A.   Yes, sir.

Q.   Do you know Dewayne P. Clark?

A.   Yes, sir.

Q.   How do you know him?

A.   First cousins.

Q.   Do you know the Defendant in this case Rodrigues Huguley?

A.   I know of him, I don't know too much about him.

Q.   Let me show you what's been previously marked as State's exhibit number five, fifteen and sixteen and ask if you recognize those photographs?

A.   Yes, sir.  That's my car.

Q.   That's your car?

A.   Yes, sir.

Q.   Did you own that car on July the 24th, 1995?

A.   Yes, sir.

198

Q.    Did you own it on the 23rd?

A.    23rd?

Q.    July 23rd?

A.    Yes, sir.

Q.    All right.  On July the 23rd did you loan your
      car to anyone?

A.    I loaned it to Dewayne Clark.

Q.    About what time?

A.    Between ten  or either 10:30 I  believe it was
      somewhere like that.

Q.    And where did that take place at?

A.    At my residence.

Q.    And where is your residence?

A.    106 Second Street, Northeast.

Q.    In Lafayette?

A.    In Lafayette.

Q.    Did you see Rodrigues  Huguley at the time you
      loaned Dewayne Clark your car?

A.    No, sir, I did not.

199

Q.   Did you give him permission to drive your car?

A.   No, sir, I did not.

Q.   When you loaned Dewayne your car did it have
     that ski mask and gun in it?

A.   No, sir.

Q.   Did you loan your car to commit a robbery?

A.   No, sir.  No, sir.

Q.   Has your car got door locks?

A.   Yes, sir.

Q.   How do they work?

A.   Power lock.  I can hit the one on the driver's
     and it will lock the whole car.

Q.   And you can hit the one on the driver's and
     unlock the whole car?

A.   Sometimes, yes, sir.

Q.   Sometimes?  Is that switch shown in one of

     those photographs?

          I show you what's marked as State's

     exhibit number five.  Can you see the door

200

lock switch in that photograph?

A.   Yes, sir.

Q.   Okay.

A.   Yes, sir.

Q.   Come down here where the jury can see, please.
Let me hold the photograph where the jury
can see and you point out the door lock,
please, sir, or the switch to the door lock.

A.   (Witness complying.)  Right one right back
there.  The switch is on the other side, where
you see a little red lock right there, it's
unlocked.

Q.   And that's an automatic door lock?

A.   Yes, sir.

Q.   Have a seat back up there, Mr. Asberry.  Thank
you.

       MR.   ABBETT:   That's  all the questions I
have.

201

THE COURT: Cross examination

## CROSS EXAMINATION

BY MR. GILLENWATERS:

Q.   Billy, you said sometimes it will unlock it.

What did you mean by sometimes?

A.   It was, like if I hit the lock it will unlock

all the doors except the driver. I have to

release the driver's side. But it will unlock

all three doors.

Q.   All right. So it will unlock all three except

the driver's door?

A.   Sometimes, yes, sir.

Q.   Sometimes.

A.   Uh-huh.

Q.   Now when you loaned the car you loaned it to

202

Dewayne Clark, is that correct?

A.    Yes, sir.

Q.    Did you see Mr. Huguley there?

A.    No, sir.

Q.    What time did you next see your car after 10:30 on the 23rd?

A.    What time did I see it? I didn't see it no more that night. I seen it the next day after twelve o'clock.

Q.    Saw it the next day?

A.    Yes, sir, they told me I could come pick it up the next day.

Q.    And Mr. Clark came to your home in Lafayette and borrowed your vehicle, is that correct?

A.    Yes, sir.

Q.    Thank you.


THE COURT: Any other questions of this witness?

203

MR. ABBETT:  That's all, Your Honor.

THE COURT:  You're excused, you may go.


(Witness excused.)


THE COURT:  Next witness.

MR. ABBETT:  Call Dewayne P. Clark.

THE    COURT:    Raise   your   right   hand,
please.


(Witness duly sworn.)


### DEWAYNE P. CLARK,

a witness, having  first been duly  sworn to  speak

the  truth, the  whole  truth and  nothing but  the

truth, was  examined and testified  as follows, to-

wit:

204

DIRECT EXAMINATION

BY MR. ABBETT:

Q.   State your name  for the jury, please?

A.   Dewayne Clark.

Q.   And where do you live, Mr. Clark?

A.   Five Points.

Q.   Is that in Chambers County?

A.   Yes, sir.

Q.   Is it near Lafayette?

A.   Yes, sir.

Q.   And  where  are  you residing  at  the present

     time?  Where are you staying now?

A.   At Lee County Jail.

Q.   Okay.  In the Lee County Jail?

A.   Yes, sir.

Q.   Were  you charged  with robbery  for the  July

     24th  1995  robbery  of  the  Heart of  Auburn

     Motel?

205

A.   Yes, sir.

Q.   What did you do about your charge in that case?

A.   I pleaded, pleaded guilty.

Q.   You entered a guilty plea?

A.   Yes, sir.

Q.   Have you been sentenced?

A.   Yes, sir.

Q.   What were you sentenced to?

A.   Twenty years.

Q.   Twenty years?

A.   Yes, sir.

Q.   Mr. Clark, I show you  State's exhibits number five, fifteen and sixteen that are photographs of a car.  Do you recognize that car?

A.   Yes, sir.

Q.   Whose car is it?

A.   Billy, Billy somebody.

Q.   Does it belong to a cousin of yours?

206

A.   Yes, sir.

Q.   What's, do you remember his name?

A.   I think it's Billy Ray.

Q.   Billy Ray?

A.   Yes, sir.

Q.   Okay.  Mr. Clark just tell the jury in your

own words what happened after you borrowed the

car.

A.   Uh, I was with Rodrigues, Rodrigues Huguley

and --

Q.   Rodrigues Huguley who is sitting right here?

     THE COURT:   Slide your chair over here

and speak right into the microphone.

Q.   This man right here?

A.   Yes, sir.

Q.   Okay.  Go ahead.

A.   And he had told me, let's go get paid.  So we

207

went and got the car, I drove it to the gas
station. We put some gas in the car and then
he started driving.

Q.   Which gas station did you go to?

A.   Spectrum.

Q.   Is that Spectrum in Lafayette?

A.   Lafayette. Yes, sir.

Q.   Okay. Did Mr. Huguley have a vehicle at that
time?

A.   Yes, sir.

Q.   What kind of vehicle did he have?

A.   He was in his truck, he had parked it behind
Spectrum.

Q.   Did he have a Nissan truck?

A.   Yes, sir.

Q.   And he left it parked behind Spectrum?

A.   Yes, sir.

Q.   What happened after ya'll left Spectrum?

A.   I told, he had told me what we was supposed to

208

do when we got down there.

Q.    He told you what you were supposed to do?

A.    Yes, sir.  And then I said --

Q.    What did you mean by get paid?

A.    Let's go rob, rob somebody.

Q.    Go rob somebody.

A.    Yes, sir.  Then  I don't know who we  going to

rob and then he  said I know the place  we can

go.  Then I said how you know and then he said

cause me  and my  cousin was  going to  go but

they had a shotgun, so he said they didn't  do

it because they had  a big gun.  Then  he said

I've  got a gun and a  mask and he went to his

truck and got it.  He said I already got a gun

and a mask.  But  then I said I don't think  I

want to do this.  Then he gave me some reefer,

he told me that, he told me to smoke this it's

going to  hype you up,  he said it's  going to

make you go on  and do it and you  ain't going

to be scared.  So on the way down the road we

were coming down to Auburn and he when we got

down here I was sleep in the car.  And then he

woke me up and he showed me and we rode around

the  motel where we was.  And then he told me,

you know,  he showed me the front and the back

and  then he said  when I give  you the signal

he's  going to go up  like he's getting a room

in  the motel and told me when he tap his head

two times then come  in and get the money.   I

said I didn't want to have the gun because I --

--

Q.    He told  you  to, that  he  was going  in  and

register  for a  room and  when he  tapped his

head two times for you to come in?

A.    Yes sir.

Q.    Is that what you did?

A.    Yes, sir.

Q.    Go ahead.

210

A.   And I said I didn't want to have the gun.
     Then he said well, whoever go in and play like

     they getting a room they got to cover for the

     person that had the gun. Then he said you

     won't be able to do that so he said you just
     come in and get the money when I tap my head.

Q.   What was he saying, you weren't smart enough
     to do that but you were smart enough to do the

     robbery?


        MR. GILLENWATERS:   We object to that,
     Your Honor.

        THE COURT:   Sustain the objection to
     that.


Q.   Go ahead.


        THE COURT: Just ask the question.

211

Q.   What, when he tapped his head what did you do?

A.   I came in and told him to give me all the cash

     money.  All the cash money they had.

Q.   Did you have anything with you to put the

     money in?

A.   A Spectrum bag.  A bag.

Q.   Could you describe it to the jury?

A.   It's a little white, little white plastic bag.

     I think it's got Amoco on it or something.

Q.   The man give you the money?

A.   He gave me the money and then I went out   the

     back and he was still, Rodrigues, he was still

     in there.  And I ran around the back and then

     I waited for him and then when he pulled up

     the police pulled up at the same time and told

     me to stop.  And I got in the car with

     Rodrigues and we rode down a few blocks and

     then I got out and ran and threw the money

     over some wall. Then I got on the ground.

212

Q.    You and Rodrigues Huguley, this man right here
      planned to rob the Heart of Auburn?

A.    Yes, sir.

Q.    Before you went in there?

A.    Yes, sir.

Q.    And what did you plan to do afterwards?

A.    We didn't make no  plan afterwards.  We didn't
      plan if we got caught it wasn't no plan.

Q.    I believe that's all.


          THE COURT:  Cross examination.

          MR. GILLENWATERS:  Yes, sir.


                CROSS EXAMINATION


BY MR. GILLENWATERS:

Q.    Mr. Clark,  you said you didn't  remember your
      cousin's last name?

A.    No, sir.

213

Q.   Was he  the gentleman that was  in purple that
     just testified?

A.   In purple?

Q.   Did  you  see  him?   You  didn't  see  Billy
     testify?

A.   No, sir.

Q.   All  right.  Now  did you make  a statement to
     the police department about this incident?

A.   Yes, sir.

Q.   All right.   And in  that statement it  says I
     got  Rodrigues Huguley, he  was driving a blue
     Grand Am two  door.   You got up  with him  in
     Lafayette and he  was wearing, driving a  blue
     Grand  Am two  door, that's  what you  said in
     your statement to the police, is that correct?

A.   I don't know.

Q.   You don't recall that?

A.   No, sir.

Q.   Well, look at it, sir, it's the first sentence

214

of your statement on July 23rd --

THE COURT:  Point it out to him.

Q.  See where it says on July 23rd?

A.  Yes, sir.

Q.  Would you read that statement?

A.  On July 23rd, 1995 about 10:30 p.m. I rode to
Lafayette, Alabama.  I got into Rodrigues
Huguley, he was driving a blue Grand Am two
door.
      I said it but I was high.

Q.  You were already high before you met up with
Rodrigues?

A.  No, sir, when I got with him.  When we got
there, when they had arrested us.

Q.  All right.  When you made this statement you
were high?

A.  Yes, sir.  They brought me back in there and

215

asked me about that, about that car when I
woke up.

Q.    All right.  Now, you woke up as they were
asking you about the car?

A.    No, sir.

Q.    All right.

A.    Later on that night when I woke up.

Q.    All right.  Well, did you go and get the car
or did Rodrigues go and get the car?

A.    Both of us went and got the car.

Q.    Both ya'll went and got the car?

A.    Yes, sir.

Q.    Okay.  So if Billy just testified a couple of
minutes ago that you were the only one then he
was mistaken, is that correct?
        How did ya'll go over to Billy's?

A.    In my mama's car.

Q.    In your mama's car.  Where did you leave your
mama's car at?

216

A.   At his house.

Q.   At Billy's house?

A.   Yes, sir.

Q.   All right. Were you in your car when you got

     with Rodrigues then, that would be right, is

     that correct?

A.   Yes, sir.

Q.   All right. And you met him at Spectrum in

     Lafayette, is that right?

A.   Well we was over in the projects and he drove

     his truck up to Spectrum and he got in the car

     with me.

Q.   All right. Did ya'll pass in the street or

     how did ya'll meet up?

A.   Yes, sir. He was parked on the side of the

     road talking to some guys.

Q.   All right.

A.   And then I rode past and he blinked his lights

     and I backed up.

217

Q.    All right.

A.    And he told me to park the car and  get in the
      truck  with him  and I  got in .the truck  and
      that's when we started talking about it.

Q.    All  right.    So  ya'll  met  the  Lafayette
      projects --


         THE COURT:  You're going to need to  talk
      a  little louder.    Move  your chair  this way
      just  a little bit.  Talk good and loud in the
      microphone.


Q.    All  right.   So ya'll .went to  the Lafayette
      projects and that's where you met up and  then
      you went  to the  Spectrum and left  his truck
      there?

A.    Yes, sir.

Q.    Well,  how did you get over  to Billy's to get
      his car?

218

A.   In my mama's car.  Rodrigues got in  the car
     with me.

Q.   All right.  So Rodrigues got in  the car with
     you?

A.   Yes, sir.

Q.   And ya'll went over to Billy's house?

A.   Yes, sir.

Q.   All right. Did Rodrigues get out there?

A.   Yes, sir.

Q.   All right.  And did Billy see him?

A.   Yes, sir.

Q.   And Billy talked to him?

A.   Yes, sir.

Q.   Okay.  And Billy  loaned you the car,  is that
     correct?

A.   Loaned,  he loaned it  to him, he  gave me the
     car, he gave me some card.

Q.   Was that an insurance card?

A.   Rodrigues told me to give him $10.00 and he'll

219

give him $10.00 to get the, let him borrow the
car.  Then he gave -- and I was going to drive

it  up to the Spectrum so he gave me his card,
some insurance card I think --

Q.  All right.

A.  -- because something was wrong with the car.

Q.  So ya'll gave Billy $20.00?

A.  Yes sir.

Q.  All right.   So  you had $10.00  and Rodrigues
    had $10.00?

A.  Yes, sir.

Q.  All right. Then ya'll drove back to Spectrum.

A.  And put some gas in the car.

Q.  Put some gas in the car.

A.  That's when --

Q.  I  assume you had money to pay for the gas, is

    that right?

A.  Yes, sir.

Q.  Who paid for the gas?

220

A.    I did.

Q.    You paid for the gas?

A.    Yes, sir.

Q.    How much gas did you get?

A.    $4.00 worth.

Q.    $4.00?

A.    Yes, sir.

Q.    Okay.  Did it already have some gas in it?

A.    It had a little bit.

Q.    All right.  And you were driving at this time,

is that correct?

A.    Yes, sir.   When I pumped gas  he, that's when

Rodrigues started driving.

Q.    All right.   Now you went  inside the Spectrum

and paid for it, didn't you?

A.    Yes, sir.

Q.    All right. And you paid $4.00?

A.    Yes, sir.

Q.    Did he give you any money to go on the gas?

221

A.  No, sir.

Q.  All right.

A.  He said he had lost all his money at some race
    track.

Q.  All right.  Is that when you went in  and got
    the plastic bag?

A.  Yes, sir.

Q.  All right.  And you got the plastic bag at
    Spectrum?

A.  Yes, sir.

Q.  Did you buy anything that was placed inside
    the bag?

A.  No, sir.

Q.  They just gave you a plastic bag?

A.  Yes, sir.

Q.  Gave it to you?

A.  Yeah.

Q.  All right.  After you got the gas what did you
    do?

222

A.   We left and we were riding down the road coming to Auburn.

Q.   I thought you just told the District Attorney or Deputy District Attorney that he went to his truck and he got this mask and this gun?

A.   Mask and gun, yes, sir.

Q.   When did he do that?

A.   After we got the gas. His truck was right behind Spectrum.

Q.   It was behind Spectrum?

A.   Right there behind it, yes, sir.

Q.   All right. So he gave you the gun and he gave you the mask?

A.   Yes, sir.

Q.   All right. Where did you put them in the car?

A.   The gun and the mask?

Q.   Yeah.

A.   On the floorboard. I was on the passenger side then.

223

Q.   All right.  So he's driving now, is that correct?

A.   Yes, sir.  Yes, sir.

Q.   All right.  And ya'll drive to Auburn.

A.   Yes, sir.

Q.   Do you remember  going to Loachapoka?

A.   Loachapoka.

Q.   Loachapoka, yeah.

A.   No, sir.

Q.   Do you remember going out seeing a lady by the name of Deanna Hand?

A.   No, sir.

Q.   Where she lives at?

A.   No, sir.

Q.   You didn't go out there?

A.   No, sir.

Q.   Okay.  Now you said he gave you some marijuana?

A.   Yes, sir.

Q. All right. Did you smoke that going down the road?

A. Yes, sir.

Q. All right. Did he give you a joint or more than one joint or --

A. We smoke them out of a cigar, split the cigar.

Q. He had a cigar?

A. Yes, sir. And put the marijuana in the cigar.

Q. All right. And did he let you smoke it all?

A. No, sir, he smoked some too.

Q. He smoked some too.

A. Yes, sir.

Q. All right. And ya'll swapped it back and forth going down the road?

A. Yes, sir.

Q. And you said you went to sleep, is that right?

A. Yes, sir.

Q. All right. While you were asleep could he have been to Loachapoka?

225

A.   No, sir.

Q.   You don't think he went to Loachapoka?

A.   No, sir.  No, sir.

Q.   All  right.  All right.  But would you be fair

     to say that you  got the car from  Billy about

     10:30?

A.   Yes, sir.

Q.   Is that about the right time?

A.   Yes, sir.

Q.   All right.  And I think it's pretty clear that

     this  incident  where  you  robbed  the  hotel

     happened about  five minutes to one, would you

     agree with that?

A.   Yes, sir.

Q.   All  right.  So it  took ya'll two  hours and

     twenty-five minutes to drive from Lafayette to

     Auburn, is that correct?

A.   We rode  around the motel a  few times, around

     the block, them blocks a few times.

226

Q.    Ya'll rode around the block a few times.

A.    And  he was showing me where I could go to run

      to.

Q.    Okay.

A.    Cause I didn't know where I was.

Q.    You didn't know where you were?

A.    No, sir.

Q.    All right.   Did you  and he ever  get into  a

      physical altercation during this time?

A.    No, sir.  Talking about a fight?

Q.    Yeah.

A.    No, sir.

Q.    You didn't get in a fight at all?

A.    No, sir.   He told, he had  told  them, the

      investigator that  we got into a  fight and he

      hit me in my head or something,  but we didn't

      get into it, no, sir.

Q.    That didn't happen, is that right?

A.    No, sir.

227

Q.   Okay.  Now were you with him when ya'll pulled
     up to the hotel?

A.   No, sir.

Q.   All right.  You had already got out?

A.   Yes, sir.

Q.   Where did you get out at?

A.   On the back where, about where they picked me
     up at.  Where the police told me to stop and I

     got in the car.

Q.   Do you see this diagram here?

A.   Yes, sir.

Q.   All right.  You got out back here, is that

     correct?

          Where did you get out, show me?

A.   Right here (indicating).  About right here on
     the corner.


          MR. ABBETT:   Your Honor, I object to

     having him pointing out things on the diagram

228

when he hasn't even oriented him to the diagram.

THE COURT:   Well, let's make sure he understands what's showing there.

Q.   All right.   This is the Heart of Auburn and this is Gay Street.  And you said you got out on, at the corner there, is that correct?

A.   Yes, sir.

Q.   All right.  And what did he do after you got out?

A.   He drove on.  He drove off.

Q.   He drove off.

A.   Yes, sir.   And I ran back up here and came in the back.

Q.   Okay.   You ran up to the hotel, is that correct?

A.   Yes, sir.

Q.   All right.  Could you see his vehicle at that

229

   time?

A.   When I got to it, yes, sir.

Q.   You could see if it --


      THE COURT:  You've got to talk a little louder for us, Mr. Clark.

      THE WITNESS: Yes, sir.


Q.   Where did his vehicle go?

A.   It was parked right here in front of, right at the doorway.

Q.   He parked it right at the doorway?

A.   Yes, sir.

Q.   Is that correct?

A.   Yes, sir.

Q.   All right.  And did you see him go in the hotel?

A.   No, sir.

Q.   You didn't see him go in?

230

A.    No, sir.  When  I got there he was  already in
there talking.

Q.    All  right.   Now do  you know  if he  had any
money at this time?

A.    He told me he didn't have any money.

Q.    He told you he didn't have any money?

A.    He got some money for a room from me.

Q.    How much money did he get from you?

A.    About $40.00.

Q.    He got the $40.00 from you for a room?

A.    Yes, sir.

Q.    Okay.  And you spent $4.00 for the gas.

A.    Yes, sir.

Q.    And gave your cousin $10.00?

A.    Yes, sir.

Q.    So you spent $54.00 already?

A.    Yes, sir.

Q.    All  right.  And where did  you get the $54.00
from?

231

A.    I had money, I had just quit working.

Q.    You had just quit working?

A.    Yes, sir, about a week before this happened.

Q.    Okay.

A.    I already had money.

Q.    Did you have any other monies other than  this

       $54.00?

A.    No, sir.  I had about a few more dollars.

Q.    You had a few more dollars?

A.    Yes, sir.

Q.    All right. Did you have that in your pocket or

       in your billfold?

A.    In my pocket.

Q.    In your pocket?

A.    Yes, sir.

Q.    All right.  You said  now that you didn't  see

       him go in the office, isn't that correct?

A.    No,  sir.   When  I got  there he  had already

       left.

232

Q.   Huh?

A.   When I got there he was already there.

Q.   All right.  He was already inside the office?

A.   Yes, sir.

Q.   All right.  And  you're talking about you were

     up here and you could see his car.  Did you go

     down to the car?

A.   When I got to the office I could see his car.

Q.   Okay.  Did you --- you went down to the office?

A.   Yes, sir.

Q.   Okay.  And could you see him inside there?

A.   Yes, sir.

Q.   How long did he stay in there?

A.   About five minutes.

Q.   About five minutes?

A.   Yes, sir.

Q.   All right.  Could you see the desk clerk?

A.   Yes, sir.

Q.   All right.  You  could see him.  What  was the

233

desk clerk doing?

A.    He was filling out papers I think.

Q.    Filling out papers?

A.    Yes, sir.

Q.    Okay.  And did  you have your mask on  at that
time?

A.    No, sir.

Q.    You didn't have your mask on?

A.    No, sir.

Q.    Where was the mask at?

A.    I  had it sitting on my head, I didn't have it
over my face.  I had it on my head.

Q.    You had it sitting on your head?

A.    Yes, sir.

Q.    Okay.  But  you  had it  rolled  up, is  that
right?

A.    Yes, sir.

Q.    All right.  Where was the gun at?

A.    I had  it.  He told  me it wasn't loaded.    He

234

said it needed racking but, but after this happened the private investigator told me it was loaded.

Q. He told you it was loaded.

A. Yes, sir.

Q. But you didn't think it was loaded?

A. No, sir.

Q. All right. And you didn't rack it or anything like that?

A. No, sir.

Q. All right. And he gave you the gun?

A. Yes, sir.

Q. Okay. You had never seen that gun before that day?

A. No, sir.

Q. Okay. Is that the gun right there and the mask right there?

A. That's the mask, I don't see a gun.

Q. You don't see the gun? Is that the gun right

235

there?  Does it look like it?

A.    (Witness nodding affirmatively.)

Q.    Okay.  You said  he was  in there  about five minutes?

A.    Yes, sir.

Q.    And he was filling out papers?

A.    Yes, sir.

Q.    All  right.  And where  were you  during this time?

A.    Standing by the window.

Q.    Standing by the window?

A.    Yes, sir.  It was some hedge bushes beside the window, I was standing beside that.

Q.    Okay.  And then you came in, is that correct?

A.    Yes, sir.

Q.    All right.  What happened when you came in?

A.    I told him to give me all the cash money.

Q.    Give you all the cash money?

A.    Yes, sir.

236

Q.   All right.  What did Rodrigues do?

A.   He just stepped to the side, he just moved out

of the way.

Q.   Did he say anything?

A.   No, sir.

Q.   He didn't say anything?

A.   No, sir.

Q.   All right.  Did he appear to be scared?

A.   No, sir.

Q.   He didn't appear to be scared?

A.   No, sir.

Q.   All right.  He just stepped out of the way?

A.   Yes, sir.

Q.   All right. And what -- now  you've got the bag

from Spectrum, right?

A.   Yes, sir.

Q.   All right.  Did you have it in your pocket?

A.   I had it in my hand when I came in.

Q.   Had it in your hand.

237

A.   Yes, sir.

Q.   So you had the gun in one hand and  the bag in

     the other, is that right?

A.   Yes, sir.

Q.   What did you do with the bag?

A.   I  took, when  I  was  going  to  cut  to  the

     sidewalk  after this had happened, after I had

     robbed --

Q.   I'm talking  about when you're  in the  hotel,

     I'm sorry.

A.   I gave the clerk the bag.

Q.   You gave it to him.  You handed it to him?

A.   Yes, sir.

Q.   Now you placed it in his hands?

A.   Yes, sir.

Q.   All right.  Did  he have to get down  and kind

     of look for it on the ground for a while?

A.   For the bag?

Q.   Yeah.

238

A.   No, sir.

Q.   He didn't?  Okay.  You handed the bag to him?

A.   Yes, sir.

Q.   All right.  Would you say at this time you're

     still under  the influence of marijuana?

A.   Marijuana, yes, sir.

Q.   Okay.  All right. Then the clerk  gave you the

     money, is that right?

A.   Yes, sir.

Q.   And then you ran out of the hotel?

A.   Yes, sir.

Q.   Did  you go out the front door or out the back

     door?

A.   The same door I went in.

Q.   All right.  So you went out the front door, is

     that correct?

A.   Yes, sir.

Q.   All right.  Let me  show you this  is State's

     exhibit  number one.   This  is  showing  the

239

office of the Heart of Auburn. This is the front door here. Is that the door you came in?

A.  Yes, sir.

Q.  Okay. And is that the door you went out?

A.  Yes, sir.

Q.  All right. When you went out the door which direction did you go?

A.  Back where I came from, out the back.

Q.  All right.

A.  I came --

Q.  Show the jury which direction you went.

A.  Around this way.

Q.  You went back up there which back to that diagram where would that be?

A.  About right here.

Q.  All right. So you went back down there, is that correct?

A.  Yes, sir.

240

Q. All right. Now while you were down off of, is that Milly Avenue? Is that right?

That appears to be Milly Avenue?

A. Yes, sir.

Q. Did anything happen unusual then?

A. The police rolled down the road at the same time Rodrigues came.

Q. All right. Was the police, was he coming toward you?

A. He had just passed Rodrigues. He was kind of just right here (indicating). Rodrigues was going this way.

Q. Which way was the police car coming?

A. This way.

Q. All right. Now you were just telling the jury that you came around and went down this street and was going down Milly Street?

A. Right, I was just walking around until Rodrigues came.

241

Q.   All right.   Now  when the police  officer met
     you  you were going toward Gay Street, is that
     right?

A.   Yes sir.

Q.   All right.  So you had  turned around and gone
     the other direction?

A.   Yes, sir.

Q.   Okay.  Did you have the money, the gun and the
     mask with you at that time?

A.   No, sir.  I had  threw the mask  and the  gun
     down by this tree.

Q.   All right.   You had throwed the  mask and all
     down already?

A.   Yes, sir.

Q.   Okay.  Were you wearing gloves?

A.   No, sir.

Q.   You weren't wearing gloves?

A.   No, sir.

Q.   Okay.  And when you saw the police officer you

said he passed you, is that right?

A.   Yes, sir.

Q.   Did you have the bag in your hand?

A.   No, sir.

Q.   Where did you have the bag at?

A.   I had took the money out of the bag and threw

the bag down on the sidewalk.

Q.   So the bag was on the sidewalk somewhere?

A.   Yes, sir.

Q.   What did you put the money in?

A.   In my pocket.

Q.   In your pocket?

A.   Yes, sir.

Q.   In your  right  front  pocket  or  left  front

pocket?

A.   Right.

Q.   Right.  You're right handed?

A.   Yes, sir.

Q.   Okay.  When you  saw the police  officer what

243

did you do?

A.  I had got, he told me to stop and I got in the car with Rodrigues and he was pulling off at the same time.

Q.  All right.  And you said now Rodrigues was going down Milly Avenue?

A.  He had came, he had came up to the stop sign and he had stopped.

Q.  He had stopped.

A.  At the stop sign.

Q.  All right.  And you saw him stop, is that correct?

A.  Yes, sir.

Q.  All right. And what, did you run around his car?

A.  I ran and got in it, yes, sir.

Q.  All right. Which side or where, how did you get in the car?

A.  The front, on the passenger side.  In the

244

front.

Q. Front seat?

A. And then he started pulling off.

Q. Okay. Did you run alongside the car for a while?

A. Yes, sir.

Q. All right. Did he finally stop for you?

A. No, sir.

Q. The car was moving --

A. I dived in it, yes, sir, it was moving.

Q. You dived in?

A. Yes, sir.

Q. Did you open the door?

A. Yes, sir.

Q. All right. Did he open the door for you?

A. No, sir.

Q. All right. You opened the door, is that correct?

A. Yes, sir.

245

Q.   And then you dived in the front seat?

A.   Yes, sir.

Q.   All right.   How far did ya'll go down Gay
     Street?

A.   About a block I think.

Q.   About a block?

A.   Yes, sir.

Q.   All right.   And did Rodrigues then pull into
     that parking lot there?

A.   Yes, sir.

Q.   All right.   And did you say anything to him
     when you got in the car?

A.   He told me to get out and run because they had
     the tag number.  He said get out and run.

Q.   All right.  Did you say anything to him?

A.   I said no, I ain't getting out and running.  I
     said if we get caught both of us is going to
     get caught.

Q.   All right.  If we get caught both of us are

246

going to get caught, is that what you said?

A.  Yes, sir.

Q.  Right?

A.  Yes, sir.

Q.  And is that when you got out of the car and ran?

A.  Yes, sir.

Q.  All right. And you told him if you went down he was going down, right?

A.  Yes, sir.

Q.  All right. Thank you, sir.


THE COURT: Redirect.


REDIRECT EXAMINATION


BY MR. ABBETT:

Q.  Mr. Clark, had you seen that diagram before you came in here to testify?

247

A.  No, sir.

Q.  Where were you before you came in here to testify?

A.  In a cell, holding cell.

Q.  Okay.  And where were you before that?

A.  In the Lee County Jail.

Q.  Have you ever talked to me before today?

A.  No, sir.

Q.  Before you came up here on the witness stand?

A.  No, sir.

Q.  Anybody promise you anything to testify today?

A.  No, sir.

Q.  Do you have a watch?

A.  A watch?

Q.  Wrist watch?

A.  No, sir.

Q.  Did you have  one back in July before you were arrested?

A.  No, sir.

248

Q.   So the times that you're talking about when
     you got the car, how do you know it was about
     10:30?

A.   That was at Spectrum.

Q.   Sir?

A.   It was at Spectrum, the time.

Q.   You saw a clock at Spectrum?

A.   I asked the clerk what time it was.

Q.   You asked the clerk what time it was?

A.   Yes, sir.

Q.   All right.  Now when -- I'm a little  confused
     about the cars and the swapping back and forth
     between  the truck and the cars.  When did you
     first get your mama's car?

A.   That night.  I don't know, I can't recall what
     time it was.   I had went to Hardee's  and got
     something to  eat in Lafayette and  I was just
     riding around in Lafayette.

Q.   In your mama's car?

249

A.   Yes, sir.

Q.   Okay.   Now how  did  you first  get  up with

     Rodrigues Huguley?

A.   He was parked on  the side of the road  in the

     projects.

Q.   And  that's  while you  were riding  around in

     your mama's car?

A.   Yes, sir.

Q.   All right.   And is  that when he  flashed the

     lights at you?

A.   Yes, sir.

Q.   So it was after dark?

A.   Yes, sir.

Q.   And what did he say to you?

A.   He  said tonight  is Sunday  and there's  some

     people probably out there sleeping so let's go

     get paid.

Q.   Okay.  And  did you  and he decide  to get  in

     your  mama's car  at that  time and  leave his

259

truck in the projects or what did ya'll do?

A.   He said he was going to Spectrum and park his

truck.

Q.   Okay.

A.   At Spectrum.

Q.   So you went to the Spectrum and parked his

truck?

A.   Yes, sir.

Q.   Did you park it behind Spectrum?

A.   Yes, sir.

Q.   And you left there in your mama's car?

A.   Yes, sir.  He got in the car with me.

Q.   He, in your mother's car?

A.   Yes, sir.

Q.   And you and he went to Billy Asberry's house?

A.   Yes, sir.

Q.   And both of ya'll got Billy's car?

A.   Yes, sir.

Q.   And then you go back to the Spectrum?

251

A.   To  the Spectrum  to put  some gas  in Billy's
     car.

Q.   All right.  Do you know what time it is then?

A.   That's when I asked what time it was.

Q.   All right.  What time was it?

A.   It was about 10:30 at night.

Q.   You bought $4.00 worth of gas?

A.   Yes, sir.

Q.   What did you do then?

A.   We  went,  we  backed  down  to  his truck  and

     that's when he  got the gun  and the mask  and
     then --

Q.   And you  think it was 10:30  because the clerk
     told you that?

A.   Yes, sir.

Q.   You didn't have a watch?

A.   No, sir.

Q.   And you don't know what time it was other than

     what somebody told you?

252

A.    No, sir.

Q.    So you get the gun and the mask?

A.    And marijuana out of his truck.

Q.    And marijuana.  Is that photograph I'm showing

      you, State's exhibit number seventeen, is that

      the Defendant Huguley's truck?

A.    Yes, sir.

Q.    That's his truck?

A.    Yes, sir.

Q.    Is that where it was parked behind Spectrum?

A.    Yes, sir.

Q.    So after ya'll get the gas and the gun and the

      mask then you come towards Opelika?

A.    Yes, sir.

Q.    And  at that time you go to sleep or after you

      smoke some marijuana you go to sleep?

A.    Yes, sir.

Q.    Do  you know where -- where  were you when you

      woke up?

A.   I didn't know where I was. I asked him where
     we was and he say in Auburn.

Q.   He said in Auburn?

A.   In Auburn, yes, sir.

Q.   Where in Auburn were you when you woke up?

A.   We were riding past a school or a college or
     something.

Q.   A school or a college?

A.   Yes, sir.

Q.   And that's when you rode around the motel?

A.   Yes, sir. We rode around down there for a
     while.

Q.   Okay. Is this the mask you used?

A.   Yes, sir.

Q.   State's exhibit number eighteen?
          And that's the gun you used?

A.   Yes, sir.

Q.   And that gun was given to you by Rodrigues
     Huguley?

254

A.    Yes, sir.

Q.    And you put it down right here when you were

      running from the motel?

A.    Yes, sir.

Q.    Show the jury the signal -- show me again on

      this diagram where you were when the

      Defendant Rodrigues Huguley was in there

      registering for a room?

A.    (Witness indicating).   Right here.   It was

      some trees right there.

Q.    Speak loud so the jury can hear you.

A.    It was a hedge bush, trees right here and I

      was standing behind, beside them.  Right here,

      looking in the window.

Q.    Looking in the window?

A.    Yes, sir.

Q.    And you had that mask up on your head like a

      cap?

A.    Yes, sir.

255

Q.   What kind of signal did Rodrigues Huguley give
     you?

A.   Tapped his head twice.

Q.   Show the jury exactly what he did.

A.   (Witness indicating).

Q.   And that's  when you went in with the mask and
     the gun?

A.   Yes, sir.

Q.   And ya'll planned this together?

A.   Yes, sir.

Q.   I believe that's all.


          MR. GILLENWATERS:  No further questions.

          THE COURT:   All   right.   You  can   step
     down.


               (Witness excused.)


          THE COURT:  Next witness.

256

MR. ABBETT:  Call  Beth Fisk I believe is her name.

THE  COURT:    Raise  your  right  hand, please.

(Witness duly sworn.)

## BETH FISK,

a witness,  having first  been duly sworn  to speak the truth,  the whole  truth  and nothing  but  the truth, was examined and   testified as follows, to-wit:)

## DIRECT EXAMINATION

BY MR. ABBETT:

Q.   Tell  the jury  your name  please, ma'am,  and speak into the microphone loud where everybody can hear you.

257

A.   Beth Fisk.

Q.   Beth Fisk?

          Beth, are you nervous?

A.   Yes, sir.

Q.   Where are you employed?

A.   Lafayette Police Department.

Q.   And what do you do at the Lafayette Police
     Department?

A.   I'm a dispatcher.

Q.   How long have you been a dispatcher with the
     police department?

A.   About eight or nine months.

Q.   Are you scared about or a little nervous about
     testifying?

A.   Yes, sir.

Q.   Okay.   Have you ever testified in court
     before?

A.   No, sir.

Q.   Beth, I want to recall your attention back to

258

July the 23rd and 24th; were you working as a dispatcher with the Lafayette Police Department at that time?

A.   Yes, sir, I was.

Q.   And did you take a break that night? Were you working the night shift?

A.   Yes, sir.

Q.   What hours did you work?

A.   I work from six to six.

Q.   From six at night to six in the morning?

A.   Yes, sir.

Q.   Do you get a break during that twelve hour shift?

A.   Yes, sir, I usually take it at twelve.

Q.   Okay. And the night of the 23rd and the morning of the 24th did you take a break about midnight that night?

A.   Yes, sir.

Q.   And what did you do when you took your break?

259

A.    I went up to the  Spectrum to get me something

      to eat and drink.


          THE COURT:  You'll have to talk a  little

      bit louder for me, please.


A.    I went to the Spectrum.

Q.    Where  is  the  Spectrum  station  located  in

      Lafayette?

A.    On  431  right  beside  Parker's,  our  grocery

      store in town.

Q.    Is there more than one Spectrum?

A.    No, sir.

Q.    Just one?

A.    Yes, sir.

Q.    Could you  tell the ladies  and gentlemen what

      if anything you saw there at the Spectrum that

      later came to your attention?

A.    I saw the truck parked behind the Spectrum and

260

the black Grand Am that was later, the Auburn

Police Department called me and asked me to

dispatch one of my officers to some man's

house about his vehicle. And they said it was

a black four door Grand Am and I saw that at

the Spectrum when I was on break.

Q.    Let me show you what's been marked as State's

exhibit number seventeen and ask if you

recognize that?

A.    Yes, sir, I do.

Q.    What is it? Do you know whose vehicle that

is?

A.    We've run that vehicle before at the police

department.

Q.    Okay. Do you know who it belongs to?

A.    Rodrigues Huguley.

Q.    Rodrigues Huguley?

       Okay. Did you see that truck at the

Spectrum station when you went for your break

261

about midnight?

A.   Yes, sir.

Q.   Okay. And where was it?

A.   It was parked behind the Spectrum.

Q.   Okay.  Did you  see anybody around it  at that
     time?

A.   At that time I saw  a black male walking  from
     the vehicle towards the Spectrum.

Q.   Could you identify that person?

A.   No, sir, I couldn't.

Q.   Okay.   I show you  what's marked  as State's
     exhibit number  five, fifteen and  sixteen and
     ask  if  you   recognize  those   photographs,
     please, ma'am?

A.   Yes, sir,  this was the vehicle  parked at the
     gas pump at the  time that I was there  at the
     Spectrum.

Q.   And that was about midnight?

A.   Yes, sir.

262

Q.    Do you remember if anybody was pumping gas or what was going on?

A.    No, sir, I just seen several black males, not several, about two or three black males standing around it talking to one another.

Q.    Okay.  And that was at the gas pumps at the Spectrum?

A.    Uh-huh.  Yes, sir.

Q.    Are you sure about the time?

A.    Yes, sir.  I always take my break at twelve.

Q.    Okay.

A.    When I work twelve hour shifts.

Q.    That's all.


            THE COURT:  Cross examination.


                CROSS EXAMINATION


BY MR. GILLENWATERS:

263

Q.   I believe that Mr. Abbett showed you a photograph of a Grand Am and you said that this was the vehicle that you saw at twelve o'clock?

A.   Yes, sir.

Q.   Okay.

A.   I saw one similar to this. I don't --

Q.   Oh, you saw one similar to it, is that correct?

A.   Uh-huh. Well, it looked like that, yes, sir.

Q.   Okay. And you said you saw Mr. Huguley's truck parked around back, is that correct?

A.   Uh-huh.

Q.   Okay. So you're not absolutely certain that this is the vehicle you saw, isn't that correct?

A.   Well, I saw a black four door Grand Am at the gas pump.

Q.   All right.

264

A.    And it looked almost identical to that.    I
      mean --

Q.    Did you pull up behind the Grand Am?

A.    No, sir, I didn't.

Q.    Did you pull up beside it?

A.    No, sir, I didn't.

Q.    Okay.

A.    When I was leaving I saw, that's when I saw
      it and when I was in the store.

Q.    All right.    Did you notice anything unusual
      about the tag?

A.    No, sir.   I wasn't studying the tag.

Q.    You didn't study the tag?   You don't know
      whether it had a twelve tag or a sixty-two tag
      or a forty-three tag?

A.    No, sir.

Q.    Okay.   Do you remember if it was -- you just
      said it was dark in color?

A.    It was, yes, sir.   It was black, you know.

265

Q.   It was black?

A.   Uh-huh.

Q.   And it looked similar  to this one,  is that
     correct?

A.   Uh-huh.

Q.   Okay.  All  right.  You said  you work  as a
     dispatcher for --

A.   Lafayette Police.

Q.   -- City of Lafayette, is that correct?

A.   Yes, sir.

Q.   All right.  Would you say  there was quite  a
     few black Grand Am's in Chambers County?

A.   Yes, sir.  I have one.

Q.   You have one?

          Thank you.


          THE COURT:  Any more questions?

266

## REDIRECT EXAMINATION

BY MR. ABBETT:

Q.   So you're  pretty  familiar with  Grand  Am's,

aren't you?

A.   Yes, sir.

Q.   Is that the only time you went  into the store

that night?

A.   Yes, sir.

Q.   That's all.

## RECROSS EXAMINATION

BY MR. GILLENWATERS:

Q.   All right.   One  other question.   You didn't

see Mr. Huguley there that evening, did you?

A.   I wouldn't notice him.

Q.   All right.

A.   I mean I  do not know this man.   I don't know

267

him.

Q.  You don't know him and you see him now, do you

    not?

A.  Uh-huh.

Q.  Did you see him there at twelve o'clock on the

    23rd, 24th?

A.  I, I don't know.  I saw a black male walking

    from his vehicle, that's all I know.

Q.  All right.  Was the person that you saw

    walking into Spectrum, did he come out with

    anything?

A.  I don't know, sir.

Q.  You didn't see him come out with anything?

A.  Huh-uh.

Q.  Do you know how much gas he pumped?

A.  No, sir.

Q.  Did he get in the driver's side or did he get

    in the passenger side?

A.  I didn't see him get in.

268

Q.    Okay.  Did  you see him get out?

A.    No, sir.

Q.    All right.

A.    I just saw him walking from the vehicle.

Q.    All  right.  Was it  one black male  or two or
      three, you've testified to?

A.    One walking from the maroon vehicle.

Q.    From the maroon vehicle?

A.    Are you  talking about the truck,  right?  The
      Nissan?

Q.    No, I'm talking about the dark Grand Am?

A.    I saw, there were several black males at  that
      car,  at the  Grand Am.   I thought  you were
      talking about --

Q.    All right.   Let's get  back to the  Grand Am.
      The Grand Am is what  I'm talking about.   You
      said that you saw one black male go in from --
      what  was the Grand Am doing,  let me just ask
      you that?

269

A.   It was sitting at the gas pump.

Q.   All right.  So they got gas, is that correct?

A.   I don't know.

Q.   All right.  Did you see someone leave the Grand Am and go inside Spectrum?

A.   No, sir.

Q.   All right.  Were they pumping gas when you got there?

A.   I, no, sir.

Q.   The car was just sitting in front of the gas pumps?

A.   And there were -- yes, sir, and there were several males standing there.

Q.   Around the vehicle?

A.   Uh-huh.  Talking to one another.

Q.   All right.  But you don't recognize this gentleman as one of them, is that correct?

A.   I, like I told you I wouldn't know who he was. Like I don't know him now.

279

Q.   Okay.   You saw  those individuals  that night
     right?

A.   Uh-huh.

Q.   And  you said there were several of them.  All

     right. And then you  said that there were some

     individuals around the truck, is that correct?

A.   No, I said I saw  one black male walking  from
     the truck.

Q.   One black male walking from the truck?

A.   Yes, sir.

Q.   All right.  Can you identify that person?

A.   No.

Q.   Okay.  What did he have on, do you know?

A.   No, sir, I don't know.

Q.   You just  –– where did he walk, he walked from
     the truck to where?

A.   To the Spectrum, into the Spectrum.

Q.   All right. Did he go in?

A.   Yes, sir.

271

Q.  All right.  Did he come out?

A.  I don't know, sir.  I left.

Q.  You left before he came out, is that correct?

A.  I guess.  I don't know, I mean, like I said I

    couldn't tell you who he was.  I just saw him

    coming in.

Q.  All right.

A.  Walking from the vehicle.

Q.  Did the individual that you saw down around

    the truck, did he close the door to the truck

    or did you see him inside the truck?

A.  I just saw him walking from the truck.

Q.  All right.  So you never saw him in the truck?

A.  No, sir.

Q.  Okay.  And all you saw him do was go in the

    Spectrum?

A.  Yes, sir.

Q.  Did he appear to be with the individuals that

    were with the dark Grand Am?

272

A.   Yes, sir.

Q.   He seemed to be with them?

A.   Uh-huh.

Q.   All right.   That would make, if there were

     three or four around the Grand Am, with him

     that would make four or five, three or four?

A.   Three or four.

Q.   Three or four.   Okay.   More than two?

A.   Yes, sir.

Q.   Thank you, ma'am.


     THE  COURT:   Anything  else  of  this

witness?

     MR. ABBETT:  No, sir.

     THE COURT:  All right.  You can step down

and you're excused.


          (Witness excused.)

273

THE COURT: Let me talk to the lawyers up here just a minute.

(An off the record discussion.)

THE COURT: All right. We'll recess for the night right now.

All right. Ladies and gentlemen, please remember what I told you. Don't discuss this case with anybody or let anybody discuss it with you. You took an oath that you would decide this case based on what you heard in this courtroom and not from any other source.

Don't go down to the Heart of Auburn and conduct your own investigation. You're supposed to decide this case based on the way they describe it here in the courtroom.

I'll let you go and ask you to be

274

back in the  morning at 9:00 o'clock.   We can

finish this case tomorrow I think without  any

problem.

      Do  not call in  on the code-a-phone

tonight.  The message on there will not be for

you thirteen, that's for the other jurors.  So

if you'll just turn your pads into the Bailiff

tomorrow morning  when you  come back  at nine

I'll have  a coffee pot  in the jury  room for

you  and we'll  get started  promptly at  nine

o'clock tomorrow.  So you may go.

        (Overnight recess.)

275

PROCEEDINGS SECOND DAY

THE COURT: One of the jurors has not shown up yet so fortunately we've got an alternate. I'm inclined to go ahead. I don't know what happened to her. Hadn't called, nothing. So since we've got thirteen I guess we'll go on without her.

Any comment from anybody?

MR. GILLENWATERS: No, sir.

MR. ABBETT: No, sir.

THE COURT: Bring them on back.

MR. ABBETT: Judge, before the jury comes back in if I have not offered State's exhibits numbers five, seven, fifteen and sixteen, those photographs, I would offer them at this time. They've been identified and authenticated. I think I've offered them.

THE COURT: Five and what?

276

MR. ABBETT:    Five, seven, fifteen and sixteen.

THE COURT: Seven is admitted.

(Whereupon, the instrument hereinabove referred to and marked for identification as State's exhibit number seven was admitted and received into evidence.)

THE COURT: The others are already in.

(Whereupon, the jury returned to the courtroom, and the following proceedings were had in their presence and hearing, to-wit:)

277

THE BAILIFF:  We've got them all here.

THE COURT:  Oh, they all got here?  Oh, okay.

All right.  Good morning, ladies and gentlemen.

THE JURY:  Good morning.

THE COURT:  Call your next witness.

MR. ABBETT:  Your Honor, the State would call Paul Register.

THE COURT:  I believe I swore you in yesterday, didn't I?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  You're still under oath.


PAUL REGISTER, (RECALLED),

a witness, having previously been duly sworn to speak the truth, the whole truth and nothing but the truth, was further examined and testified as

278

follows, to-wit:


## REDIRECT EXAMINATION


BY MR. ABBETT:

Q.   Are you the same Paul Register that testified

     yesterday?

A.   Yes, I am.

Q.   For the record.

          Paul, in your investigation of the case

     did you have an occasion to search the get

     away vehicle, that is the black Trans Am?

A.   Yes, I did.

Q.   Or did an inventory as you impounded it at the

     police department?

A.   Yes, sir, I did.

Q.   Did you find any other guns in the vehicle?

A.   No, sir, I did not.

Q.   Did you find any other gun other than the one

279

that's been introduced during the entire investigation?

A.  No, sir, I did not.

Q.  Did you examine the identification that the Defendant had in his wallet?

A.  Yes, I did.

Q.  Would you tell the jury about that, please?

A.  He had his own driver's license but also he had another I.D., I believe it was his brother's I.D. I asked him about it. It did not have a picture on it. I asked him about this I.D. and he said his brother was in the military overseas and that he was not able to have a photograph on this I.D. and that it was valid.

Q.  It was a non-photograph I.D.?

A.  Correct.

Q.  Do you know if it was a driver's license or what it was?

230

A.   Yes, sir, it was a driver's license.

Q.   Do  you  remember  the  name  on  the driver's

     license?

A.   I'm not  sure but I believe  it was Garlington

     and I believe he stated it  was his brother in

     the military.

Q.   Also  during the investigation did you have an

     occasion  to  have  a  conversation  with  the

     Defendant?

A.   Yes, I did.

Q.   Where did this take place?

A.   At the Auburn Police Department.

Q.   Okay.  And what time?

A.   I interviewed him, it began at two a.m. in the

     morning.

Q.   And who was present?

A.   Myself and the Defendant.

Q.   And  prior to having  a conversation  with him

     did  you  advise  him  of  his  constitutional

281

rights?

A.  Yes, I did.

Q.  And did you use a written form or did you do that orally?

A.  It's a written form, read and signed by the Defendant.

Q.  Okay. Do you have that form with you?

A.  Yes, I do.

Q.  I believe it's marked as State's exhibit number twenty, is that correct?

A.  Yes, sir, it is.

Q.  Prior to having a conversation with the Defendant and advising him of his rights did you or anyone in your presence or hearing offer him any reward, hope of reward, promise him anything or threaten him or coerce him in any way?

A.  No, sir, we did not.

Q.  All right. Did you read State's exhibit number

282

twenty over to the Defendant?

A. There's a line on there that you'll see that's

underlined under the first sentence where it

says I have been advised. I underlined that

line, had him read that line aloud to make

sure that he could read and write and at that

point he read the rest of the rights form to

himself.

Q. All right, sir. And after he read State's

exhibit number twenty over did you ask him if

he understood it?

A. Yes, sir, I did.

Q. And what did he say?

A. He said he did understand.

Q. And did you ask him if he was willing to make

a statement to you at that time?

A. Yes, sir, I did.

Q. And did you ask him if he was willing to waive

his rights to an attorney and make a statement

283

to you?

A.   Yes, sir.

Q.   And what did he say?

A.   He was willing to make a statement.  He wanted

to cooperate.

Q.   And did he sign State's exhibit number twenty,

the waiver of rights?

A.   Yes, he did.


MR. ABBETT:  Your Honor, we offer State's

exhibit number twenty?

MR. GILLENWATERS:  No objection.

THE COURT:  Admitted.


(Whereupon,   the   instrument

hereinabove   referred   to   and

marked   for   identification   as

State's   exhibit   number   twenty

was admitted  and received into

284

evidence.)


REDIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.   Did the  Defendant  then make  a statement  to

     you?

A.   Yes, sir, he did.

Q.   Was  it  an  oral  statement  or  a  written

     statement?

A.   It was an oral statement reduced to writing by

     myself.

Q.   All right. Did you  reduce it to writing truly

     and accurately as he related it to you?

A.   Yes, sir, it was.

Q.   After  you  reduced  it  to  writing  did  you

     provide the  Defendant with an  opportunity to

     read the statement over?

A.   Yes, sir.

Q.   After he read it over did he agree that it was

     true and correct?

285

A.   Yes, sir, he did.

Q.   Did he sign it?

A.   Yes, sir.

Q.   Did you sign it?

A.   Yes, sir, I witnessed it.

Q.   Do you have it with you?

A.   Yes, sir, I do.

Q.   Has that been marked State's exhibit number

twenty-one?

A.   Yes, sir, this is it.

Q.   Is State's exhibit number twenty-one the

statement that the Defendant made to you at

that time?

A.   Yes, sir, it is.


          MR. ABBETT:  Your Honor, we offer State's

exhibit number twenty-one.

          MR. GILLENWATERS:  No objection.

          THE COURT:  Admitted.

286

(Whereupon, the instrument hereinabove referred to and marked for identification as State's exhibit number twenty-one was admitted and received into evidence.)

REDIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.    Would you read that to the jury, please?

A.    Yes.  This is a statement of Rodrigues Huguley on 7-24-95.  "My name is Rodrigues Gomez.  I am eighteen years old and I can read and write.  I was coming from the race track in Tuskegee and I stopped at the Heart of Auburn Motel.  I was by myself, to get a room to spend the night because I was exhausted and hungry.  While I was in there the place was robbed by a man with a mask on.  He took all the money and my money too.  Me and the owner

287

stayed to give a description to the police. I
was leaving when the police got there. The

owner had gave me the key. I went out the
door to see which way the man was running and

I told the owner. I got in my car and left.
I was going to cut a block and go to the store

and come back to the room. When I went around
the corner I saw a guy walking towards Auburn

University. I passed and stopped at a stop
sign. As I signaled to turn -- I signaled to

the left and I turned and proceeded up the
road, that's when the guy ran towards the

car. I wasn't stopping but he was able to
open the door and jump in. I seen a gun. I

hollered. He said drive. I didn't know who
the guy was that jumped in, I was scared

because he had the gun. I went up the street
about a block and stopped in a parking lot and

told the guy to get out. The police were

288

behind us and the guy  just jumped out and ran

off.  I hadn't even -- it hadn't even  crossed

my  mind that it was  Dewayne.  I  just put my

hands up and  told the police  everything.  I

cooperated.  Later on in the police station an

officer told me it was Dewayne that robbed the

Heart  of Auburn.  When we got  to the police

station  I  seen Dewayne  and  this  time  I

recognized him."  It was  signed by Rodrigues

Huguley.

Q.  So he  told you that he didn't  know that that

was  Dewayne Clark  that got  in the  car with

him?

A.  That's correct.

Q.  As you proceeded in  the investigation did you

have another conversation with the Defendant?

A.  Yes, sir, later that same morning I did.

Q.  Okay.  And what time was that?

A.  That was about nine a.m. in the morning.

289

Q.  Okay.  And where had he been between two o'clock and nine o'clock a.m.?

A.  In the city jail.

Q.  And again prior to having a conversation with him at nine o'clock did you advise him of his constitutional rights the same as you did before?

A.  Yes, sir.  The same form was used.

Q.  Okay.  And did you go over each of the rights with him that are contained on that form?

A.  Yes, sir.

Q.  And I believe it's marked as State's exhibit number twenty-two, is that correct?

A.  Yes, sir.

Q.  Again, prior to him waiving any rights or making any statement to you did you or anyone in your presence or hearing offer him any reward, hope of reward, threaten him, coerce him in any way or promise him anything to get

him to waive his rights or make a statement to
you?

A.    No, sir.

Q.    Did  he again  waive his  rights and  sign the
form, State's exhibit number twenty-two?

A.    Yes, sir, he did.

Q.    And did you sign it as a witness?

A.    Yes, sir.


        MR. ABBETT:    We offer  State's  exhibit
number twenty-two.

        MR. GILLENWATERS:  No objection.

        THE COURT:  Admitted.


                (Whereupon,    the   instrument
                hereinabove  referred   to  and

                marked   for   identification as
                State's exhibit  number  twenty-

                two  was admitted  and received

291

into evidence.)


REDIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.   Did the Defendant again make an oral statement

     to you that you reduced to writing?

A.   Yes, sir he did.

Q.   After you reduced the statement to writing did

     you allow the Defendant to read  the statement

     over to  ascertain if you had  written it down

     truly and correctly?

A.   Yes, sir, I did.

Q.   And in  fact did you  write it down  truly and

     correctly?

A.   Yes, sir.

Q.   And do you have that marked as State's exhibit

     number twenty-three?

A.   Yes, sir, I do.


          MR. ABBETT:  Your Honor, we offer State's

292

exhibit number twenty-three.

      MR. GILLENWATERS:  No objection.

      THE COURT:  Admitted.

            (Whereupon,   the   instrument
hereinabove   referred   to   and
marked   for   identification   as
State's exhibit number   twenty-
three was admitted and received
into evidence.)


REDIRECT EXAMINATION RESUMED BY MR. ABBETT:

Q.   Would you read that to the jury, please?

A.   Yes.

Q.   Let  me   ask you  something before  you start
     reading.  What had you  told him at that  time
     about  the investigation  prior to  taking the
     second statement from him?

A.   Well, prior to taking this statement we had, I

293

had, I told him that we had spoken with Mr.
Clark and that Mr. Clark had indicated that he

did in fact know him and that he had gone to
high school with him and that they had

planned, that Mr. Clark stated that they had
come to Auburn together and planned this

robbery. And we had also, I told him that I
had also been to Lafayette and seen, you know,

I had seen his truck parked at the Spectrum
where they met. And I told him all of this

before this second interview. Before the
second statement.

Q.   Okay. Would you read that statement to the
jury, please?

A.   Yes. This is Rodrigues Huguley. "My name is
Rodrigues Huguley and I am eighteen years old.

I can read and write. The reason I am making
this statement is because I was nervous this

morning and I was scared. I didn't know

294

Dewayne was going to imply that I was in on the crime with him but since he's done that I

want to tell everything that happened. I was riding around Lafayette in my truck. Dewayne

stopped me and said let's get somebody's car and ride out. I asked if he had any money and

he said yes. I knew we could get Billy's car to ride in that evening. I thought we were

going to LaGrange at first. Dewayne picked me up at Spectrum where I left my truck and he

gave me a ride to Billy's to get his Grand Am. I got out and told Billy that I wanted to go

ride in his car and he said yeah. Then Dewayne got out and Billy said all right,

ya'll take it easy in my car and he gave me the insurance card. I told him I wouldn't be

driving, to give it to Dewayne and he did. We went to Tuskegee and rode around for a while,

maybe forty minutes. It was getting late and

295

we decided to go back.  On the way up the road
on the interstate me and Dewayne got to

fussing.  I had got mad at him and hit him in
the head.  He got mad  and we stopped in

Auburn and I made  him get out down  by Auburn
University.  I went to  the Heart  of Auburn

Motel.  When he got  out of my  car he didn't
have a  gun or mask with  him.  I went  in and

paid for my room.  While I was in there a  guy
in a ski mask came in  and pointed a gun at me

and  the cashier.  The  cashier gave  him the
money  and he ran out the door.  I stepped out

of  the  door to  catch a glimpse  of him  and
after that the  story is just  like I said  it

before.  I went the opposite way that the guy
ran  and as I  was going  around the  street I

passed Dewayne.  I realized  that he was the
one who robbed the place I thought.  I wasn't

going to stop for him but I stopped for a stop

296

sign and put on my signal light. Then the police started chasing him and he tried to

catch up with the car as I was pulling off. Then he opened the door himself and jumped in.

I didn't see money or anything. I drove a block up the street. The police put the

lights on me and I pulled over. That's when Wayne got out and ran again. Then I just

talked to the police. I didn't make him get no money. I just made him get out after we

had the fight." Signed by Rodriques Huguley.


MR. ABBETT: Did I offer that, Your Honor?

THE COURT: Yes, sir.


Q. Detective Register if you were going to drive from the Heart of Auburn back to Lafayette by

the most direct route which way would you go?

297

A.    From the Heart of Auburn to Lafayette?

Q.    Yes, sir.

A.    You would get on, you would get on College
      Street right here if you came out of the

      entrance.  You would turn north, go on to
      College Street and College Street takes you

      all the way out to Highway 280 which you then
      would turn again and go up through Gold Hill

      and go to Lafayette that way.  That would be
      the most direct route.

Q.    Okay.  Or North on Gay Street?

A.    Correct.

Q.    Where would you go  if you went north  on Gay
      Street?

A.    You could go north on Gay Street.  You could
      go to Opelika Road or Highway 29 and then turn

      and go that way.

Q.    So that's back in the direction of Lafayette?

A.    Yes, sir.  Both of  those streets are  in the

298

        direction of Lafayette.

Q.   That's all.


        THE COURT:  Cross examination.


        RECROSS EXAMINATION


BY MR. GILLENWATERS:

Q.   Officer, how  long did  you talk with  him the
     first time?

A.   About an hour.

Q.   About an hour?

A.   Yes, sir.

Q.   Okay.  One would assume he  said other things
     than  what  you  just took  down,  isn't  that
     correct?

A.   Yes, sir.

Q.   He said things that you didn't take down?

A.   Well,  there  was  conversation  before  we

299

actually wrote down the statement, between he
and I about what he, what had happened.

Q.    Okay.  Do you  recall anything in  that first
statement  that he said  that you didn't write

down?

A.    Specifically I  don't remember anything.   I'm

sure there were things said, every single word
that he said to me was not written down.  As I

said,  you  know,  there  was  a  conversation
between he and  I and  at the point  that   he

decided that  that was the truth  we wrote the
statement down.

Q.    All right. Did you tape the conversation?
A.    No, sir.

Q.    Do you  have a  tape recorder available  to do
that?

A.    We don't record interviews.
Q.    But you talked to him for an hour and you were

able to  read that  statement in about  two or

300

three minutes, isn't that correct?

A.   Correct.

Q.   All right.   Was it a question answer type situation?

A.   There was some questioning and answering, yes.

Q.   Okay.   Did he appear to be nervous and upset?

A.   He was nervous.

Q.   Okay.   Now did Sgt. Ramsey, did he come in during this interview the first time?

A.   Sgt. Ramsey was interviewing Dewayne Clark in the room directly beside me and yes, at different times he and I met outside to discuss you know, what we were discussing with the two Defendants and I'm sure at some point he may have went in and asked a question or two.

Q.   All right.   So he was interviewing Dewayne Clark?

A.   That's correct.