Q.   Okay.   And   he   would tell   you what   Dewayne
     Clark   was   saying and you would   tell him what
     Rodrigues was saying, is that correct?

A.   Yes, sir.

Q.   All right.   And this went on for an hour until
     you got   the statement that you   got from him,
     is that correct?

A.   Yes, sir.

Q.   All right.   And you said that Sgt.   Ramsey did
     come   in and   interview Rodrigues   during this
     first occasion, is that correct?

A.   Well, as I said, at a point where I would come
     out, I even went in and asked questions of Mr.
     Clark, so I'm sure at some point he would have
     went in and asked a question of Mr. Huguley.

Q.   Do you recall Sgt. Ramsey coming in and saying
     something to   the effect   that son,   you could
     get twenty-five years for this?

A.   No, sir, I don't.

302

Q.   You don't recall that?

A.   No, sir.

Q.   All right.  Now you interviewed him the second
     time at around nine a.m. the next morning?

A.   Yes, sir, that's right.

Q.   The same morning.

         All right.  Did  Sgt. Ramsey participate
     in that interview also?

A.   I don't recall if he did or not.  I know  that
     I was primarily interviewing him.  Sgt. Ramsey

     would have  been in the detective  office.  He
     may have come in or out,  I'm not sure.

Q.   All  right.  And at that time you had already,
     you  or  Sgt. Ramsey  had  already obtained  a

     statement  from  Dewayne  Clark,  isn't  that
     correct?

A.   Sgt. Ramsey had.

Q.   Sgt. Ramsey had.

A.   Yes.

303

Q.   All right.  And you made Rodrigues Huguley
     aware of the fact that you had obtained a
     statement from him, did you not?

A.   He was --

Q.   Had gotten a statement from Clark?

A.   He was aware that Mr. Clark was being
     questioned as we were questioning both of
     them.  He was aware the whole time that Mr.
     Clark had been interviewed.

Q.   All right.  But he was aware that you had
     obtained a statement from Clark incriminating
     him, isn't that correct?

A.   Yes, sir.

Q.   All right. And you made him aware of that as
     you stated earlier, right?

A.   Yes, sir.

Q.   Okay.  And then he gave you this statement, is
     that correct?

A.   That's correct.

304

Q.   All right.  How long did this interview last?

A.   It was probably somewhere around the same.   I

     don't recall the exact time, but it would have

     been --

Q.   You don't have a start and an end time on your

     notes?

A.   It's on the statements  that they have at this

     time.   I can look at it and tell you exactly.

     I believe it was maybe forty-five minutes  but

     I have to look and see.

Q.   Let me show you this copy.

A.   It  was  forty-five  minutes.   It  began, the

     rights  form was read  to him at  nine and the

     conclusion of the statement is 9:45 so it  was

     forty-five minutes.

Q.   Okay.  All right.    During that  time,  that

     forty-five  minutes,  you  did  question  and

     answer again, is that correct?

A.   That's correct.

Q. All right. And did he appear nervous or upset?

A. Yes, sir, he was nervous.

Q. All right. Had he got any sleep that night to your knowledge?

A. I guess he would have had the time between roughly three and nine, yes, sir.

Q. Okay. Did you get him anything to eat during that time?

A. I don't have any control over the inmates and their feeding times. They have a schedule and I'm not aware if he was fed or not.

Q. So you don't know if he had anything to eat from breakfast that morning or not?

A. No, sir, I don't.

Q. Okay. Now, do you recall what he was wearing that day?

A. He had a, kind of a shirt that had, you know, several different colors on it. I don't

306

remember specifically.

Q. Was it a pull over shirt or was it a button

down collar shirt?

A. I don't remember.

Q. You don't recall?

A. No, sir.

Q. Okay. You said you did an inventory of his

possessions, is that correct?

A. No, I inventoried the vehicle, the booking

does an inventory of every piece of property

that's turned in to booking. If you're

inquiring about his I.D., yes, I did look at

his wallet and his I.D. and all that.

Q. You did look in his wallet?

A. Yes, sir.

Q. And you recall seeing his driver's license?

A. Yes, sir.

Q. Is that correct?

A. Yes, sir.

307

Q. And you said a non-picture driver's license also?

A. Yes, sir.

Q. All right. Do you recall anything else being in his wallet?

A. There were just, I think there were some credit cards, I don't recall what kind. There were a few other items in the wallet.

Q. Okay. Credit cards, we heard one officer say that there were telephone credit cards, do you remember if there were other type credit cards?

A. No, sir, I don't remember.

Q. You don't remember what kind of credit cards they were?

A. No, sir.

Q. Do you remember if he had any monies?

A. I don't remember any money right offhand, but it could have been, I don't remember.

308

Q.   All right.   Did you, you said that you
     searched the vehicle and you did not find  any
     pistol  or any  weapons of  any kind,  is that
     correct?

A.   Correct.

Q.   All right. Did  you  find any,  any  monies
     anywhere, any  dollar  bills, any  ten  dollar
     bills,  twenty dollar bills,  those  kinds of
     monies?

A.   No, sir.

Q.   Laying in the seat or anywhere?

A.   No, sir.

Q.   Okay.  Thank you, sir.


          THE COURT:  Other questions?

          MR. ABBETT:  That's all we have.

          THE  COURT:  All  right.  You can  step
     down.

309

(Witness excused.)


THE COURT:  Next witness.

MR. ABBETT:  Your Honor, at this time the

State rests.


## STATE RESTS


THE COURT:  Defense ready to proceed?

MR. GILLENWATERS:  Yes, sir.

THE COURT:  Call your first witness.

MR. GILLENWATERS:  Your Honor, this is

Cornelius Reese.

THE COURT:  Step right up in front of the

bench and raise your right hand.


(Witness duly sworn.)

319

<u>CORNELIUS REESE,</u>

a witness, having first been duly sworn to speak

the truth, the whole truth and nothing but the

truth, was examined and testified as follows, to-

wit:


<u>DIRECT EXAMINATION</u>


BY MR. GILLENWATERS:

Q.    Mr. Reese, state your name for the jury,

      please?

A.    Cornelius Reese, Jr.

Q.    And where do you live at, sir?

A.    Lafayette, Alabama.

Q.    All right.  And where are you employed at?

A.    I'm the principal at Lafayette High School,

      also pastor two Baptist Churches in Lafayette,

      one in Whatley and one in Lafayette and I'm

      also a Lafayette City Councilman.

311

Q.  All right, sir. And in your capacity as
principal at Lafayette High School have you
come to know and do you know Rodrigues
Huguley?

A.  Yes, I do.

Q.  How long have you known Mr. Huguley?

A.  All of his life because his mother was one of
my students at the time she became pregnant
with him so I've known him all of his life.

Q.  All right, sir. And did he attend Lafayette
High School while you were principal?

A.  Yes.

Q.  And you are familiar with him, is that
correct?

A.  Yes.

Q.  How many years did he attend Lafayette High
School?

A.  He attended from the ninth through the twelfth
grade.

312

Q.   Okay.  And at the time that he was in the
ninth through the twelfth grades, during those
four  years,  did  you  come  to  know  his
reputation at school?

A.   I think so.

Q.   What was his reputation at school?

A.   Well, academic-wise I checked his  record this
morning,  he had  an  89.02  average  for  four
years  which is almost an A average.  He was a
typical student  as far as conduct.   He would
do something mischievous things --

     MR.  ABBETT:   Your  Honor, I'm  going to
object.  I'm  going to object  at this  point.
He can either say good or bad.
     THE COURT:  Sustain the objection.


Q.   Did you know his reputation?

A.   I think so.

313

Q. All right. What was it? Good or bad?

A. Good.

Q. All right. Are you familiar with his plans after high school?

A. Yes.

Q. All right. And what were his plans after high school?

A. He had planned to go --

        MR. ABBETT: I'll object, Your Honor.

        THE COURT: Sustained.

Q. Now, let me ask you, Principal Reese, do you know his reputation at school for truthfulness and veracity?

A. I think so.

Q. All right. And what was his reputation for truthfulness and veracity?

A. Well, he never lied to me --

314

MR. ABBETT:  Objection.

THE WITNESS:  -- to my knowledge.

MR. ABBETT:  Objection,  Your  Honor.
That's not a proper answer.

THE COURT:  Sustained.  You  can ask him
whether the reputation  for truth and veracity
is  good or bad.  That's the typical way to do
that.

Q.  All right.  Is his reputation for truthfulness
and veracity good or bad?

A.  Good in my opinion.

Q.  All  right, sir.  Now, did he  have any times
that  he  worked  in  the  office  to  your
knowledge?

A.  Yes, he was assigned --

MR. ABBETT:  Your Honor,  I'm going  to
object  to this.  He's already  testified to

215

his character and unless this specifically

relates to something do to with this case it's

not admissible.

    THE COURT:  Well, we'll have to see where

it goes.  Overrule the objection.


Q.   All  right.  What was  his job or  what did he

volunteer to do at the office?

A.   He  was an office aide which  one period a day

he would  work in the office,  run errands for

office     workers,    whatever,    answer    the

telephone, et cetera.  We chose those students

on the basis of, you know, of good conduct and

good students.

Q.   All right.  Did  he, at this job as  an office

aide did he have exposure to monies that  were

the school's monies?


    MR. ABBETT: Objection, Your Honor.

316

THE COURT: Sustained.

Q.  Thank you, sir. You can answer their questions.


THE COURT: Cross examination.


## CROSS EXAMINATION


BY MR. ABBETT:

Q.  Mr. Reese, you weren't in Auburn, Alabama on the night and the early morning hours of July the 24th, 1995, were you?

A.  No, sir.

Q.  And you don't know anything about the facts of this case, do you?

A.  No, I don't.

Q.  That's all. Thank you.

317

THE COURT: Anything else of this witness?

MR. GILLENWATERS: No, sir.

THE COURT: All right. You're excused, you may go.


(Witness excused.)


THE COURT: Next witness.

MR. GILLENWATERS: Call Glenda Brooks.

THE COURT: Raise your right hand, please.


(Witness duly sworn.)


THE COURT: Come around and have a seat up here.

318

<u>GLENDA BROOKS,</u>

a witness, having  first been duly  sworn to  speak

the  truth, the  whole  truth and  nothing but  the

truth,  was examined and  testified as follows, to-

wit:


<u>DIRECT EXAMINATION</u>


BY MR. GILLENWATERS:

Q.    Ma'am, state your name for the jury, please?

A.    My name is Glenda Brooks.

Q.    And where do you live at, ma'am?

A.    I live in Roanoke, Alabama.

Q.    Okay.  And where are you employed at?

A.    I teach high school English at Lafayette  High

      School.

Q.    All  right.   And how  long  have you  taught

      English at high school there  in Lafayette?

319

A.    Twenty-one years.

Q.    All right.  And in your capacity as an English

      teacher did  you  come  to  know  Rodrigues

      Huguley?

A.    Yes, I've taught him two years.

Q.    Okay.   And during  the  two  years that  you

      taught him did you know his general reputation

      in the community of the school at Lafayette?

A.    Yes,  Rodrigues  was  known  as  a  fun loving

      student.


            MR. ABBETT:   Objection.


Q.    Did you know his general reputation to be good

      or bad, ma'am?

A.    Good.

Q.    And  let me ask you  further, did you know his

      reputation   for  truthfulness   and  veracity

      whether or not it was good or bad?

A.    To the best of my knowledge it was good.

Q.    Thank you, ma'am,    You may answer their

questions.

        THE COURT:  Cross examination.

        MR. ABBETT:  No questions.

        THE COURT:    All right.    You're excused,

you may go.


            (Witness excused.)


        THE COURT:  Next witness.

        MR. GILLENWATERS:  Reverend James Rice.

        THE    COURT:    Raise    your    right    hand,

please.


            (Witness duly sworn.)

### JAMES RICE,

a witness, having first been duly sworn to speak

the truth, the whole truth and nothing but the

truth, was examined and testified as follows, to-

wit:


### DIRECT EXAMINATION


BY MR. GILLENWATERS:

Q.    Reverend Rice, would you state your name for

      the jury, please?

A.    James Rice.

Q.    And where are you a minister at, sir?

A.    I'm the Pastor of the Lafayette circuit in

      Lafayette, Alabama.

Q.    All right. And in your capacity as a minister

      have you come to know Rodrigues Huguley?

A.    Yes, I have.

Q.    How do you know him, sir?

322

A.   He attends one of the churches that I pastor.

Q.   All right. And could you explain to the  jury,

you said one of the churches, do you have four

different churches?

A.   Yeah, I have four churches, yes.

Q.   All right.   And do the members go from Sunday

to Sunday and you go from church to church, is

that correct?

A.   Well, they're  independent of each  other.   I

have  church  every  Sunday   at  one  of  the

churches.

Q.   All  right. And  which  church does  Rodrigues

attend?

A.   Mitchell Springs.

Q.   Where is that at, sir?

A.   Highway 50 at Lafayette Alabama.  Or they  may

call it Veteran's -- something, I don't know.

Q.   Parkway?

A.   Veteran's Parkway, yes.

323

Q.   Okay.  How long have you known Rodrigues?

A.   Year and a half.

Q.   A year and a half.  All right. And during that
     time  have  you  come  to  know  his  general

     reputation in the community that you live in?

A.   More  or less.  Yes, I know that he attends my

     church every Sunday, every meeting  Sunday and

     he helps with the collection and --


          MR. ABBETT:  Your Honor?

          THE COURT:  Huh?

          MR. ABBETT:  Could I object, please?

          THE  COURT:   If you  want  to.   Are you
     objecting?

          MR. ABBETT:  I'm objecting.

          THE COURT:  Sustained.


Q.   Reverend Rice,  I  need  to  ask  you  is  his

     reputation,   general    reputation   in   the

324

community good or bad?

A.   It's good as far as I know.

Q.   All right, sir.   Let me ask you, have you an
     opinion as to whether, what his reputation is
     for   truthfulness   and   veracity   in   the
     community?

A.   Yes, I have an opinion,

Q.   And what would that be sir, is it good or bad?

A.   Good.

Q.   Thank  you,   sir,   you  can   answer   their
     questions.


          MR. ABBETT:   No questions.

          THE COURT:   All right.   You're excused,
     you may go.


                    (Witness excused.)


          THE COURT:  Next witness.

MR. GILLENWATERS:  Call Melinda White?

THE   COURT:   Raise  your  right  hand,

please.


(Witness duly sworn.)


THE COURT:  Have a seat up here.


### MELINDA WHITE,

a witness, having  first been duly  sworn to  speak

the  truth, the  whole  truth and  nothing but  the

truth, was examined and  testified as follows,  to-

wit:



### DIRECT EXAMINATION


BY MR GILLENWATERS:

Q.    Ms.  White  state  your  name  for  the  jury,

326

please.

A.   Melinda White.

Q.   And where do you live at ma'am?

A.   Lanett.

Q.   And where do you go to church at?

A.   Mitchell Springs United Methodist Church.

Q.   All right.  And what is your  capacity at that
     church?

A.   I'm the church secretary and treasurer.

Q.   All  right.   And in  your capacity  with that
     church  have  you   come  to   know   Rodrigues
     Huguley?

A.   Yes, sir.

Q.   And how long have you know Rodrigues?

A.   All his life.

Q.   All his life?

A.   Uh-huh.

Q.   All right.  And in your capacity as  treasurer
     of the church how do you know Rodrigues?

327

A.    He is our usher and he takes up the money.

Q.    All right, ma'am.    Now, do  you  know  his

general reputation there in  the church and in

the community, is it good or is it bad?

A.    It's good.

Q.    All  right.    Do you  know his  reputation for

truthfulness and veracity, is it good or is it

bad?

A.    It's good.

Q.    All right.  Thank you,  ma'am.  You can answer

their questions.


        MR. ABBETT:  No questions.

        THE COURT:  You're excused, you may go.


            (Witness excused.)


        THE COURT:  Next witness.

        MR. GILLENWATERS:  Morris Lewis.

328

### MORRIS LEWIS,

a witness, having first been duly sworn to speak

the truth, the whole truth and nothing but the

truth, was examined and testified as follows, to-

wit:


### DIRECT EXAMINATION


BY MR. GILLENWATERS:

Q.  Mr. Lewis, state your name for the jury,

please?

A.  Morris E. Lewis.

Q.  And where do you live at, sir?

A.  2800 Watson Street, Opelika, Alabama.

Q.  And where are you employed at?

A.  Self employed, Lewis Truck and Equipment

Company.

Q.  And how long have you been self employed

there?

329

A.   About sixteen years.

Q.   All right.  And while you've been employed  or

working there for yourself have you employed a

individual by the name of Rodrigues Huguley?

A.   Yes, I have.

Q.   When did you employ Mr. Huguley?

A.   In the summer of '91 and '92.

Q.   And did he work there -- here in Opelika?

A.   Here in Opelika.

Q.   All right.    And  do  you  know  his  general

reputation there at the work place?

A.   Yes, I do.

Q.   And  is  his general  reputation  at  the work

place, is it good or is it bad?

A.   It was good.

Q.   All  right.  Thank  you, sir.   You can answer

their questions.


          THE COURT:  Cross.

330

CROSS EXAMINATION


BY MR. ABBETT:

Q.   What did the Defendant do for you, Mr. Lewis?

A.   He cleaned up, watched  the place when I would

     go to town,  see customers when  they come  in

     and  he  handled some  money  on  a couple  of

     occasions for me.

Q.   Did you send him  out about the community from

     time to time?

A.   No, I didn't send him out.

Q.   That's all.


        MR. GILLENWATERS:  Thank you, Mr. Morris.

        THE COURT:  All right.  You're excused,

     you may go.


                (Witness excused.)

331

THE COURT:  Next witness.

MR. GILLENWATERS:  Call Deanna Hand.


DEANNA HAND,

a witness,  having first  been duly sworn  to speak
the truth,  the whole  truth  and nothing  but  the
truth, was examined  and testified as  follows, to-
wit:


DIRECT EXAMINATION


BY MR. GILLENWATERS:

Q.    Deanna, state your name for the jury, please.

A.    Deanna LaCheree Hand.

Q.    And where do you live at Ms. Hand.

A.    In Loachapoka, Alabama.

Q.    All  right.   In relation  to Auburn  where is
      that at?

A.    It's on Highway 14.

332

Q.   In relation to the Heart of Auburn Motel/Hotel
where is that?

A.   It's probably about ten miles from where I
live at.

Q.   Okay. Now back on July, the evening of July
23rd, early morning hours of July 24th of this
year did you see Rodrigues Huguley and Dewayne
Clark?

A.   Yes, sir.

Q.   Where did you see them at?

A.   Well, they came to my house around 12:30 that
night.

Q.   All right. And do you recall what vehicle
they were driving?

A.   Yes, a black four door Grand Am.

Q.   Okay. And let me show you State's exhibits
five, seven, fifteen and sixteen. Does that
appear to be the vehicle that they were in?

A.   Yes, sir.

333

Q.   Okay.  And how long did they stay at your
     house?

A.   Probably about ten or, ten or fifteen minutes,
     something like that.

Q.   All right.  And did you have any plans for
     later in that evening with Rodrigues?

A.   Yeah, I had told him to go to the motel and
     get a room.  I had given him some money.

Q.   How much money did you give him?

A.   $40.00.

Q.   Okay.  And what was the plan?

A.   Excuse me?

Q.   What was the plan, were you to meet him later
     at the motel?

A.   Yeah.  Yes, sir.

Q.   Did you specifically tell him which hotel?

A.   Yes, sir.

Q.   All right.  Which hotel did you tell him?

A.   Heart of Auburn.

334

Q.  Okay.  And did you  see Dewayne Clark  and he
    leave together?

A.  Yes, sir.

Q.  Okay.  And who was driving when they left?

A.  Rodrigues.

Q.  All right.  Now, before they left did you hear
    any   conversations   between   Dewayne   and
    Rodrigues?

A.  All I  heard they was  arguing.  I  don't know
    exactly what they was arguing about.

Q.  All  right.  How  could  you  tell they  were
    arguing?

A.  I just heard  a lot of, you know,  fussing and
    stuff.  Like I  say I don't know  exactly what
    they was arguing about.

Q.  Okay.  Did  Dewayne,  did  he  appear  to  be
    intoxicated or high or anything like that?

A.  His eyes looked kind of closed I guess I would
    say.  I really don't know.

Q.   Okay.   Now later that evening, did you ever get a call from Rodrigues at the hotel?

A.   Did I get a call from Rodrigues?

Q.   Right.

A.   No, he never did call me back.

Q.   All right.   Was he supposed to call you and you were going to drive to the hotel, is that correct?

A.   Yes, sir, he had told me he was going to give me a call and let me know when to come out.

Q.   All right.   And you never did get that call, did you?

A.   No, sir.

Q.   Okay.   Thank you, ma'am.


                THE COURT:  Cross examination.

336

<u>CROSS EXAMINATION</u>

BY MR. ABBETT:

Q.   Ms. Hand, I believe you said they arrived at your house in Loachapoka about 12:30?

A.   Yes, sir.

Q.   How do you, how do you know the Defendant Rodrigues?

A.   Well, I've been knowing him probably about four or five months. I met him at a party.

Q.   Where did you meet him at?

A.   It was in Auburn.

Q.   Where in Auburn?

A.   It was over to one of my friend girl's house, Lisa.

Q.   How many times have you seen him since that time?

A.   Numerous times.

Q.   Was he coming to your home to visit you or

where were you seeing him?

A.   He came to my house, been coming to my house.

Q.   And you say you're boyfriend  girlfriend?

A.   We're good friends.

Q.   Had you been to  a motel with him  before that
     night?

A.   No, sir.

Q.   What  was  the  occasion for  he  and  Dewayne
     coming to your home that night?

A.   Well, I know  what his occasion  was to  come,
     to get the money so he could go get a room.

Q.   And what was the purpose for the room?

A.   Just  have, you  know, talking.   Just  have a
     little fun, I guess.

Q.   Well, were  you going to  go there and  have a
     little fun with he and Dewayne both?

A.   No, sir.


          MR. ABBETT:   May  I approach the  bench,

Your Honor?

THE COURT: Yes, sir.

(Whereupon, the following proceedings were had at the bench, inside the presence of the jury but out of its hearing, to-wit:)

MR. ABBETT: Your Honor, she's presently been arrested in Auburn where she's got charges of dealing drugs and that shows bias and prejudice against the Auburn Police Department, the arresting agency in this case and I want to ask her about it.

MR. GILLENWATERS: We would object to it unless he can show she was convicted.

MR. ABBETT: That's for impeachment to show bias and prejudice. We need it to

impeach her or to show bias.

    THE COURT:  Do you object to it?

    MR. GILLENWATERS:  Yes, sir.

    THE COURT:  Sustain the objection.

    (Whereupon,   the   following proceedings  were  had  in  the jury's  presence  and  hearing, to-wit:)

## CROSS EXAMINATION RESUMED BY MR. ABBETT:

Q.   They arrived at your house at 12:30 a.m.

A.   Yes, sir.

Q.   In a black Grand Am?

A.   Yes, sir, four door black Grand Am.

Q.   And they stayed about ten or fifteen minutes?

A.   Ten to fifteen minutes, something like that.

Q.   Well, do you  think it would  have been  about 12:45 when they left, is that correct?

340

A.   I guess approximately about that time, I

     guess. Like I said ten to fifteen minutes.

     They didn't stay long.

Q.   Ms. Hand, how long do you think it would take

     to drive from Lafayette to your home in

     Loachapoka?

A.   Uh, see, I haven't driven to Lafayette.

     Probably about twenty or twenty-five minutes,

     something like that. Twenty or twenty-five

     minutes.

Q.   Do you think you could drive from Lafayette to

     Loachapoka in twenty or twenty-five minutes?

A.   From my house?

Q.   Yes.

A.   Yes, about twenty or twenty-five minutes.

Q.   If there was testimony that this Grand Am was

     in Lafayette at midnight, do you think they

     could have drove to your house in Loachapoka

     at about 12:30?

341

A.   If it, if the Grand Am was in Lafayette?

Q.   Uh-huh.

A.   Like I said, it's about twenty or twenty-five
     minutes.

Q.   And how long from your home back to the Heart
     of Auburn?

A.   Probably take about ten minutes.  About ten
     minutes to get to the Heart of Auburn from my

     house.  A good ten minutes, yeah.

Q.   So that would have put them back at the Heart

     of Auburn about 12:55 a.m., wouldn't it?

A.   I guess, yeah, like I said about ten minutes.

Q.   When were you contacted about being a witness
     in this case?

A.   When was I contacted?  Uh, I guess a couple of
     days ago.

Q.   Okay. And who contacted you?

A.   Uh, the lawyer, his lawyer.

Q.   Did anybody talk to you about your testimony

342

before the lawyer contacted you?

A.   No, sir.

Q.   All right.   Did you talk with  him about your
     testimony?

A.   Talked with who?

Q.   Mr. Gillenwaters?

A.   Yes, sir.

Q.   Where did you talk with him at?

A.   Well, I talked with him here.

Q.   At the Justice Center?

A.   Yes, sir.

Q.   When Mr. Huguley was  first arrested did  you
     know about it?

A.   No, sir, I didn't know about it.

Q.   When did you find out about it?

A.   Uh, probably a couple of days, about a  couple
     of days after.

Q.   A couple of days after he was arrested?

A.   Yes, sir.

343

Q.    Did you go to the Auburn Police at that time
      and tell them that he was at your home prior
      to the robbery?

A.    No, sir, I didn't.

Q.    Who did you tell about it?

A.    Who did I tell about what?

Q.    Him being at your home?

A.    Well, I didn't tell nobody.

Q.    What's the most direct route from your house
      to the Heart of Auburn?

A.    Direct route?

Q.    Uh-huh.

A.    Just hit 14.

Q.    14 goes right into Auburn, doesn't it?

A.    Uh-huh. Well, where I live at. I live like
      you know where Water Creek is? Right on
      Highway 14.

Q.    You don't get on the interstate to --

A.    No, sir.

344

Q.    -- go from your house  to the Heart of Auburn,
do you?

A.    No, sir.  I  mean unless you want to  take all
the rounds.

Q.    I believe that's all.


        THE    COURT:    Anything    else   of   this
witness?

        MR. GILLENWATERS:    No, sir.   Thank you,
Deanna.

        THE    COURT:   All   right.   You're excused,
you may go.


                (Witness excused.)


        THE COURT:   Next witness.

        MR.  GILLENWATERS:     We   call  Rodrigues
Huguley, Your Honor.

        THE COURT:   Raise your right hand.

345

(Witness duly sworn.)


**RODRIGUES HUGULEY,**

a witness, having first been duly sworn to speak

the truth, the whole truth and nothing but the

truth, was examined and testified as follows, to-

wit:


**DIRECT EXAMINATION**


BY MR. GILLENWATERS:

Q.    Rodrigues, state your name for the jury,

      please.

A.    Rodrigues Gomez Huguley.


Q.    All right.  Where do you live at, Rodrigues?

A.    Lanett, Alabama.


Q.    Okay.  And where did you go to high school at?

A.    Lafayette High School.


Q.    All right.  Did you graduate this past year?

346

A.    Yes, sir.

Q.    And   this   summer,   were   you   employed   this

      summer?

A.    Yes, sir.

Q.    Where did you work this summer?

A.    Sanders Brothers Construction Company.

Q.    All right.

A.    And  I worked at Row Master, I don't know if I

      still got a job or not.


      THE COURT:   Now you're going  to have to

      talk a little bit louder than that.


A.    I say I  work at  Row Master right  now but  I

      don't know if I still have a job or not.

Q.    All  right.  Back  in July 23rd,  24th of this

      year,  do you  remember getting  together with

      Dewayne Clark?

A.    Yes, sir.

Q. All right. Where did ya'll meet at?

A. In Lafayette at Spectrum, something like that.

Q. All right. Were you driving your vehicle that evening?

A. Yes, sir.

Q. All right. And what time did ya'll meet at the Spectrum, do you know?

A. I'm not sure about the time we met up that night. I know I had been racing my motorcycle that evening and I had put my motorcycle up and I was in Lafayette riding around and I seen Dewayne but I'm not sure what the time was when I met him.

Q. All right. Where had you been racing your motorcycle at that evening?

A. At the race track.

Q. All right. Would that -- where is that race track at?

A. In Tuskegee.

Q.   All right. And what time was that from?

A.   It was that evening, earlier that day.  I  had

     been racing all day.

Q.   All  right.  And what time did you get back to

     Lafayette?

A.   It was dark, it was at night.  I went straight

     home and I took my motorcycle off my truck and

     then I rode around Lafayette a little while.

Q.   Okay.  Was  there  anybody with  you at  this

     time?

A.   No, sir.

Q.   All right. Where did you see Dewayne at?

A.   I seen him in town, when I got in  town I seen

     him.

Q.   Okay.  And then  you saw him at the  Spectrum,

     is that correct?

A.   Yes, sir.

Q.   All  right. And what  happened after ya'll got

     together at the Spectrum?

349

A.    We rode around Lafayette a little while.

Q.    What vehicle did you ride around in?

A.    We rode around in a Grand Am.

Q.    The Grand Am.  All right. Did ya'll go and get the Grand Am?

A.    No, sir, I didn't go with him.

Q.    You didn't go with him?

A.    No, sir.

Q.    Okay.  All right.  He met you and had the Grand Am there at the Spectrum, is that correct?

A.    Yes, sir.

Q.    All right.  Did ya'll put any gas in the Grand Am?

A.    I didn't.

Q.    You didn't.  Okay.  All right.  Where did ya'll ride around in Lafayette at?

A.    We just rode around this place called Abilene, we rode down Abilene.

Q.   All right.  And did you leave Lafayette and go somewhere else?

A.   Yes, sir.

Q.   Where did you go?

A.   We went to Loachapoka.

Q.   All right. Did you see anybody at Loachapoka?

A.   Yes, sir.

Q.   Who did you see at Loachapoka?

A.   Dee, Deanna.

Q.   Deanna Hand?   All right.   When you got to Deanna Hand's was there anybody else there besides her?

A.   It was just her.  Nobody else came out.  It was late when we got there.

Q.   Okay.  Did you knock on her door or how did you --

A.   Yes, sir, I knocked on her door.

Q.   All right.  And did you go inside the home?

A.   Yes, sir, I went inside.

351

Q.   All right.   And  did Dewayne  get out  and go
     inside?

A.   Yes, sir.  He got out and went in too.

Q.   All right.   Were you driving at this  time or
     was he?

A.   He was driving then but I ended up driving.

Q.   All right.   He drove to Loachapoka?

A.   Yes.

Q.   All right.  During that time did you offer him
     any marijuana or did you smoke any marijuana?

A.   I  didn't offer  any, I  didn't offer  him any
     marijuana.   He,   Dewayne  had  smoked  some
     earlier.   Dewayne was  high when he  got with
     me.

Q.   All  right.   But while  you were  with, while
     ya'll were  together you didn't  see him smoke
     any?

A.   No, he didn't smoke any while he was with me.

Q.   Okay.  Did, he went in Deanna's home?

352

A.    Yes, sir.

Q.    All right.    Who lives there  with Deanna,  do

you know?

A.    I think her mom.  She's disabled though.

Q.    All right.  And  did you have some discussions

with Deanna there at her home?

A.    Yes, sir.

Q.    All right.  Was Dewayne there and did he hear

these discussions?

A.    He  didn't hear but we was on the couch and he

was sitting across from  us.  We were talking,

I  was talking in her ear.  He kind of figured

what was going on though.

Q.    All  right.    How  long  did  ya'll  stay  at

Deanna's?

A.    We stayed for about, we stayed for a while.  I

didn't  keep up with time,  I just, when I got

ready to leave, when I got the money and stuff

I just left.

353

Q.  All right. Did she give you any monies?

A.  Yes, sir.

Q.  How much monies did she give you?

A.  Two twenty dollar bills.

Q.  And what was the purpose of her giving you the
    $40.00?

A.  She told me to go, we were going to ge a room
    that night.

Q.  All right.  Now, did at anytime  during that
    evening, did Dewayne give you $40.00?

A.  No, sir.

Q.  All right.  Deanna is  the one that  gave you

    $40.00, is that correct?

A.  Yes, sir.

Q.  All right.  And you left  Deanna's house, who
    was driving this time?

A.  I was driving.

Q.  All right.  And was Dewayne  in the passenger

    seat then?

A.   Yes, sir.

Q.   All right.  What happened as ya'll were  going

     down the road?

A.   Me and Dewayne got into an argument.

Q.   What was the argument about?

A.   About I told  him that he  had did  something,

     that he  was trying  to do something  that was

     stopping me.   He didn't want me and Deanna to

     hook up, he was trying to block me  and that's

     why we got to fussing.


          THE COURT:  You're going to need to  talk

     a  little louder  than that.    You can  get a

     little closer to the microphone.


A.   That's why we was fussing because of that.

Q.   He didn't want you to hook up with Deanna?

A.   No, sir.

Q.   All right.  Did he talk about doing a robbery?

A.  He talked about robbing somebody but I ain't, he never did get specific about it. But he said he wanted to rob somebody.

Q.  All right. As this conversation developed what happened?

A.  Well, I mean after, after I had said that he was trying to block me from getting with my girl, then he got mad and I hit him.

Q.  All right.

A.  And he hit me.

Q.  All right. So ya'll had a physical altercation is that correct?

A.  Yes, sir.

Q.  All right. Where were you when this physical altercation happened?

A.  We were coming up the four lane.

Q.  Coming up the four lane?

A.  Yes, sir.

Q.  Where is that at?

356

A.  It's right, it's -- I'm not familiar with these maps and stuff, but it's like, it's a four lane in Auburn we were coming up. It was dark that night but we was on the four lane when we got to arguing. Dewayne hit me and I swerved in the car and I liked to wreck. We were down by, it's the four lane right in front of those big expensive motels in Auburn, across from Auburn University.

Q.  All right. How far is that from the Heart of Auburn?

A.  This is the Heart of Auburn Motel right here, right?

Q.  Yes.

A.  This is the entrance, right?

Q.  Right.

A.  This is from the, this is the main office. All right. The University has to be down here then.

Q.   It was around the University where you're talking about?

A.   Yes, sir.  The University is across the street from the Heart of Auburn Motel all the way down.

Q.   All right.  You were in that vicinity, is that correct?

A.   Yes, sir.

Q.   All right. And did you and Dewayne continue to argue?

A.   No, sir.  After I hit him, after I hit him and we exchanged licks I made him get out because he made me like to wreck the car.

Q.   All right. Where did he get out of the car at?

A.   It's a little driveway right as you pull into Auburn University.  I put him out right there in the driveway.

Q.   All right.  And what did you do after you put

358

Dewayne out?

A.   I told him I wasn't going home no way and I

turned around and went to Heart of Auburn

Motel.

Q.   All right.  How far is that from where you put

him out?

A.   It's about a block, two blocks.

Q.   A block or two?

A.   Block or two.

Q.   Okay.  And when you got to the Heart of Auburn

Motel what happened there?

A.   When I got, when I went in the clerk's office

he was messing with the computer or something.

I went in and I pulled out my license and I

keep both of my licenses in the same place so

they were stacked on top of each other.  I

didn't know that my cousin's I.D. was on top

cause I had just -- when you go in the race

track you have to show your I.D. because to

359

show that you're old enough to race and I,
that's why I had his I.D.

Q.   By the race track, you mean the motorcycle
race track?

A.   Yes, sir.

Q.   All right. And so you had your cousin's I.D.,
is he over twenty-one?

A.   Yes, sir.

Q.   All right. And you gave him your cousin's
I.D.?

A.   No, sir. I, I, when I, when I noticed that it
wasn't, it was the wrong I.D. I put it back up
and I gave him my I.D. because I knew I could
get a room when I was eighteen.

Q.   All right. And --

A.   I didn't really know you had to be eighteen to
get a room because I got a room before.

Q.   Let me show you State's exhibit twenty-five.
That's the hotel registration?

360

A.  Yes, sir.

Q.  Do you recall the clerk filling that out?

A.  Yes, sir.

Q.  All right.  And that's in your name, is it not?

A.  Yes, sir.

Q.  All right. And it has your home address, doesn't it?

A.  Yes, sir.

Q.  And what's your home address?

A.  7308 County Road 87, Lanett, Alabama, 36863.

Q.  All right.  And that's your correct home address?

A.  Yes, sir.

Q.  Right?

A.  Yes, sir.

Q.  And your correct name?

A.  Yes, sir.

Q.  All right.  How long were you there -- how

    long were you there  with the desk clerk doing

    something with the computer and then --

A.   When I went in--

Q.   -- filling this out?

A.   When  I  went  in  the  clerk was  up  at  the

    computer and he  wasn't doing  nothing but  he

    was trying  to get some paper  or something in

    it.  And I went in and I put my license up and

    he took  them and he  ran them  through for  a

    while and then  I stayed there  for about  ten

    minutes because something  was wrong with  the

    computer or something.

Q.   Okay. And then what happened?

A.   And then he, I gave him the money for the room

    and Dewayne came in.

Q.   All right.  Dewayne came in.  How was Dewayne

    dressed at that time?

A.   He had on a ski mask.

Q.   The ski mask right there in front of you?

362

A.   Yes, sir.

Q.   Did he have the gun that's in front of you?

A.   Yes, sir.

Q.   All right.  Did you know it was Dewayne when

     he came in?

A.   I mean, at first it kind of hit me that, I

     didn't, I figured it was him.

Q.   You figured it was him.  What did you do when

     Dewayne came in?

A.   I stepped aside.  I was scared.

Q.   Did you say anything?

A.   I didn't say nothing.

Q.   Okay.  And what happened or what did you see?

A.   Dewayne gave the clerk a sack, he throwed it

     down on the floor.  The clerk picked it up and

     gave him the money and he left running.  And I

     asked the guy that was working there did he

     want me to follow him and see which way he was

     running.

363

Q.   All right.

A.   And I went out the door and I caught a glimpse

     of him and I came back in and I told the clerk

     and we stayed on the phone and I had gave a

     description of the guy and everything.

Q.   You gave a description of the guy?

A.   Yes, sir, on the telephone.

Q.   Let me show you State's exhibit number one

     which purports to be the office of the Heart

     of Auburn.   Where were you when the, when

     Dewayne came into the hotel?

A.   I was about right here (indicating).

Q.   Okay.   That's where it says, where it says
     Huguley that's about correct, is that right?

A.   Yes, sir.

Q.   All right. And where was the clerk at?

A.   He was about right where it says.

Q.   All right.   He was behind the desk is that

     correct?

364

A.   Yes, sir.

Q.   All right. And the front door would have  been

     to your --

A.   Right.

Q.   Is that the door that you came in?

A.   Yes, sir, this one right here (indicating).

Q.   All right.  Where did you park at?

A.   Right here  (indicating).   Right in  front of

     the window, driveway.

Q.   All right.   You parked right in  front of the

     window there?

A.   In the driveway, yes, sir.

Q.   Okay.  And  did you know where Dewayne  was at

     that time?

A.   No, sir.

Q.   Okay.


          THE COURT:  You're going to have to  talk

     louder for us.

A.   No, sir.

Q.   All right. And which door did Dewayne come  in

     or the person with the mask and the gun, which

     --

A.   The B door.

Q.   He came in the  front door, the same door  you

     came in, is that correct?

A.   Yes, sir.

Q.   All  right.   And  how  long  did  the  robbery

     itself,  how long did it take?

A.   About a minute.

Q.   A minute?

A.   Or two.

Q.   All right. And what door did Dewayne go out?

A.   The same one he came in.

Q.   Okay.  And after  he went  out the  front door

     which direction did he go?

A.   I  went out the door  to see which  way he ran

     and he  ran this  way (indicating).   Straight

366

back.

Q.   All right.  He ran back?  Okay.

A.   He ran -- where is the front door?  Is this the office?  He ran back this way.

Q.   Okay.  Ran back toward Gay Street, is that correct?

A.   Toward the rooms, he ran --

Q.   Toward the rooms?

A.   Yes, sir.

Q.   All right.  And you came back in and you gave the clerk a description of the person?

A.   Yes, sir.

Q.   All right.  Had he already called the police?

A.   Yes, sir.

Q.   All right.  What did you do after that?

A.   He gave me my key and my car was, I had pulled in, I had pulled in straight and my car was pointed that way (indicating).  I went in, I went in the way the guy ran and I turned

around because I was, you know I still didn't
want to go back that way and I was on my way

to the police station. I came back out of the
office and I came down and I went up this way

and I passed Dewayne and he was walking down
this way. And the police car, one right here,

the police car was right here and I passed
Dewayne right here. I came to the stop sign

and I didn't stop for him and then I put my
left signal light on and I was going to the

police station and as I came right here I seen
the police jump out of the car and Dewayne

started running from them I guess and he ran
up, as I was putting my signal light on to

turn I was out in the road turning and the car
was moving and everything and Dewayne came

out, opened the door and jumped in the car.

Q.   When Dewayne jumps in the car --

A.   He dove in. He dove in.

Q.  Dove in?  When Dewayne jumped in  the car did
    some  other officers  get  behind you  at that
    time?

A.  No,  sir.  When he jumped in the car the first
    thing he did, he  hit my leg and I  stepped on
    the gas and I was trying to stop, I was trying
    to hit the brakes and stop but he still was on
    my  leg  trying to  make  me drive  and  I was
    trying  to hit  the  brake lights  and when  I
    finally got control of the car good enough  to
    where I could pull over I pulled off the  side
    of the road.  The  police, that was before the
    police, the  police had  to come up  behind me
    and catch me.

Q.  All right.

A.  Catch up with me.

Q.  All right.  And then you  pulled over at  the
    lighted parking lot up there at  the Methodist
    Church, is that correct?

369

A.   Yes, sir.

Q.   All right.   And was the police officer,

Officer Ricks, was he behind you at that time?

A.   I'm not sure which officer it was, but it was

a officer behind me, yes, sir.

Q.   There was an officer behind you, all right.

When you pulled over what happened?

A.   I pulled over  but Dewayne jumped  out -- no,

before he  got out, immediately  after Dewayne

got in  the car he told  me if I went  down he

went down,  that was  the first thing  he said

when he jumped in the car.

Q.   All right.  And then he, did you pull, you saw

the  officers  and you  pulled  over, is  that

correct?

A.   Yes,  sir.    Yes,  sir.   I  pulled  over and

Dewayne jumped out and ran again.

Q.   All right. Did you attempt to run?

A.   No, sir, I got  out and I was walking  back to

the police  car and the police  hollered at me
and told me to get back in the car  and I went

and got back in the car.

Q.   All right.  Did you ever -- you never tried to

run from the police officers?

A.   No, sir.

Q.   All right.  Did  -- now you remember Detective

Register, do you not?

A.   Yes, sir.

Q.   All right.  And  do  you remember  the  first

interview  that  you  had  with  him  at  two

o'clock?

A.   Yes, sir.

Q.   All right. And then you later had an interview

at nine o'clock, is that correct?

A.   Yes,  sir.  I'm not sure of the times but they

locked me back  up for a  while and then  they

came and wanted to talk to me again.

Q.   Okay. And you heard him read those statements,

371

is that correct?

A.    Yes, sir.

Q.    All right.  Were those statements true?

A.    The  first statement,  I  mean,  it's a  lot of

things that  were said  that were not  written

down.  He, it seemed like certain things  were

picked to go in the first statement.    But the

second statement, he more or less wrote what I

said.

Q.    The second statement is what you said, is that

correct?

A.    Yes, sir.

Q.    What you said to him?

A.    Not exactly  but it was like  a question like.

Most  of the  questions I  was asked  were, he

would always lead  me, you know  what I  mean?

Like  when he   asked  me   a  question   he

volunteered  an answer for  it before  I could

even get  a chance to  answer.  But  he didn't

372

write what he was writing, he was writing what
i was saying.

Q.    All right.    Now, Did  you and  Dewayne Clark
plan this robbery?

A.    No, sir.

Q.    Did you help him in any way?

A.    No, sir.

Q.    Did you aid him in any way?

A.    No, sir.    Dewayne opened the  door and jumped
in hisself.    I  didn't try  to help  him with
nothing.    I  was  on  my  way to  the  police
station.

Q.    All  right.    Thank  you.    Now answer  their
questions.

        THE COURT:  Cross examination.

573

## CROSS EXAMINATION

BY MR. ABBETT:

Q.   Mr. Huguley, do you remember when Officer
     Hillyer walked up to the car there when you
     were first stopped by the police?

A.   No, sir.

Q.   You don't remember that?

A.   No, sir.

Q.   You don't remember telling him that you were
     car jacked?

A.   I don't remember saying car jacked, no sir.

Q.   Do you remember telling him that the guy
     pointed a gun at you and jumped in the car?

A.   Yes, sir.

Q.   You told him that?

A.   Yes, sir.

Q.   That wasn't true, was it?

A.   No, sir.

374

Q.   He didn't point a gun at you, did he?

A.   No, sir.

Q.   So you lied, didn't you?

A.   Yes, sir.

Q.   When you made this first statement to
     Detective Register isn't what happened that

     you and he went through and went over what
     your story was and then he wrote it down?

A.   No, sir.

Q.   You didn't sit there and have a conversation

     with him about what your story was?

A.   No, sir.

Q.   What did ya'll talk about?

A.   He came in there and asked me did I want some

     water. He gave me some water and then he

     asked me did I want to make, would I want to

     make a statement. Then he came in there and I

     signed -- he gave me the paper for my rights

     and all that and then he started talking to me

about the, about what had happened and stuff.

Q.   Okay.  He  started talking to  you about  what

happened and  you started  talking to  him, is
that right?

A.   No, sir.  He started telling me what Dewayne –
– at  first  he asked  me  what  went  on  and

everything and  then I told him  what went on,
yes, sir.

Q.   Okay.   You told  him your name   was Rodrigues
Gomez Huguley, didn't you?

A.   Yes, sir.

Q.   You told him you were eighteen years old?

A.   No, sir,  he already knew that   on my license.
I didn't tell him that.

Q.   Did you tell him you were coming from the race
track in Tuskegee?

A.   Yes, sir.

Q.   That wasn't true, was it?

A.   No, sir.

376

Q. So you told him another lie?

A. Yes, sir, in my first statement, yes, sir.

Q. Okay. Did you tell him you were going to get a room to spend the night because you were exhausted and hungry?

A. Yes, sir.

Q. And that wasn't true, was it?

A. No, sir.

Q. Actually what your testimony is now or what Ms. Deanna Hand implied was that you were getting a room to have sexual intercourse with her? Is that true or not true?

A. Yes, sir.

Q. Isn't that what she implied?

A. Yes, sir.

Q. So you weren't exhausted and hungry, were you?

A. No, sir.

Q. Another lie, wasn't it?

A. I was hungry. No, sir.

377

Q.   And that was a lie, wasn't it?

A.   I wasn't exhausted but I was hungry.

Q.   Okay.   And when you said in your first
     statement when you went around the corner I
     saw a guy walking toward Auburn University.
     You knew that was Dewayne Clark, didn't you?

A.   In my first statement when I said what?

Q.   I went around the corner and I saw a guy
     walking toward Auburn University.   I passed
     him and stopped at a stop sign.

A.   Yes, sir.

Q.   You knew it was Dewayne Clark, didn't you?

A.   Yes, sir.

Q.   So that was another lie, wasn't it?

A.   Yes, sir.

Q.   Okay.   I seen a gun when he jumped in the car.
     That was a lie, wasn't it?

A.   Yes, sir.

Q.   I didn't know who the guy was that jumped in,

378

that was another lie, wasn't it?

A.  Yes, sir.

Q.  I was scared because he had the gun, that was
another lie, wasn't it?

A.  No, sir.

Q.  That was not a lie?

A.  I was scared when he had the gun.

Q.  I'm talking about when he got in the car you
said I was scared because he had a gun.

A.  Oh. Yes, sir, that's true. I was scared of
him. I didn't know if he still had it or not.
I didn't have no way of knowing that.

Q.  You didn't see it though, did you?

A.  No, sir.

Q.  It hadn't even crossed my mind that it was
Dewayne, that's another lie, wasn't it?

A.  Yes, sir.

Q.  I cooperated --

A.  Yes, sir.

Q.   -- that was another lie, wasn't it?

A.   No, sir, I did cooperate.  I hadn't never been

     in no  trouble before,  I didn't know  what to

     do.

Q.   You lied to the police, didn't you?

A.   Yes, sir, on my first statement, yes, sir.

Q.   And you lied to the first officer that stopped

     you, didn't you?

A.   Did I  lie to  the first officer  that stopped

     me?

Q.   Uh-huh.  You said he pointed a gun at you.

A.   Oh, yes, sir.

Q.   Okay.  You said you pretty much told the truth

     in the second statement, right?

A.   Yes, sir.

Q.   All  right.   We  went  to  Tuskegee and  rode

     around for  a while, maybe forty  minutes, was

     that the truth?

A.   In the second statement  I didn't say  nothing

380

about Tuskegee.

Q.   Well that's in your statement, isn't it?   You

     didn't say that?

A.   No.

Q.   Right here  on page two of  three pages, would

     you read right there?

A.   What line are you on?

Q.   The second line, right there.

A.   Dewayne  and he did.  We  went to Tuskegee and

     rode around for a while.

Q.   That's in your statement, isn't it?

A.   Yes, sir.

Q.   Is that the truth?

A.   No, sir.

Q.   That's another lie, isn't it?

          On the way up the ride up the  interstate

     me and  dewayne got to fighting.   You weren't

     on the interstate, were you?

A.   No, sir, we were on the four lane.

381

Q. That's another lie, wasn't it?

A. I didn't know the interstate from the four lane.

Q. Well, you said you were driving back from Tuskegee.

A. Yes, sir. We had took a back road, we had took Wire Road.

Q. You took Wire Road from where?

A. From where we was on 14th Street.

Q. I'm a little confused about what you're talking about now.

A. It's more than one way.

Q. From where?

A. From Loachapoka.

Q. Oh, from Loachapoka you went down Wire Road to I-85 and back up I-85 to the Heart of Auburn?

A. Yes, sir. We was just riding that night.

Q. Uh-huh. That's a pretty long drive from Loachapoka down Wire Road --

382

A.   It's not that far.

Q.   -- to the Torch 85, that's where you come out

     at, at the Torch 85, isn't it, on Wire Road?

A.   Past the truck stop.

Q.   Torch Truck Stop?

         Then how far back is it up the interstate

     and back to Auburn?

A.   I'm not sure of the mileage.  It was dark that

     night.  We were driving past ---

Q.   About fifteen or twenty miles, isn't it?

A.   I don't know.

Q.   Okay.

A.   Maybe fifteen.

Q.   Well, did ya'll get to fussing on the

     interstate?

A.   Yes, sir.  We had been fussing ever since we

     had left Deanna's house.

Q.   Uh-huh.  You said you got mad at him and hit

     him in the head?

A.   Yes, sir.

Q.   Where did he hit you?

A.   He  hit me in the chest and I liked to wrecked
     the car cause when  he hit me in the  chest my
     arm, I had  just broke my  arm recently and  I
     got  two places in there and when he hit me my
     arm  hit  the  window  and  I  let go  of  the
     steering wheel and I liked to have wrecked the
     car.   That's the main  reason I made  him get
     out.

Q.   Tell us  something, when  did the gun  and the
     mask get in the car?

A.   I  don't know.   Probably, I don't  know if it
     had to have been  there before I got  in there
     because I didn't put it in there.

Q.   When did you first see it?

A.   When he was robbing the place.

Q.   When he was robbing the place?

A.   Yes, sir.

Q.   He didn't have it when he got out of the car?

A.   No, sir.

Q.   Where do you think he got it from?

A.   I don't know, he must have -- I don't know.

Q.   I show you what's been marked as State's exhibit number twenty-seven and ask if you recognize that?

A.   Yes, sir.

Q.   What is it?

A.   Dewayne Clark.

Q.   That's a photograph?

A.   Yes, sir.

Q.   Is that the way he appeared on that occasion?

A.   Uh, I'm not for sure, I guess so.

Q.   That's the shirt he had on, isn't it?

A.   Yes, sir.


     MR. ABBETT:  Your Honor, we offer State's exhibit number twenty-seven.

385

THE COURT: Admitted.

(Whereupon, the instrument hereinabove referred to and marked for identification as State's exhibit number twenty-seven was admitted and received into evidence.)


CROSS EXAMINATION RESUMED BY MR. ABBETT:

Q.   Now where did he have this ski mask and gun when he got out of the car?

A.   He must have had it up under his clothes.

Q.   Up under his clothes.

     You say in your second statement, I passed Dewayne and I realized that he was the one that robbed the place I thought?

A.   Yes, sir.

Q.   You knew that when he came in didn't you?

386

A.   I thought, yes, sir. I didn't know for sure
     cause he had on a mask.

Q.   And you recognized that shirt, didn't you?

A.   No, sir. The guy, when the place was robbed
     whoever came in with the shirt on had it on
     backwards. They didn't have it on that way.

Q.   He had his shirt on backwards?

A.   Yes, sir. Flipped on the wrong side.

Q.   So Dewayne turned his shirt inside out while
     he committed the robbery?

A.   I guess so.

Q.   And then turned it back around?

A.   I guess so.

Q.   Well Mr. Rodrigues Huguley, you've told so
     many lies to the police what do you expect
     this jury to believe?

A.   Yes, sir, this is the truth.

Q.   That's all.

THE COURT:  Redirect?

MR. GILLENWATERS:  None, Your Honor.

THE COURT:  You can step down.


(Witness excused.)


THE COURT:  Next witness.

MR. GILLENWATERS:  We rest, Your Honor.


## DEFENDANT RESTS


THE COURT:  Any rebuttal by the State?

MR. ABBETT:  No, sir.

THE COURT:   All right.   Ladies and

gentlemen, we'll  take our mid  morning break.

I'll let you  go downstairs and  get cokes  or

there should  be some coffee left  back there.

I've got to go over my jury charge  with these

lawyers.   It  will  take  fifteen  or  twenty

minutes and we'll come back and hear the closing arguments. So I'll let you step out with the Bailiff.

> (Whereupon, the jury retired from the courtroom and the following proceedings were had out of their presence and hearing, to-wit:)

THE COURT: All right. Anybody have any requested jury charges?

MR. ABBETT: I think the Court will give it anyway but I have one.

THE COURT: Okay. The Defendant's requested charge number one I'll give.

And the State's requested in the course of committing a theft I would give that as part of my oral charge anyway.

I'll charge on aiding and abetting. I'll charge on reputation and I'll charge on robbery in the first degree.

I have two verdict forms, one is guilty and the other is not guilty.

Anything else, gentlemen?

MR. GILLENWATERS: No, sir.

THE COURT: How much time do ya'll want to argue?

MR. GILLENWATERS: About fifteen minutes, Judge.

MR. ABBETT: I'd like a little longer than fifteen minutes.

THE COURT: Well, how long do you want?

MR. ABBETT: Twenty-five minutes.

THE COURT: All right. I'll give both of you twenty-five minutes.

Anything else?

All right. We'll take about a

39Ø

fifteen minute recess and we'll come back and get started.

> (Whereupon, proceedings were in a brief recess, after which the following occurred, to-wit:)

THE COURT: Ya'll ready?

MR. ABBETT: Yes, sir.

> (Whereupon, the jury returned to the courtroom and the following proceedings were had in their presence and hearing, to-wit:)

THE COURT: All right. Ladies and gentlemen, we've heard all the evidence and

now we'll hear the closing arguments.

Mr. Abbett?

(Whereupon, both attorneys made

their closing arguments to the

jury, after which the following

occurred, to-wit:)


## COURT'S CHARGE


THE COURT:  Now ladies and gentlemen,
you've heard all the evidence in this case and
at this point I'm going to tell you what the
law is that you apply to what you've heard.
This case comes to you by means of an
indictment which was returned by the Grand
Jury of this county and at the time it was
returned to this Court the Defendant entered a
plea of not guilty, which he has a perfect

legal right to do.  By virtue of his entering

that plea it casts the burden of proof on  the

State of Alabama   to satisfy each  one of you

beyond a  reasonable doubt of his  guilt.  The

Defendant has  no burden  of proof.   He comes

into court presumed  to be  innocent and  that

presumption  stays with him until such time as

each one   of  you  is  satisfied  beyond  a

reasonable  doubt that  he  is guilty.    That

presumption of innocence is evidence  that you

may consider on the Defendant's behalf.

How  do we  define this  burden that

the State has,  and  that is  to prove  guilt

beyond  a  reasonable doubt?    Well, you  can

define  that in  several ways.   A  reasonable

doubt is a real doubt  which grows out of  the

evidence in the case  or the lack of evidence.

It's a  doubt  which appeals  to  your  reason

after you consider the evidence in the case or

393

the lack of evidence. A reasonable doubt is not a doubt based on speculation or conjecture or guesswork. In short it's a doubt for which a reason can be given.

The State is not required to prove guilt beyond all doubt. That would be virtually impossible in any criminal case.

Now the charge in this case is robbery in the first degree and the criminal code of the State of Alabama says this with reference to that charge, and I'm going to read this to you: A person commits the crime of robbery if in the course of committing a theft he first uses force against the person of the owner with intent to overcome his physical resistance or physical power of resistance or, number two, threatens the imminent use of force against the person of the owner to compel acquiescence to the taking

394

of or escaping with the property. Now that's the definition of robbery in general.

Robbery in the first degree is that definition plus the use of a deadly weapon or a dangerous instrument. And the code says this: A person commits the crime of robbery in the first degree if he is armed with a deadly weapon or a dangerous instrument.

The term in the course of committing a theft is further defined in the code as follows: In the course of committing a theft embraces acts which occur in an attempt to commit or the commission of theft or in immediate flight after the attempt or commission.

You've heard the terms aiding and abetting in this case. I'm going to tell you what the law of this state is with reference to that. The terms aid and abet comprehend

395

all assistance rendered by acts or words of
encouragement or support or presence, that is
actual or constructive to render assistance
should it become necessary. To authorize
conviction as an aider or abetter there must
be by prearrangement or on the spur of the
moment a common enterprise or adventure or a
criminal offense contemplated. The
participation in a crime and the community of
purpose of the perpetrators need not be proved
by direct or positive testimony but may be
inferred from circumstantial evidence. It is
not necessary for the State to show that a
Defendant himself physically committed the
crime with which he is charged in order for
you to find the Defendant guilty. A person
who aids or abets another to commit an offense
is just as guilty of that offense as if he
committed it himself. Accordingly you may

find the Defendant guilty of the offense charged if you find beyond a reasonable doubt

that the State has proved that another person actually committed the offense with which the

Defendant is charged and that the Defendant aided or abetted that person in the commission

of that offense. In order to aid or abet another to commit a crime it is necessary that

the Defendant intentionally associated himself in some way with the crime and that he

intentionally seeked by some act to help make the crime succeed. The mere presence of a

Defendant where a crime is being committed without more is not sufficient to establish

aiding and abetting.

You've had persons who have come

before you in this case and testified as to the Defendant's good character. I charge you

that proof of good character in connection

397

with all the other evidence or lack of evidence may generate a reasonable doubt which

entitles the Defendant to an acquittal even though without such proof of good character the jury would otherwise be disposed to convict.

In this case ladies and gentlemen, you base your verdict on the evidence in the case. Evidence consists of three things. The sworn testimony of the witnesses that have come before you in this trial, the various exhibits that you'll have with you in the jury room and the presumption of innocence that I have already described for you.

You do not consider as evidence the fact that there has been an indictment in the case, or the arguments of the attorneys or any ruling that this Court has made during the course of this trial.

398

Your verdict must be a unanimous verdict. And that is all twelve of you must agree on that verdict whichever way it goes. We do not have majority verdicts in this state and when you come back later and that verdict is announced in court I will poll the jury and that is I will ask each one of you whether or not you agree with that verdict and naturally I would expect each one of you to indicate to me that you do agree with the verdict as it is announced.

Now you folks are the judges of the weight to be given to the testimony and the evidence in this case. And in deciding what weight it's entitled to you certainly have a right to use your good common sense. You don't leave that at home when you come here to serve on the jury. You have a right to consider what the various witnesses have

399

testified    to,    the    substance    of    their testimony,    the    manner    in    which    they've testified, any interest that  they may have in the outcome  of the case, all  of those things are  certainly legitimate  areas  for  you  to consider in determining  what weight is to  be given to the testimony of each witness.

If you're satisfied that any witness has  come before  you and  willfully testified falsely as to any material fact then you have a right  to  disregard all  of that  witness's testimony, although you do not have to.

To assist you in  your deliberations I have  prepared two verdict forms.   If after considering all the evidence in this case each one of  you is satisfied  beyond a  reasonable doubt  that the  Defendant  is  guilty of  the charge of  robbery then it would  be your duty to convict him and the form of that verdict is

400

we the jury find the Defendant Rodrigues Huguley guilty of robbery one as charged in the indictment. And then one of you would sign that as foreman.

On the other hand if you're not satisfied beyond a reasonable doubt that the Defendant is guilty of that charge then it would be your duty to acquit him and the form of that verdict is we the jury find the Defendant Rodrigues Huguley not guilty. And the foremen would then sign that verdict form.

The first thing that you need to do when you go out to the jury room is to elect a foreman. You can do that in any way you want.

The foreman has two duties. First is to preside over your deliberations and second is to sign the appropriate verdict form once you have reached a decision.

Now once you have reached a decision

401

you just knock on the door, the Bailiff will be right outside your door and tell him that

you have reached a verdict and then we will bring you and everyone else back into the

courtroom and that verdict will be handed to me and I will announce it in court.

If you have any questions that come up during your deliberations just write the

question out on one of the pads and hand it to the Bailiff and he'll give to me and I'll try

to answer it for you if I can.

Now we're getting close to the lunch

hour. If you have not reached a verdict by somewhere close to twelve I'll probably bring

you back in here and send you on to lunch, but I'm going to let that be your decision not

mine. So if you want to recess for lunch send me a note and I'll let you go to lunch and

then we'll come back and continue the

deliberations after that.

What says the State as to the Court's charge?

MR. ABBETT: Satisfied, Your Honor.

THE COURT: Defense?

MR. GILLENWATERS: Satisfied, Your Honor.

THE COURT: All right. We have one alternate and we didn't need the alternate in this case and the alternate is Mary M. Herd. Which one is Ms. Herd?

All right. Ms. Herd, I'm going to let you stay here just a minute and the rest of you folks can go out to the jury room and we'll send this evidence out to you in just a minute.

(Whereupon, the jury retired to the jury room at approximately 11:30 a.m. to

403

begin     their     deliberations,
after    which    at    approximtely
12:00    o'clock    p.m.,    the
following occurred, to-wit:)


THE COURT:  Bring them  in.


(Whereupon,   the   jury returned
to    the    courtroom   and   the
following proceedings  were had
in their   presence and hearing,
to-wit:)


THE COURT:  Ya'll want to  go to  lunch,
ladies and gentlemen?

THE JURY:  (Indicating affirmatively.)

THE COURT:  All  right.  I'm going  to
adjourn and let you go to lunch and ask you to
be back here  about 1:15.  That  will give you

404

about an hour and fifteen minutes. Everybody ought to be able to get back in that time.

Please remember what I told you about discussing the case. Actually you shouldn't discuss it if a couple of you go to lunch together because that's considered deliberations and that ought to be in the presence of all twelve of you.

So we'll let you go and ask you to be back in here, we'll just lock this room up and open it up right before you're supposed to get back and leave everything in there and we'll see you back at 1:15.

(Noon recess.)

VOLUME TWO CONCLUDED

405

## C E R T I F I C A T E

STATE OF ALABAMA          )

LEE COUNTY                )


    I, Willie T. Bennett, Official Court Reporter at Opelika, Alabama, do hereby certify that I reported in shorthand the proceedings and testimony in the foregoing styled cause at the time and place stated in the caption hereof; that I later reduced my shorthand notes to typewriting; or the same was done under my supervision; that the foregoing pages beginning with the word "Proceedings", where the same appears in the center of the page, following the style of the case, the caption and the appearances, contain a full, true and correct transcript of VOLUME TWO of the proceedings and testimony as therein set out.

    I FURTHER CERTIFY that I have placed in the Court File all of the exhibits offered in said

406

trial in the order offered, which fact is certified to the Clerk of the Court.

I FURTHER CERTIFY that I have on this date notified counsel for the parties of the filing of

this transcript in the Office of the Clerk of the 37th Judicial Circuit of Alabama, Law Division.

THIS _____*18th*_____ day of *March* ~~January~~, 1996.




OFFICIAL COURT REPORTER


FILED

MAR 18 1996

IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK